# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————

**TRANXITION, INC., a Delaware corporation**
*PLAINTIFF-APPELLANT*,

V.

**LENOVO (UNITED STATES), INC., a Delaware corporation,**
*DEFENDANT-APPELLEE*

**NOVELL, INC., a Delaware corporation,**
*DEFENDANT-APPELLEE*

———————

2015-1907, -1941, -1958

———————

Appeals from the United States District Court for the District of Oregon in
Nos. 3:12-cv-01065-HZ and 3:12-cv-01404-HZ, Judge Marco A. Hernandez

———————

**APPELLANT'S CORRECTED OPENING BRIEF IN SUPPORT OF
ITS APPEALS OF THE DISTRICT COURT'S ORDERS ON
CLAIM CONTRUCTION AND ORDERS INVALIDATING THE
PATENTS-IN-SUIT AS "ABSTRACT" PURSUANT TO
SECTION 101 OF THE PATENT ACT**

———————

Dayna J. Christian
dayna.christian@immixlaw.com
Immix Law Group PC
121 S.W. Salmon Street, Suite 1000
Portland, OR  97204
Telephone: (503) 802-5533

Arthur S. Beeman
arthur.beeman@arentfox.com
Joel T. Muchmore
joel.muchmore@arentfox.com
Arent Fox LLP
55 2nd Street, 21th Floor
San Francisco, CA  94105
Telephone: (415) 757-5500

Attorneys for Appellant

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

                                          Lenovo (United States), Inc.
_____ Tranxition, Inc. _____ v. _____ and Novell, Inc. _____

Nos. 15-1907, -1941, -1958

**CERTIFICATE OF INTEREST**

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
                                    certifies the following (use "None" if applicable; use
Appellant, Tranxition, Inc. extra sheets
if necessary):

1.      The full name of every party or amicus represented by me is:
Tranxition, Inc.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  N/A

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
Tranxition, Inc.

_____

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Arthur S. Beeman and Joel T. Muchmore, Arent Fox LLP
Dayna J. Christian, Immix Law Group, PC
_____

_____ November 18, 2015 _____          /s/ Arthur S. Beeman _____
            Date                             Signature of counsel
                                       Arthur S. Beeman _____
                                         Printed name of counsel

Please Note: All questions must be answered
cc: All Counsel of Record (via E-mail) _____

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF RELATED CASES ........................................................1

II.    JURISDICTIONAL STATEMENT .............................................................3

III.    STATEMENT OF THE ISSUES ...............................................................4

IV.    STATEMENT OF THE CASE ...................................................................6

V.    STATEMENT OF THE FACTS .................................................................8

VI.    SUMMARY OF THE ARGUMENT .......................................................11

VII.    ARGUMENT............................................................................................16

     A.    The District Court Erred In Construing Claim Terms, Leading
         To Its Numerous Errors In Its § 101 Analysis. ...................................17

         1.    "Personality Object" ...................................................................18

         2.    "Extraction plan" .........................................................................19

         3.    "active configuration settings"..................................................21

         4.    "value" ..........................................................................................22

         5.    "(transitioning or transitions) one or more of the retrieved
             configuration settings from a format used on the source
             computing system to a format used on the target
             computing system" ......................................................................22

         6.    "manipulating at least one of the extracted configuration
             settings from a location, a name, a value, and a format
             used on the source computing system to a location, a
             name, a value, and a format used on the target computing
             system"...........................................................................................23

         7.    The Properly Construed Terms..................................................24

     B.    On A Motion For Summary Judgment, The District Court Must
         Draw All Reasonable Inferences In Favor Of Tranxition As The
         Nonmoving Party. ...............................................................................25

     C.    A Presumption Of Validity Applies To All Patents And May
         Only Be Overcome By Clear And Convincing Evidence..................26

i

## TABLE OF CONTENTS
### (continued)

Page

1.  § 282 Of The 1952 Patent Act Establishes That Patents "Shall Be Presumed Valid" And The "Burden Of Establishing Invalidity . . . Shall Rest On The Party Asserting It." ........................................................................ 26

2.  Binding Supreme Court Authority Establishes That The Statutory Presumption In Favor Of Validity May Only Be Overcome By Clear And Convincing Evidence. ............... 27

3.  The District Court Erred In Finding That There Is No Longer A Presumption Of Validity Nor A Clear And Convincing Burden With Regard To Questions Of Patent Invalidity. ................................................................... 28

D.  The District Court's Failure To Apply The Proper Legal Standards Resulted In Multiple Reversible Errors ............................ 29

E.  The Current Status Of § 101 "Abstractness" Law. ............................ 31

F.  The District Court Erroneously Found That The Patents-In-Suit Claim An Abstract Idea .......................................................................... 34

1.  The District Court Failed To Follow Supreme Court Precedent In Applying Step One Under the *Mayo/Alice* Test. ......................................................................... 34

2.  The District Court's "Abstraction" Analysis Is Reliant On The Concept Of "Migration," Which Is Not Claimed By The Patents-In-Suit .......................................................... 35

3.  The District Court's Reliance On "Manual" Migration Confirms That The District Court Misunderstood The Patents-In-Suit .......................................................... 39

4.  The Patents-In-Suit Comply And Are Consistent With The USPTO's Examples Of Claims That Do Not Constitute Abstract Ideas. ......................................................... 44

G.  By Failing To Consider The Claims As An Ordered Combination, The District Court Erroneously Found That None Of Nearly 40 Claims At-Issue Contain An Inventive Concept. ........ 45

# TABLE OF CONTENTS
## (continued)

**Page**

1.    The District Court Conclusorily Read The Claim Elements In Isolation – Not As An Ordered Combination......46

2.    The Most Directly On-Point Case Is *DDR Holdings, LLC V. Hotels.Com, L.P.*, Which The District Court Attempted To Distinguish By Relying On Conclusory, Unsupported Factual Inferences In Favor Of Lenovo And Novell......52

3.    The Court Selectively Discussed Portions Of The Two Mackin Declarations But Ignored Other Portions Creating Issues Of Material Fact As To Whether Migration Was A Long-Standing Practice. ............54

4.    Moreover, The Patents-In-Suit Comply And Are Consistent With The USPTO's July 2015 Update On Subject Matter Eligibility With Respect To Step Two............58

H.    While Not Dispositive, The Machine-Or-Transformation Test Confirms That The Patents-In-Suit Cover Patent-Eligible Subject Matter. ......59

I.    The District Court Improperly Concluded That The Patents-In-Suit Create Broad Preemption Concerns. ......61

1.    The District Court Improperly Relied On Inaccurate Attorney Argument In Finding That The Patents-In-Suit Pose Broad Preemption Risks......62

2.    The Coexistence Of Other Patents Claiming Methods And Systems For Transitioning Settings Demonstrates That The Patents-In-Suit Do Not Preempt The Entire Field. ......63

VIII.    CONCLUSION ......65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Pty Ltd. v. Facebook, Inc.*,
No. 1-15-CV-156 RP, 2015 WL 5883331 (W.D. Tex. Oct. 8, 2015) ............... 46

*Abstrax, Inc. v. Dell, Inc.*,
No. CIV.A. 2:07CV221DFCE, 2009 WL 3255085 (E.D. Tex. Oct. 7, 2009) ....................................................................................................... 61

*Alice Corp. PTY Ltd. v. CLS Bank International*,
134 S. Ct. 2347 (2014) ...................................................................... *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
56 F. Supp. 3d 813 (E.D. Va. 2014) ................................................... 42

*Arrhythmia Research Tech., Inc. v. Corazonix Corp.*,
958 F.2d 1053 (Fed. Cir. 1992) ..................................................... 30, 46

*Bilski v. Kappos*,
561 U.S. 593 (2010) ........................................................ 31, 35, 41, 59

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989) .......................................................................... 28

*Broadcom Corp. v. Int'l Trade Comm'n*,
542 F.3d 894 (Fed. Cir. 2008) ........................................................... 23

*California Inst. of Tech. v. Hughes Commun. Inc.*,
59 F.Supp.3d 974 (C.D. Cal. 2014) ................................................... 42

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002) ......................................................... 17

*Chamberlain Grp., Inc. v. Linear LLC*,
No. 14-CV-05197, 2015 WL 4111456 (N.D. Ill. July 7, 2015) ........................ 61

*CLS Bank Int'l v. Alice Corp. Pty.*,
717 F.3d 1269 (Fed. Cir. 2013) ......................................................... 37

iv

*Commil USA, LLC v. Cisco Sys., Inc.*,
135 S. Ct. 1920 (2015)................................................................27, 28

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*
776 F.3d 1343 (Fed. Cir. 2014) .......................................................52

*CyberSource Corp. v. Retail Decisions, Inc*,
620 F. Supp. 2d 1068 (C.D. Cal. Mar. 27, 2009) .............................59

*DataTern, Inc. v. Microstrategy, Inc.*,
No. CV 11-11970-FDS, 2015 WL 5190715 (D. Mass. Sept. 4,
2015) .................................................................................................51

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ...............................................*passim*

*Dentsply Int'l, Inc. v. Hu-Friedy Mfg. Co.*,
202 F. App'x 464 (Fed. Cir. 2006) ..................................................17

*Diamond v. Diehr*,
450 U.S. 175 (1981).......................................................31, 37, 39, 41

*Elbex Video, Ltd. v. Sensormatic Electronics Corp.*,
508 F.3d 1366 (Fed. Cir. 2007) .......................................................19

*Estee Lauder Inc. v. L'Oreal, S.A.*,
129 F.3d 588 (Fed. Cir. 1997) .........................................................63

*Fairfield Indus., Inc. v. Wireless Seismic, Inc.*,
No. 4:14–CV–2972, 2014 WL 7342525 (S.D.Tex. Dec. 23, 2014)...................50

*France Telecom S.A. v. Marvell Semiconductor Inc.*,
39 F. Supp. 3d 1080 (N. D. Cal. 2014).............................................61

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) .......................................................34

*Intellectual. Ventures I, LLC v. Motorola Mobility LLC*,
81 F. Supp. 3d 356 (D. Del. 2015) ...................................................50

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999) .........................................................21

v

*Kaneka Corp. v. Xiamen Kingdomway Group Co.*,
     790 F.3d 1298 (Fed. Cir. 2015) .................................................................16, 17

*Kenexa BrassRing, Inc. v. HireAbility.com, LLC*,
     No. CIV.A. 12-10943-FDS, 2015 WL 1943826 (D. Mass. Apr. 28,
     2015) ......................................................................................................................57

*Kickstarter, Inc. v. Fan Funded, LLC*,
     No. 11 CIV 6909, 2015 WL 3947178 (S.D.N.Y. June 29, 2015) ......................25

*Liebel–Flarsheim Co. v. Medrad, Inc.*,
     358 F.3d 898 (Fed. Cir. 2004) ...........................................................................20

*In re Lowry.*,
     32 F.3d 157 (Fed. Cir. 1994) .............................................................................60

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
     132 S. Ct. 1289 (2012)........................................................................31, 35, 54

*Messaging Gateway Solutions, LLC v. Amdocs, Inc.*,
     No. CV 14-732-RGA, 2015 WL 1744343 (D. Del. Apr. 15, 2015)...................38

*Microsoft Corp. v. i4i Ltd. P'ship*,
     131 S. Ct. 2238 (2011)........................................................................26, 27, 28

*Modern Telecom Sys. LLC v. Earthlink, Inc.*,
     No. SA CV 14-0347-DOC, 2015 WL 1239992 (C.D. Cal. Mar. 17,
     2015) ......................................................................................................................46

*Pandrol USA v. Airboss Ry. Products, Inc.*,
     10 F. App'x 837 (Fed. Cir. 2001)......................................................................24

*Phillips v. AWH Corp.*,
     415 F.3d 1303 (Fed. Cir. 2005) .........................................................................20

*Planet Bingo, LLC v. VKGS LLC*,
     576 F. App'x 1005 (Fed. Cir. 2014)...................................................................57

*Research Corp. Technologies Inc. v Microsoft Corp.*,
     627 F.3d 859 (Fed. Cir. 1994) ...........................................................................46

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)..................................................................26

*Rus v. Gonzales*,
180 Fed. Appx. 711 (9th Cir. 2006) ....................................63

*Seachange Ina, Inc. v. C-Cor Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) ...........................................20

*Smartflash LLC v. Apple Inc.*,
6:13CV447-JRG-KNM, 2015 WL 661174 (E.D. Tex. Feb. 13,
2015)..............................................................................47, 48

*StoneEagle Services, Inc. v. Pay-Plus Solutions, Inc.*,
No. 8:13-CV-2240-T-33MAP, 2015 4042097 (M.D. Fla. July 1,
2015 ) ...........................................................................41, 56

*Teleflex v. Ficosa North America Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ...........................................22

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015)............................................................17

*TQP Dev., LLC v. Intuit Inc.*,
No. 2:12-CV-180-WCB, 2014 WL 651935 (E.D. Tex. Feb. 19,
2014)....................................................................................57

*Trading Technologies Intl., Inc. v. CQG, Inc.*,
No. 05-CV-4811, 2015 WL 774655 (N.D. Ill. Feb. 24, 2015)...........29

*U.S. Gypsum Co. v. Nat'l Gypsum, Co.*,
74 F.3d 1209 (Fed. Cir. 1996) .............................................38

*Ultramercial, Inc., LLC, v. Hulu*,
LLC, 772 F. 3d 709 (Fed. Cir. 2014)....................................28, 33, 60

*Veracode, Inc. v. Appthority, Inc.*,
No. CV 12-10487-DPW, 2015 WL 5749435 (D. Mass. Sept. 30,
2015)....................................................................................55

*Versata Dev. Group, Inc. v. SAP Am., Inc.*,
793 F.3d 1306 (Fed. Cir. 2015) ...........................................39

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ............................................................. 17

**Statutes**

28 U.S.C. § 1295 ................................................................................... 3

28 U.S.C. § 1331 ................................................................................... 3

28 U.S.C. § 1338 ................................................................................... 3

35 U.S.C. § 101 .................................................................................. 44

I.    **STATEMENT OF RELATED CASES**

On June 15, 2012, Plaintiff Tranxition, Inc. ("Tranxition"), filed a patent infringement suit against Appellee Lenovo (United States), Inc. ("Lenovo"), in the District of Oregon, asserting infringement of patent U.S. Patent No. 6,728,877 (the "'877 Patent") and U.S. Patent No. 7,346,766 (the "'766 Patent," together with the '877 Patent, the "Patents-in-Suit").  (12-CV-01065 (the "Lenovo Action"), Dkt. No. 1.)  Shortly thereafter, on August 3, 2012, in the same court, Tranxition filed a patent infringement suit against Appellee-Defendant Novell, Inc. ("Novell"), asserting infringement of the same patents.  (12-CV-01404 (the "Novell Action"), Dkt. No. 1.)

On February 9, 2015, Lenovo filed a motion for partial summary judgment with regard to Claim 30 of the '877 Patent, arguing that this claim targeted an abstract idea pursuant to § 101.  (Lenovo Action, Dkt. No. 229.)  On March 3, 2015, Lenovo filed a supplemental motion for summary judgment with regard to the remaining claims in the '877 Patent and the entirety of the '766 Patent. (Lenovo Action, Dkt. No. 234.)

On July 10, 2015, the District Court entered an order granting Lenovo's summary judgment motions and invalidating the Patents-in-Suit.  (JA0001-31.) On August 4, 2015 and August 19, 2015, respectively, Tranxition filed notices of appeal regarding invalidity and claim construction.  (15-1907, 15-1941; Dkt. Nos.

1.)  The District Court entered final judgment in the Lenovo Action on August 7,

2015.  (JA0032-33.)

On August 24, 2015, this Court docketed Tranxition's claim construction

appeal and on the same day this Court entered an order consolidating Tranxition's

claim construction and invalidity appeals.  (15-1941, Dkt. Nos. 1, 2 (together with

Case No. 15-907, the "*Lenovo* Appeal").)

Because Novell had no case-dispositive motions pending at the time, on

August 5, 2015, Novell filed a motion asking the District Court to adopt the

invalidity opinion entered in the Lenovo Action.  (Novell Action, Dkt. No. 141.)

On August 10, 2015, in order to preserve its appellate rights, Tranxition opposed

the motion, and, on August 11, 2015, Novell filed a reply.  (Novell Action, Dkt.

Nos. 143, 144.)  On August 19 and 20, 2015, the District Court entered an order

and final judgment in the Novell Action, primarily citing collateral estoppel.

(JA0034-37; JA0038-39.)  On August 28, 2015, Tranxition filed a notice of appeal

regarding both claim construction and invalidity.  (Novell Action, Dkt. No. 147.)

On September 1, 2015, this Court issued a docketing notice regarding the case no.

15-1958.  (15-1958, Dkt. No. 1 (the "*Novell* Appeal").)

On September 2, 2015, Tranxition filed a motion with this Court seeking to

consolidate the appeals in the Lenovo and Novell Actions.  (15-1907, Dkt. No. 17.)

Specifically, Tranxition sought to consolidate the *Lenovo* and *Novell* Appeals and

to streamline the briefing across the appeals by requesting leave to file a single opening and reply brief in any consolidated appeal, directing Lenovo and Novell to file a single, joint response, and setting a briefing schedule in any consolidated appeal triggered from the docketing of the appeal in the later-docketed *Novell* Appeal, and extending the word-count limits.  On September 17, 2015, the Court granted Tranxition's motion to the extent that the appeals are consolidated and a new briefing schedule was set.  (15-1907, Dkt. No. 26.)  The motion was otherwise denied.  (*Id.*)  As a result of the Court's order, on Monday, November 2, 2015, Tranxition submitted separate briefs on invalidity and claim construction. (15-1907, Dkt. Nos. 30, 31.)  On Wednesday, November 4, 2015, this Court entered an order rejecting both of Tranxition's opening briefs and ordering that a corrected brief must be filed within 14 days of the date of the order.  (15-1907, Dkt. No. 32.)

## II.     JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because the cases at issue here involve two patent infringement actions brought by Tranxition against Lenovo and Novell.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1) because this is an appeal from two final judgments, two claim construction orders and two orders invalidating the Patents-in-Suit.  Tranxition timely filed notices of appeal in both the Lenovo and Novell Actions.

III.    **STATEMENT OF THE ISSUES**

With regard to the District Court's Invalidity Orders (defined herein as this Court's July 10, 2015 invalidity order in the Lenovo Action (JA0001-31) and August 19, 2015 order in the Novell Action adopting the invalidity order (JA0034-37), Tranxition presents the following issues to this Court for review:

1.      Did the District Court commit reversible error by failing to apply the statutory presumption of validity to the Patents-in-Suit?

2.      Did the District Court commit reversible error by failing to apply the clear and convincing standard of proof in finding the Patents-in-Suit invalid?

3.      Did the District Court commit reversible error by concluding that the Patents-in-Suit are invalid under § 101 of the Patent Act because: (a) the Patents-in-Suit are aimed at a patent-ineligible abstract idea; and (b) the Patents-in-Suit did not state an inventive concept sufficient to satisfy the Supreme Court's test for patentability of an abstract idea under § 101 of the Patent Act?

4.      Did the District Court commit reversible error by finding that the Patents-in-Suit present substantial preemption concerns?

With regard to the District Court's Claim Construction Orders (defined herein as the District Court of Oregon's October 15, 2014 and December 2, 2014, claim construction orders (JA0056-72; JA0040-55) and all orders made during the

August 26 and 27, 2014, *Markman* hearing (12-cv-1065, Dkt. Nos. 159-160)),

Tranxition presents the following issue to this Court for review:

Did the District Court commit reversible error in its construction of the

following terms:

a.    "Personality object";

b.    "Extraction plan";

c.    "active configuration settings";

d.    "value";

e.    "(transitioning or transitions) one or more of the retrieved

configuration settings from a format used on the source computing

system to a format used on the target computing system"; and

f.    "manipulating at least one of the extracted configuration settings from

a location, a name, a value, and a format used on the source

computing system to a location, a name, a value, and a format used on

the target computing system"?

As Tranxition argued in its response to Novell's Motion for Partial

Dismissal (15-1958, Dkt. No. 14), incorporated by reference herein, claim

construction and subject matter eligibility are particularly intertwined with regard

to the Patents-in-Suit.  Indeed, the District Court's improper claim construction led

to its disregard of the dynamic attributes claimed in the patents.  As a result, the

District Court erred in viewing the Patents-in-Suit as an "abstract" idea and failing to identify the inventive concepts.

## IV.    STATEMENT OF THE CASE

Both of Tranxition's Patents-in-Suit teach systems and methods for the dynamic transition of computer settings (a.k.a., a computer's "personality"), adapting the settings to new, similar or different systems and applications.  The Lenovo and Novell Actions sought recovery for the infringing activity of Lenovo and Novell for their respective "migration" software – such as Lenovo's System Migration Assistant ("SMA"), as well as other Lenovo products that include SMA or versions thereof, and Novell's ZENWorks Personality Migration (or Migration Assistant).

The parties completed claim construction briefing in April 2014 (Novell Action) and in July 2014 (Lenovo Action).  (Novell Action, Dkt. Nos. 69-74, 79-81, 85; Lenovo Action, Dkt. Nos. 134-141, 151.)  On August 26 and 27, 2014, the District Court held a single claim construction hearing for both matters and issued the bulk of the claim construction rulings from the bench while taking a limited number of issues under advisement.  (Lenovo Action, Dkt. Nos. 159-160.)  Subsequently, the District Court entered near-identical claim construction orders on October 15, 2014, and December 2, 2014.  (JA0040-55; JA0056-72.)  However,

the Order in the Novell Action addresses "indefiniteness," which was not raised by Lenovo.  (JA0040-55; JA0056-72.)

On February 9, 2015, invoking the recent Supreme Court decision in *Alice Corp. PTY Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014), Lenovo filed a motion for partial summary judgment with regard to Claim 30 of the '877 Patent, arguing that this claim targeted an abstract idea pursuant to § 101.  (Lenovo Action, Dkt. No. 229.)  On March 3, 2015, Lenovo filed a supplemental motion for summary judgment with regard to the remaining claims in the '877 Patent and the entirety of the '766 Patent.  (Lenovo Action, Dkt. No. 234.)  On May 20, 2015, the District Court heard argument on Lenovo's motions.  (Lenovo Action, Dkt. No. 285.)

Nearly three weeks after the hearing, on June 10, 2015, Novell filed a motion for judgment on the pleadings as to Claim 30 of the '877 Patent, but not with regard to any other claims in the '877 Patent or the '766 Patent.  (Novell Action, Dkt. No. 126.)

On July 10, 2015, the District Court entered an order granting Lenovo's summary judgment motions and invalidating both the '877 Patent and the '766 Patent pursuant to § 101.  (JA0001-31.)  Subsequently, relying primarily on collateral estoppel, the District Court entered final judgment in the Novell Action.

(JA0034-37; JA0038-39.)  Tranxition appeals the District Court's Invalidity Orders and Claim Construction Orders in the Lenovo and Novell Actions.

## V.    STATEMENT OF THE FACTS

Tranxition owns the Patents-in-Suit, which describe methods and systems that allows operators to recreate, to a great extent, the workings and configuration of their previous computer, thereby avoiding user disruption after the purchase of a new computer – particularly when the new operating systems or applications are different versions.  (JA0073, '877 Patent, Abstract.)

As computers became simpler for an individual to use, internally, computers also grew vastly in their complexity.  (JA0082, '877 Patent, col. 1, ll. 24-35.) Modern computers may have tens of thousands of settings that result in the computer having, in effect, a "personality" reflective of the user.  (JA02531-32, ¶¶ 11-13; JA03173-74, ¶ 13.)  Transitioning these settings in an automated and dynamic manner, using entirely different methods from those previously employed, is uniquely a computer problem necessitating an advanced and innovative computer solution such as that provided by the Patents-in-Suit. (JA02529-30, ¶ 5; JA03171-72, ¶¶ 4-6, 11.)

Not only do operating systems and applications typically have unique and often obscure methods to store configuration settings, the architecture for these settings can actually change between versions of an application.  (JA03172-73, ¶¶

6-9.)  This is, in part, because operating systems and applications typically use data structures and methods that obfuscate, conjoin, and/or encrypt configuration settings, all of which makes the systematic transition of settings difficult.  (*Id.*)  It is axiomatic that computer models evolve rapidly, and manufacturers induce users to upgrade frequently.  In part due to these manifold challenges, prior to the settings transfer systems and methods claimed by the Patents-in-Suit, there was no systematic, repeatable, reliable, and automatic way to identify, capture, collect, store, transition, and infuse the transitioned settings into a new and different installation.  (JA03173, ¶¶ 8-9.)

Complicating this problem of the *ability* to migrate personality settings, there was no easy way to locate, deep in the system, the configuration settings, that the user or network administrator *wanted* to transfer because personality is recorded in dozens of different ways, with varying levels of obfuscation. (JA03172, ¶ 6; JA0244, JA0262-63, '766 Patent, Abstract, and col. 20, ll. 56-68-col. 21, 1-15.)  Even when a central settings-location exists, the methods used to create this so-called "personality" have little consistency because these settings are encoded in a manner that flows from the personal preferences of software developers that develop operating systems and applications.  (JA03172, ¶ 6.)  With a typically complex computer personality, it would be, for all intents and purposes, practically impossible for an individual to "manually" get this right in one lifetime.

(JA02531-32, ¶¶ 11-13; JA03173-74, ¶ 13.)  Due to the manifold variety of encoding methods and data structures, only a computer that has been specially programmed with specific applications can carry out the claimed methods and systems.  (JA03174, ¶ 18.)

In order to account for and create a computer solution to this uniquely computer problem, the Patents-in-Suit teach unique methods and systems to transition a computer's personality using dynamic rules that respond to the extant personality of either the source computer and/or target computer.  (JA03174, ¶ 17.)  To accomplish transitioning, the Patents-in-Suit further teach implementing a translation system with transition rules (found in a Personality Object) that describe the exact manner in which a setting can be found, what should happen to the setting (change, leave alone, alter format, alter name, alter values, alter location) and where and how to place the setting in the target and manipulate many of the dynamically selected settings found on a particular source computer and are used by the preparation application and translation application.  (JA0073, JA0076, JA0079-80, JA0082-83,  JA0085 ('877 Patent, Abstract, Figs. 3 and 6, col. 2, l. 57- col. 3, l. 3, col. 7, ll. 21-8); JA0247, JA0250-51, JA0253, JA0258 ('766 Patent, Figs. 3 and 6, col. 1, ll. 57-59, col. 11, ll. 37-44).)

The claims asserted in the District Court actions below include Claims 1-12, 15-26, 29 and 30 of the '877 Patent and Claims 1-3, 5-11, 15, and 42-44 of the

'766 Patent (collectively, the "Asserted Claims").  Claims 1, 16 and 30 are the

independent claims in the '877 Patent.  Claims 2-12 and 15 of the '877 Patent

depend (directly or indirectly) from Claim 1 and further limit the claimed method

to specific applications.  Claims 17-26 and 29 of the '877 Patent depend (directly

or indirectly) from Claim 16 and further limit the claimed system to specific

applications.

Claims 1 and 42 are the independent claims in the '766 Patent.  Claims 2-3,

5-11, and 15 of the '766 Patent depend (directly or indirectly) from Claim 1 and

further limit the claimed method to specific applications.  Claims 43 and 44 of the

'766 Patent depend (directly or indirectly) from Claim 42 and further limit the

claimed method to specific applications.

These claims in the '877 and '766 Patents define specific technological

solutions to these technological problems – transitioning a computer's personality

from a source computer to a target computer.

## VI.    <u>SUMMARY OF THE ARGUMENT</u>

In order to invalidate the '877 and '766 Patents for lack of subject matter

eligibility under § 101, the District Court misapplied the Supreme Court's *Alice*

decision and contorted the meaning of "abstract" to the point of making it

impossible for an innovator to obtain patent protection for building a better

mousetrap.

On November 4, 1879, the United States Patent and Trademark Office issued patent 221,320, often credited as the first patented lethal mousetrap.[1] Dubbed "Royal No. 1," the patent issued described a set of fierce-looking cast-iron jaws, operated by a coiled spring, triggered by a mechanism nestled between the jaws. The now-classic spring-loaded mousetrap was first patented by William C. Hooker, who received U.S. Patent No. 528,671 in 1894. In fact, in the 100+ years since Royal No. 1, more than 4,400 mousetrap patents were awarded in dozens of different subclasses, including "Electrocuting and Explosive," "Swinging Striker," "Choking or Squeezing," and 36 others.[2]

Thousands of mousetraps have successfully been patented, up to the present date. Yet, each and every mousetrap can be distilled to the abstract purpose of "catching and killing mice." Through the lens of such a distillation, each and every mousetrap would be properly deemed "abstract" – after all, people have been catching and killing mice since before recorded history. However, in order to advance ingenuity, the USPTO has labored to define the purpose of a mousetrap in terms of its *actual functionality* and its *methods to achieve that functionality* (such

---

[1] *See* Wikipedia, *Mousetrap*, https://en.wikipedia.org/w/index.php?title=Mousetrap&oldid=679892525.

[2] *See* Nicholas Jackson, *Mousetraps: A Symbol of the American Entrepreneurial Spirit*, The Atlantic (Mar. 28, 2011), http://www.theatlantic.com/technology/archive/2011/03/mousetraps-a-symbol-of-the-american-entrepreneurial-spirit/70573.

as advancements in spring-loaded traps), rather than limiting the purpose to the end result (catching and killing mice).

Tranxition's Patents-in-Suit teach systems and methods for the dynamic transitioning of computer settings, adapting the settings to new, similar, or different operating systems and applications.  The patents teach this through creation of transition rules that transfer much of the unique individual personality of a source computer, by locating configuration settings, extracting configuration settings, storing, and manipulating the extracted configuration settings, preparing a transition package and receiving and infusing the transition.  (JA0262-63; col. 20, ll. 11-44. 56-68-col. 21, ll. 1-15 ('766 Patent, claims 37 and 42).)  By teaching dynamic (a.k.a. "smart") location, manipulation and transitioning of settings, Tranxition's Patents-in-Suit enable ordinary users to accurately transition any number, including *thousands*, of settings, across different platforms (such as Mac to PC), retrieved from and placed in countless different locations on a computer – many impossibly obscure to a lay user yet critical to the proper usage of the computer.

Despite this specialized and unique method of solving for the problem of transitioning computer settings across heterogeneous environments, the District Court grossly simplified the Patents-in-Suit, distilling them to the abstract notion of "the process of transferring settings between computers."  (JA0011.)

13

Tranxition's Patents-in-Suit can no more be distilled into this simplistic process than a mousetrap can be distilled to "an animal trap used primarily to catch mice."

The District Court's simplification of the Patents-in-Suit were reflected in claim construction as well. Rather than adopt the plain, ordinary meaning in accordance with the language used in the Patents-in-Suit, the District Court stripped the Patents-in-Suit of their dynamic qualities by importing limitations from the specification into the claims as well as limitations expressly recited in other claims.

Relieved of this simplistic mischaracterization, the Patents-in-Suit are anything but abstract and the remainder of the District Court's Invalidity Orders similarly unravels. For example, furthering its expansive and unjustified broadening of the abstraction label, the District Court determined that, because some "migration" processes might be done by hand, to some degree or another, it is therefore presumed to be well-known, conventional and routine despite the fact that the mechanism described by the Patents-in-Suit is completely different from this so-called "manual migration." (JA0014.) Again, the parallel to patenting mousetraps is inescapable. Despite the fact that humans have killed mice for millennia, the focus on mousetrap functionality has allowed the patenting of *thousands* of mousetraps. Because the Patents-in-Suit teach specialized and dynamic systems and methods of transitioning settings, so too can they be

patented, despite the fact that some form of transferring settings has allegedly been performed by someone, in some manner, for years.

Furthering the District Court's error, the term "migration" is found in the patent specification, but not anywhere in the actual claim language, which actually claims the dynamic activity of "transitioning" settings. The District Court improperly lifted a term in the specification – "migration" – and grafted this term into the claim language. Suffice to say, whether the unclaimed action of "migration" is abstract is irrelevant to whether the dynamic transitioning process claimed by the Patents-in-Suit is abstract.

Similarly, in determining whether or not the Patents-in-Suit supply an inventive concept, the District Court had the obligation to understand the claims and claim elements as an ordered combination. Instead, the District Court selected fragments of claim language, condemning each for a lack of inventive concept. (JA0019.) However, just as a mousetrap is more than a "wood plank," "spring," "swing bar," and "triggering mechanism," so too are the Patents-in-Suit more than "retrieving," "extracting," and "transitioning." When properly analyzed as a whole, the inventive concept is found in the dynamic nature of the patents, and less so in the isolated atomic pieces. (JA0262-63; col. 20, ll. 11-44. 56-68-col. 21, ll. 1-15 ('766 Patent, claims 37 and 42).)

In its rush to invalidate the Patents-in-Suit, the District Court disregarded the long-standing statutory presumption of patentability, and the corresponding Congressionally-mandated "clear and convincing" burden of proof for a finding of invalidity. Because Congress has not acted – *Alice* and its progeny notwithstanding – there has not and cannot be a change in the application of this statutory presumption without the action of Congress. The District Court's error is not harmless – it liberally supplied its own unsupported factual conclusions, accepted as true the unsupported factual statements of Lenovo's counsel, and weighed, then dismissed, much of Tranxition's unrebutted evidence. The District Court's treatment of the evidence that permeates this issue runs afoul of its obligations with regard to a motion for summary judgment.

Properly understood, the Patents-in-Suit teach specific, dynamic computer solutions to a uniquely computer problem. Tranxition respectfully asks this Court to prevent its patented computer solutions from being unfairly swept in with truly abstract ideas implemented on a general purpose computer. *See Alice*, 134 S. Ct. at 2347.

## VII.  <u>ARGUMENT</u>

The law of the regional circuit applies to the standard of review for a grant of summary judgment. *Kaneka Corp. v. Xiamen Kingdomway Group Co.*, 790 F.3d 1298, 1303 (Fed. Cir. 2015). Accordingly, with regard to invalidity, the Ninth

Circuit *de novo* standard of review applies. *Id.*; *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014). Questions of claim construction are also reviewed *de novo*. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

### A.    The District Court Erred In Construing Claim Terms, Leading To Its Numerous Errors In Its § 101 Analysis.

In construing patent claims, the court first looks to the words of the claims themselves. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Indeed, there is a "'heavy presumption'" that claim terms will be given their "ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). "Courts, however, must be careful to avoid reading limitations from the specification into the claims." *Dentsply Int'l, Inc. v. Hu-Friedy Mfg. Co.*, 202 F. App'x 464, 467 (Fed. Cir. 2006) (JA5324) (citing *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)).

The District Court misunderstood the dynamic nature of Tranxition's inventions, *i.e.*, the ability to not only *collect* obscure computer settings hidden throughout a computer, but also to *transition* the settings between the potentially heterogeneous environments (*e.g.*, different operating systems, application versions, or registry locations) of a target computer to a source computer. By disregarding the clear language of the patents, the District Court overly-narrowed

17

the meaning of the claim terms discussed in further detail below, stripping away

the inventive concepts that abound in the Patents-in-Suit.

### 1.    "Personality Object"

The District Court erred in construing "Personality object" because

"Personality object" is not limited to an object oriented programming object, to not

being a wizard, or to not being directly associated with an initialization file.

Tranxition maintains that the proper construction is: "An object containing

information related to the collection of configuration settings."  Lenovo, on the

other hand, proposed: "An object oriented programming object containing:  (1) at

least one object with information about configuration settings and (2) multiple

transition rules for locating configuration settings and that (3) is not a wizard or

other programming module capable of reading and writing settings."  (JA0792.)

Arguing prosecution history disclaimer, Lenovo mischaracterized the record

and misled the District Court.  Lenovo plucked two pieces of correspondence out

of the prosecution history for a different patent application: (i) an Office Action,

dated November 27, 2001; and (ii) Tranxition's "Amendment and Response,"

dated February 27, 2002.  Lenovo then argued the application of the "prosecution

disclaimer doctrine" by asserting that Tranxition abandoned the patent application

No. 09/300,862 (the "'862 Application") because it could not distinguish the

invention in the Hunter patent (the "Hunter reference") from Tranxition's

invention.  Misled by Lenovo's distortion of the record, the District Court

construed the term "Personality object" to contain three limitations that stemmed

from the prosecution history for the ***'862 Application*** – but not for the Patents-in-

Suit.

Yet, to the extent any disclaimer could have occurred, it was limited to the

parent application – not the applications for either of the '877 and '766 Patents.  As

to the Patents-in-Suit, however, prosecution history disclaimer could not apply.

Even if prosecution history disclaimer applied, Lenovo failed to demonstrate a

clear, unambiguous, and deliberate disclaimer.  *See Elbex Video, Ltd. v.*

*Sensormatic Electronics Corp.*, 508 F.3d 1366, 1368-69, 1372 (Fed. Cir. 2007).  It

is plain that the statements from the file history of the '862 Patent Application

relied on by Appellees at the *Markman* hearing, do not amount to the clear,

unambiguous, and deliberate "disavowal" of claim scope required by the Federal

Circuit.  *Id.*

The proper construction of "Personality object" is invariably: "An object

containing information related to the collection of configuration settings."

### 2.    "Extraction plan"

The District Court erred in construing "Extraction plan" because "Extraction

plan" cannot be defined to necessarily include a full list, an exclusion list, and an

inclusion list under the doctrine of claim differentiation.  Tranxition proposed its

plain and ordinary meaning. (JA0701.) Lenovo and Novell proposed: "a plan for extracting configuration settings that includes a full list of identity units to be located, an exclusion list and an inclusion list." (JA0787.)

The construction reached by the District Court, however, was "a plan for extracting configuration settings that includes a full list of identity units to be located, an exclusion list, and an inclusion list." (AP0051.) In arriving at this errant construction, the District Court improperly imported a limitation into an independent claim when that limitation was expressly recited in related dependent claims, violating the doctrine of claim differentiation. *Seachange Ina, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) (quoting *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999*)); see also Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim.").

The District Court also swept details from the specification into the language of the claims – *i.e.*, "importing the limitations from the preferred embodiments onto the claims." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1319-20 (Fed. Cir. 2005) (reading a limitation from the written description into claims is a "cardinal sin"). The claim language is not limited to the examples in the specification.

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ("[g]eneral descriptive terms will ordinarily be given their full meaning").

As advocated by Tranxition, the term "Extraction plan" should be given its plain and ordinary meaning.

### 3.    "active configuration settings"

In the Novell Action, the District Court erred in construing "active configuration settings" because "active configuration settings" is not limited to configuration settings selected through an inclusion list.  Tranxition proposed its plain and ordinary meaning.  Novell proposed: "[c]onfiguration settings selected from an inclusion list."  (JA4635.)

In construing the term "active configuration settings," the District Court concluded that the term means "configuration settings selected from an inclusion list."  (JA0067.)  But this construction does not work because it violates the doctrine of claim differentiation.  Additionally, the court's construction of "active configuration settings" ignores the fact that full lists, inclusion lists, and exclusion lists are alternative ways of selecting "active configuration settings."  Nothing in the intrinsic evidence suggests that Tranxition intended to limit this term to only those settings selected from an inclusion list.  Accordingly, the proper construction of the term should be its plain and ordinary meaning.

### 4.    "value"

Fourth, the District Court erred in construing "value."  Tranxition proposed "[t]he data stored in a variable or constant." (JA0692.)  Novell proposed: "The data stored in a variable or constant that is distinct from location, name, and format." (JA0783.)

The District Court, in the Novell Action, construed "value" to be "data stored in a variable or constant that is distinct from location, name, and format." (JA0066.)  The District Court's construction, however, imports the limitation that the data must be "distinct from location, name and format." (*Id.*)  But, there is no intrinsic evidence requiring this limitation to be imported into this term.  Thus, the District Court's construction must be reversed.  *See, e.g.*, *Teleflex v. Ficosa North America Corp.,* 299 F.3d 1313, 1324 (Fed. Cir. 2002).  The term "value" should be construed as "the data stored in a variable or constant."

### 5.    "(transitioning or transitions) one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system"

Next, the District Court erred in construing "(transitioning or transitions) one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system."  Tranxition proposed its plain and ordinary meaning.  (JA0692.)  Lenovo proposed: "[c]hanging the arrangement of data of the one or more retrieved configuration

settings from a format used on the source computing system to a different format used on the target computer system." (JA0786.)

The District Court construed the term to be "(changing or changes) the arrangement of data of one or more retrieved configuration settings from a format used on the source computing system to a format used on the target computing system." (JA0051.) The District Court's construction is confusing and unnecessary. The addition of the "arrangement of data" redundantly requires that a configuration setting have a format. *See Broadcom Corp. v. Int'l Trade Comm'n*, 542 F.3d 894, 907 (Fed. Cir. 2008) (citing *nCube Corp. v. SeaChange Int'l, Inc.*, 436 F.3d 1317, 1321-22 (Fed. Cir. 2006)). This limitation, however, is already present in the claim phrase as written because it requires that the configuration setting be transitioned from a format used on the source computer to a format used on the target computer.

The proper construction of the term should be its plain and ordinary meaning.

> **6.    "manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format used on the target computing system"**

Lastly, the District Court erred in construing "manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format

used on the target computing system." Tranxition proposed its plain and ordinary meaning. (JA0702.) Lenovo, however, proposed: "[c]hanging at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a different location, name, value, and format used on the target computing system." (JA0783.)

The District Court construed the term to be "changing at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, name, value, and format used on the target computing system." (JA0052.) By the District Court's construction, altering the intentional selection of the all-encompassing word "manipulating" to the very narrow and restrictive word "changing," the scope and the breadth of Claim 1 is lost. *Pandrol USA v. Airboss Ry. Products, Inc.*, 10 F. App'x 837, 842 (Fed. Cir. 2001) (JA5400). Such narrowing is improper and reversible error. *Id.* The term should be given its plain and ordinary meaning.

### 7.    The Properly Construed Terms

Tranxition respectfully requests that the District Court's Claim Construction Orders be vacated with regard to the terms below, and that the following constructions be entered:

| Term | Requested Construction |
|------|------------------------|
| "Personality object" | "An object containing information related to the collection of configuration settings." |

| "Extraction plan" | Plain and ordinary meaning |
|---|---|
| "active configuration settings" | Plain and ordinary meaning |
| "value" | "The data stored in a variable or constant." |
| "(transitioning or transitions) one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system" | Plain and ordinary meaning |
| "manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format used on the target computing system" | Plain and ordinary meaning |

**B.    On A Motion For Summary Judgment, The District Court Must Draw All Reasonable Inferences In Favor Of Tranxition As The Nonmoving Party.**

At the summary judgment stage, Lenovo[3] bore "the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *Kickstarter, Inc. v. Fan Funded, LLC*, No. 11 CIV 6909, 2015 WL 3947178, at *4 (S.D.N.Y. June 29, 2015) (JA5207-8) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Accordingly, the Court should have viewed "the established facts, as well as any inferences of fact drawn from such facts," "in the light most favorable to [Tranxition]." *Id.* (citing *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  In

---

[3] Because Novell filed a subsequent motion requesting that the District Court adopt the Lenovo invalidity order, the same summary judgment standard applies to Novell.  (Novell Action, Dkt. No. 141, JA0034-39.)

drawing those inferences, the Court should have avoided making credibility determinations or weighing the evidence, as those are functions of the jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

As described further below, despite nominally applying the summary judgment standard, the District Court actually denied the existence of disputed issues of material fact, improperly weighed evidence, and failed to view established facts and factual inferences in the light most favorable to Tranxition.

## C.    A Presumption Of Validity Applies To All Patents And May Only Be Overcome By Clear And Convincing Evidence.

In addition to only superficially applying the summary judgment standard, the District Court declined to apply the presumption of validity to the Patents-in-Suit and the accompanying "clear and convincing" standard to the determination of the facts at issue. In doing so, the District Court disregarded controlling statutory and Supreme Court authority.

### 1.    § 282 Of The 1952 Patent Act Establishes That Patents "Shall Be Presumed Valid" And The "Burden Of Establishing Invalidity . . . Shall Rest On The Party Asserting It."

As alleged infringers, Lenovo and Novell "must contend with the first paragraph of § 282, which provides that '[a] patent shall be presumed valid' and '[t]he burden of establishing invalidity . . . rest[s] on the party asserting such invalidity.'" *Microsoft Corp. v. i4i Ltd. P'ship,* 131 S. Ct. 2238, 2243 (citing 35

USC § 282(a)). As such, "by its express terms, § 282 establishes a presumption of patent validity, and it provides that a challenger must overcome that presumption to prevail on an invalidity defense." *Id.* at 2245. On this point, the Supreme Court has been explicit:

> [§] 282 creates a presumption that a patent is valid and imposes the burden of proving invalidity on the attacker. *That burden is constant and never changes and is to convince the court of invalidity by clear evidence.*

*Id.* at 2243 (emphasis supplied) (citing *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984)). This "presumption takes away any need for a plaintiff to prove his patent is valid to bring a claim." *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1929 (2015).

### 2. Binding Supreme Court Authority Establishes That The Statutory Presumption In Favor Of Validity May Only Be Overcome By Clear And Convincing Evidence.

In *Microsoft Corp.*, the Supreme Court unanimously held that pursuant to § 282, "any invalidity defense" must "be proved by clear and convincing evidence." *Microsoft Corp.*, 131 S. Ct. at 2242, 2242-43, 2245-48. Not only did Congress intend a "clear and convincing" burden in 1952, Congress has amended § 282 multiple times in the last 30 years, yet apparently has declined to "even consider[] a proposal to lower the standard of proof." *Id.* at 2252. Congress "is presumed to

have chosen" this "high bar,"[4] and it remains unchanged.  *Commil, USA, Inc.*, 135

S. Ct. at 1929 (citing *Microsoft*, 131 S. Ct. at 2245-2248).

**3.    The District Court Erred In Finding That There Is No Longer A Presumption Of Validity Nor A Clear And Convincing Burden With Regard To Questions Of Patent Invalidity.**

The District Court erred in declining to apply the proper statutory

presumption and evidentiary standard to the question of validity of the Patents-in-

Suit.  Without citing *Microsoft* or § 282, the District Court relied on the

concurrence in *Ultramercial, Inc., LLC, v. Hulu,* LLC, 772 F. 3d 709, 720 (Fed.

Cir. 2014) (Mayer, J., Concurring) and concluded that the long-standing statutory

scheme had been upended by the "recent Supreme Court decisions in *Mayo* and

*Alic*e."  (JA0008.)  Citing the same concurring opinion, the District Court further

elaborated that the "clear and convincing standard" is now "'unwarranted' in light

of recent Supreme Court decisions."  (JA0009.)

The District Court's reliance on the *Ultramercial* concurrence is misplaced.

Neither Congress nor the Supreme Court has spoken as to propriety of the

---

[4] Given the high stakes of patent invalidation, it is not surprising that overturning the presumption of validity requires an act of Congress.  Inventors create and disclose "new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years."  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 151 (1989).  Denying this presumption unjustly deprives patent holders of this essential part of the bargain. If patents are too easy to invalidate based on a lower standard, the risk of invalidation undercuts the incentive to disclose inventions.

presumption of validity and accompanying clear and convincing standard. The

District Court, thus, remained "'duty-bound to apply the law as enacted by

Congress and signed by the President, and in light of the Federal Circuit's

interpretation thereof.'" *Trading Technologies Intl., Inc. v. CQG, Inc.*, No. 05-CV-

4811, 2015 WL 774655, at \*3 (N.D. Ill. Feb. 24, 2015) (JA5263) (quoting

*CertusView Techs., LLC v. S & N Locating Servs., LLC*, No. 2:13cv346, 2015

269427, at \*14 (E.D. Va. Jan. 21, 2015).) The District Court should have granted

summary judgment only if Lenovo and Novell had shown "by clear and

convincing evidence that the Patents-in-Suit claim patent-ineligible subject

matter," *id.*; yet, it improperly declined to hold Novell and Lenovo to this

heightened standard.

## D.    The District Court's Failure To Apply The Proper Legal Standards Resulted In Multiple Reversible Errors.

Instead, the District Court only nominally applied the summary judgment

standard and totally disregarded the presumption of validity and the related clear

and convincing evidentiary standard. This misapplication of the law is

compounded by the District Court's reliance on the false premise that "[t]he parties

ha[d] not raised any factual disputes . . . for the Court to resolve."[5] (JA0009.)

---

[5] The presumption of validity still applies when subject matter eligibility is considered a question of law. In those circumstances (not present here), the court must still afford "with appropriate recognition of the burdens on the challenger of a duly issued United States patent" because the "statutory presumption of validity is

Material issues of fact persist and, therefore, foreclose summary judgment on §
101 grounds.  Further, even when the District Court addressed the underlying
factual issues (despite denying their existence), it failed to view those facts in the
light most favorable to Tranxition or to apply the clear and convincing evidentiary
standard.

These factual issues include, but are not limited to: (1) the District Court's
results-oriented and dismissive analysis of the unrebutted declarations of inventor
Kelly Mackin which set forth crucial facts about, among other things, the state of
the art technologically at the time of the invention; (2) broad and conclusory
factual inferences drawn from the patent language that the claimed process was
"fundamental" and "widely-utilized process" that was performed "manually" at the
time of the invention (JA0011); and (3) the District Court's reliance on attorney
argument to support its conclusion that the Patents-in-Suit impose "potentially
extensive" preemption concerns.  (JA0030.)  In sum, the Court committed multiple
reversible errors in failing to recognize these and other factual issues and to
properly draw inferences from those same factual issues.

---

based in part on recognition of the expertise of patent examiners." *Arrhythmia
Research Tech., Inc. v. Corazonix Corp.*, 958 F.2d 1053, 1056 (Fed. Cir. 1992)
(citing *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed. Cir. 1985)).

### E.     The Current Status Of § 101 "Abstractness" Law.

§ 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has found exceptions to patentability, holding that "laws of nature, natural phenomena, and abstract ideas" are not patentable. *Diehr*, 450 U.S. 175, 185 (1981).

With respect to "abstract ideas," the Supreme Court, in *Bilski v. Kappos*, determined that the patent covered "the basic concept of hedging, or protecting against risk," which was an "unpatentable abstract idea" and a "fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class." 561 U.S. 593, 611 (2010).

The Supreme Court revisited patent eligibility in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, where the Court expanded on the contours of patent eligibility under § 101. 132 S. Ct. 1289 (2012). In *Mayo*, the Court first determined whether the claims covered an unpatentable law of nature. The Court then asked: "What else is there in the claims before us?"; and, in answering the question, the Court laid out the applicable analysis by considering the individual elements of the subject claim as well as the claim as an ordered

combination to find sufficient material to transform the nature of the claim.  *See id.* at 1297-98.

Most recently, in *Alice*, the Supreme Court made clear that the two-step approach set forth in *Mayo* applied not only to patents relating to natural laws, but also to patents relating to abstract ideas.  *Alice*, 134 S. Ct. at 2355.  In *Alice*, the Supreme Court explained that *Mayo* established "a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts": "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. [Citation.]  If so, we then ask 'what else is there in the claims before us?'"  *Alice*, 134 S. Ct. at 2355 (internal citations omitted).  Aside from confirming the applicable test, *Alice*'s holding is limited: "[M]ere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358.

In the wake of *Alice*, the Federal Circuit has wrestled with the issue of whether various computer technology patents disclose the "inventive concept" required for patentability.

In *Ultramercial*, the Federal Circuit addressed the eligibility of a patent directed to "a method for distributing copyrighted media products over the Internet where the consumer receives a copyrighted media product at no cost in exchange

for viewing an advertisement." 772 F.3d at 712. The Court held that the claims of the patent were not directed to patent-eligible subject-matter because they merely recited the abstract idea "that one can use [an] advertisement as an exchange or currency" without adding any "inventive concept" to that abstract idea. *Id.* at 714-16 (internal citation omitted). The fact that the claims invoked the Internet was "not sufficient to save [the] otherwise abstract claims from ineligibility . . . ." *Id.* at 716.

By contrast, in *DDR Holdings*, the Federal Circuit, closely adhering to *Alice*'s limited holding, upheld the validity of claims directed to a computer solution "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." 773 F.3d at 1257. The patent in *DDR Holdings* described a system for generating a web page that could, for example, "combine the logo, background color, and fonts of the host website with product information from the merchant." *Id.* at 1248-49 (quoting U.S. Patent No. 6,629,135 at 2:56-63, 3:20-22). The purpose of the invention was to allow a website to "display a third-party merchant's products, but retain its visitor traffic by displaying the product information from within a generated web page that 'gives the viewer of the page the impression that she is viewing pages served by the host' website." *Id.* This Court confirmed that inventive concept can

be established by something that targets and improves existing technological processes for a specific problem in a variety of fields of invention. *Id.*

Then, most recently, in *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369-71 (Fed. Cir. 2015), the Federal Circuit considered a patent that claimed "[a] system for providing web pages accessed from a web site in a manner which presents the web pages tailored to an individual user." U.S. Patent No. 7,603,382 claim 1. Determining that "customizing information based on (1) information known about the user and (2) navigation data" was an abstract idea, in part because other media outlets had utilized variants of that technique "for decades," this Court found that the patent claims contained no inventive concept. *Intellectual Ventures*, 792 F.3d at 1369-70. This Court distinguished *DDR Holdings* from *Intellectual Ventures*, reasoning that, like the Patents-in-Suit here, the patent in *DDR Holdings* provided an Internet (computer) based solution to an Internet (computer) problem. *See* 792 F.3d at 1371.

### F.    The District Court Erroneously Found That The Patents-In-Suit Claim An Abstract Idea.

#### 1.    The District Court Failed To Follow Supreme Court Precedent In Applying Step One Under the *Mayo/Alice* Test.

In determining that the Patents-in-Suit are directed to abstract ideas and lacked any inventive concept, the District Court committed reversible error by

ignoring applicable law, misconstruing the actual claim language, and disregarding material factual issues.

The abstract idea exception to patent eligibility does not apply if the invention "solve[s] a technological problem in conventional industry practice," "improve[s] an existing technological process," or otherwise "effect[s] an improvement in any other technology or technical field." *Alice*, 134 S. Ct. at 2358, 2359 (internal citation omitted). Under *Alice*, a claim that does represent such a technological advance is patent-eligible. *Id.*

Lost from the District Court's opinion is any consideration that a patent may be directed to a unique ***application*** of a fundamental principle. *See Alice*, 134 S. Ct. at 2355; *Mayo*, 132 S. Ct. at 1293-94; *Bilski*, 561 U.S. at 611 (An "'*application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection.'") (quoting *Diehr*, 450 U.S. at 187) (emphasis in *Bilski*).

> ### 2. The District Court's "Abstraction" Analysis Is Reliant On The Concept Of "Migration," Which Is Not Claimed By The Patents-In-Suit.

The District Court erred by ignoring the actual language of the Patents-in-Suit and characterizing them as being directed to "migration" of computer settings, which it identified as a "fundamental and widely-utilized process." (JA0011.) Whether or not "migration" is fundamental and widely utilized is irrelevant –

Tranxition's claims are directed to the **transitioning** – not "migration" – of a computer's complex personality from a source computer to a target computer, a patent-eligible, computer-based solution to a computer problem.

The term "migration" appears nowhere in the claims of the Patents-in-Suit. Because the term "migration" is not in the claim language, it is evident that the District Court took the word "migration" from the specification (with its predicate "manual") and grafted those words, and their accompanying concept, into the claim language. However, in construing the claims, a court is not permitted to construe language from outside the claims inconsistent with the claims themselves. By doing so, the Court injected an unclaimed abstract idea – settings "migration" – into the claims themselves, then subsequently found that this abstract idea has been performed "manually" for years. However, the Patents-in-Suit specifically claim a technology that does not merely "migrate," but "transitions," in a dynamic fashion, computer settings from a source to a target computer. (*See, e.g.*, JA0261, col. 17, 1. 51-col. 18, ll. 1-9, 38-55 (specifically claiming "transitioning").)

Because it was not in the patent claims, "migration" was not construed by the District Court. However, "migration" is commonly defined as movement from one part of something to another.[6] By contrast, transition generally means the

---

[6] http://www.oxforddictionaries.com/us/definition/american_english/migration

process or a period of changing from one state or condition to another, which exceeds the abstract concept of migration.[7]   By improperly inserting the concept of "migration" into the claim language, then finding the resulting concept abstract, the District Court committed reversible error.  Because, per the terms of the claims, the Patents-in-Suit claim a dynamic transitioning of settings, the Patents-in-Suit are not abstract, and the District Court's analysis regarding "manual migration" must be disregarded.

It is axiomatic that a court must consider the claims together "as a whole" and cannot "dissect the claims into old and new elements" to reach a conclusion that the claim is directed to an abstract idea.  *See Diamond v. Diehr*, 450 U.S. at 188-189.  Any patent claim, if so stripped, simplified, generalized, paraphrased, and reduced to ever higher levels of abstraction, cannot avoid becoming improperly labeled as "abstract."  *See CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1298 (Fed. Cir. 2013), *aff'd*, 134 S. Ct. 2347 (2014) ("A court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims.").

---

[7] The District Court's construction of the term "(transitioning or transitions) one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system" is one of the terms under appeal.  However, under either interpretation of the term, the District Court failed to find the inventive concepts in the claims.

Applying the District Court's analysis, even some of history's greatest

inventions would be considered "abstract":

> For example, Alexander Graham Bell's patent could be
> said to claim the abstract idea of oral communication.
> But his invention was not the concept of oral
> communication itself; it was a technological innovation
> that allowed a type of oral communication between
> people who could otherwise not communicate in that
> way.

*Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, No. CV 14-732-RGA, 2015

WL 1744343, at *5 (D. Del. Apr. 15, 2015) (JA5229).

Far from claiming the abstract idea of migrating settings, the Patents-in-Suit

claim specific applications of concepts for transitioning computer settings – *i.e.*,

the computer's personality – by invoking transition rules relevant to the unique,

individual personality of a source computer. (JA0090, '877 Patent, col. 17, ll. 29-

62.) Far from a general application of an abstract idea on a general purpose

computer, the claims of the Patents-in-Suit recite computer-implemented methods

and systems requiring a specific configuration of computer hardware and software,

with specified functions.

Against all inferences most favorable to Tranxition, Lenovo failed to

overcome the presumption of validity by clear and convincing evidence. *U.S.

Gypsum Co. v. Nat'l Gypsum, Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996). The

Asserted Claims are rooted in computer technology intended to overcome a

problem specifically arising in the realm of computers — the problem of computer

settings unknown to the target computer.  *See DDR Holdings*, 773 F.3d at 1257.

Claims, such as the Asserted Claims, that solve a technological problem are

patentable.  *Cf. Diehr*, 450 U.S. at 177-78 (computer-implemented process that

employed widely used mathematical equation to solve technological problem was

patentable); *Versata Dev. Group, Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1326 (Fed.

Cir. 2015).

> **3.     The District Court's Reliance On "Manual" Migration
>          Confirms That The District Court Misunderstood The
>          Patents-In-Suit.**

The keystone of the District Court's flawed reasoning is based on a

misunderstanding of the concept of "manual" migration.  In finding that the

Patents-in-Suit were directed to "well-known, conventional, and routine" activity,

the District Court relied on the specification's description of manual migration –

*i.e.*, reconfiguring a new computer:

> "When a new computer system is used," the patents
> explain, "a user or a user's agent typically has to re-
> configure the new computing system to include
> configuration settings that were used on an old computer
> system. **All but the most rudimentary pieces of 'the
> migration process' are done by hand[**.]"

(JA0014 (quoting '877 patent, col. 2, ll. 2–8) (emphasis in original).)

But the District Court's finding violates at least two basic precepts: (1)

Tranxition is entitled to every favorable inference in its favor – not Lenovo (or

Novell); and (2) reference to "manual activity" in the specification is not what the patents claim.

First, the District Court pointed to no evidence of "well-known, conventional, and routine;" nor was any submitted into the record. Rather than interpret the specification in Tranxition's favor, as it was required to do, the District Court mistakenly inferred that, because migrating settings could have been performed manually, it must have been a long-standing, routine activity.

Second, the District Court also mistakenly assumed that the description of manual migration in the patents were the same methods and systems being claimed. As such, the very basis of the decision which concluded that the Patents-in-Suit rested upon an abstract idea finds no support in the record, or in a proper reading of the patents' claims. The methods and systems claimed by Tranxition use a completely different process that bears no resemblance to any purported "manual" process that the District Court relied upon. According to the District Court, because it was possible to migrate some settings by hand, the Asserted Claims are patent ineligible abstract ideas. (JA0014.) The District Court, however, erred as a matter of law in broadly concluding that anything that can be performed "manually" is precluded from patent protection.

The District Court improperly adopted a theory that there was a "manual" process that performed the same steps claimed in Tranxition's patents. Citing from

40

specification of the '877 Patent that "[a]ll but the most rudimentary pieces of 'the migration process' are done by hand. This requires many hours of hands-on time," the District Court relied on the inaccurate premise that a reference to migration-by-hand necessarily leads to the District Court's conclusion that the "invention is directed at a practice that was well-known, conventional, and routine at the time of the invention." (JA0014.)   However, the District Court's conclusion is also inconsistent with the language of the specification, which discloses that the invention *seeks to avoid* the processes of "manual" migration: "It is also desirable to provide an automatic migration of configuration settings from an old computing system to a new computing system *without using a time consuming manual migration process*." (JA0082, '877 Patent, col. 2, ll. 39-44 (emphasis added).)

The District Court conflated the problems identified in the specification with the solution embodied by the Patents-in-Suit, compounding its error by improperly concluding that migration-by-hand was "well-known, conventional, and routine" at the time of the invention. (*See* JA0011,14.)  The Asserted Claims teach a novel way to transition a computer's personality from a source computer to a target computer – *i.e.*, a patentable application of known concepts. *See Bilski*, 561 U.S. at 611; *Diehr*, 450 U.S. at 187; *see also Alice*, 134 S. Ct. at 2355.  Lenovo offered no evidence that the Asserted Claims involve a longstanding practice. *StoneEagle Services, Inc. v. Pay-Plus Solutions, Inc.*, No. 8:13-CV-2240-T-33MAP, 2015

41

4042097, at *8 (M.D. Fla. July 1, 2015 ) (JA5252) ("Defendants have not provided clear and convincing evidence to establish that the prior arts engaged in the practice implemented by the Patents or that the claims at issue involve a fundamental economic practice, thus making them unpatentable subject matter.").

Further, "manual performance" is increasingly a red herring in *Alice* abstraction analysis. As one Court has stated, "*Alice* focuses the inquiry, however, on whether the claim is directed to an abstract idea, not on whether the claim could be performed by a human." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 56 F. Supp. 3d 813, 821 (E.D. Va. 2014) (JA5381). The manual performance analogy relied upon by the District Court, however, has been chastised by courts for being "unhelpful":

> Many inventions could be theorized with pencil and paper, but pencil and paper can rarely produce the actual effect of the invention.
>
> * * *
>
> The problems of pencil-and-paper analysis are heightened in the context of software, which necessarily uses algorithms to achieve its goals. Pencil-and-paper analysis can mislead courts into ignoring a key fact: although a computer performs the same math as a human, a human cannot always achieve the same results as a computer.

*California Inst. of Tech. v. Hughes Commun. Inc.,* 59 F. Supp. 3d 974, 994-995 (C.D. Cal. 2014) (JA5040). Manual performance is no touchstone at all. Here, the activity of transitioning computer personality did not come before computers – it

arises *because of* computers.  The District Court's reliance on the manual

performance analogy is therefore inapplicable.  And it is also clear that the

inventions described in the Patents-in-Suit are entirely different than any purported

"manual migration."

The District Court tautologically determined that the Asserted Claims are

abstract ideas merely because it was possible to "manually" migrate some settings,

even though the transitioning claims in the Patents-in-Suit bear no resemblance to

any "manual migration" methods.  However, the District Court erred as a matter of

law because Tranxition demonstrated that it could reasonably be inferred from the

Patents-in-Suit and the evidence proffered by Kelly Mackin, one of the inventors

of the Patents-in-Suit, that the transitioning of settings as claimed by the Patents-

in-Suit was not previously performed and that there was no ordered process for

dynamically transitioning settings in the manner described by the Patents-in-Suit

before the patents.  Accordingly, the District Court fundamentally erred in

concluding that the asserted claims of Tranxition's patents are ineligible under 35

U.S.C. § 101.

On its motion for summary judgment, Lenovo carried the burden of

demonstrating invalidity as a matter of law and it failed to meet that burden.  Yet,

by denying Tranxition every reasonable, favorable inference, the District Court in

essence shifted the burden to Tranxition to demonstrate that the Patents-in-Suit are not abstract and, in turn, committed reversible error.

>    **4.    The Patents-In-Suit Comply And Are Consistent With The USPTO's Examples Of Claims That Do Not Constitute Abstract Ideas.**

The District Court's conclusion is also inconsistent with USPTO's 2014 Interim Eligibility Guidance, explaining whether certain claims are directed to an abstract idea.[8]  The USPTO's analysis of the hypothetical method claim for protecting a computer from an electronic communication containing malicious code, which is similar in many respect to the independent claims in the Patents-in-Suit, determined that the claim did "not recite an abstract idea" but instead was "directed towards performing isolation and eradication of computer viruses, worms, and other malicious code, a concept inextricably tied to computer technology and distinct from the types of concepts found by the courts to be abstract."  (JA5327, JA5329.)  Similarly, the Patents-in-Suit relate to transitioning configuration settings between computer systems and are directed to isolating active configuration settings and extracting those settings to create a transition

---

[8] http://www.uspto.gov/patents/law/exam/abstract_idea_examples.pdf.  The USPTO "issued the 2014 Interim Guidance on Patent Subject Matter Eligibility (Interim Eligibility Guidance) for USPTO personnel to use when determining subject matter eligibility under 35 U.S.C. [§] 101 in view of recent decisions by the U.S. Supreme Court, including Alice Corp., Myriad, and Mayo." http://www.uspto.gov/patent/laws-and-regulations/examination-policy/2014-interim-guidance-subject-matter-eligibility-0.

package to transition the desired configuration settings from the source computing system to be functional on the target system.  (*See* JA0082, '877 Patent, col. 3, ll. 27-36.)  The Patents-in-Suit are "inextricably tied to computer technology." (JA5329.)  Thus, the Asserted Claims are in fact, as they had been before, patent-eligible and not directed to an abstract idea.

### G.    By Failing To Consider The Claims As An Ordered Combination, The District Court Erroneously Found That None Of Nearly 40 Claims At-Issue Contain An Inventive Concept.

After erroneously concluding that the Asserted Claims are drawn to an abstract idea, the District Court further erred in concluding that the Asserted Claims do not contain an inventive concept by ignoring the claims *as ordered combinations*.  Not only are the Asserted Claims anything but abstract, even a cursory search of the Asserted Claims reveals the inventive concepts in the Patents-in-Suit.  The Asserted Claims teach how to locate computer personality settings, organize those settings into a list, allow the inclusion or exclusion of settings on the list, store the settings, manipulate the settings to prepare the settings for transitioning, and transition the settings to be operative on a target computer, thereby transforming the function and operation of the target computer and, in turn, transforming the computer.

Like the Asserted Claims, claims directed towards a specific problem in the art and, through the patented systems and methods, improved functionality have all

been held to disclose inventive concepts and were, therefore, patent eligible subject matter. *See, e.g.*, *Research Corp. Technologies Inc. v. Microsoft Corp.*, 627 F.3d 859, 868 (claimed "invention presents functional and palpable applications in the field of computer technology"); *DDR Holdings*, 773 F.3d at 1257 (claims directed to a computer solution "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks").

As it did with Step One, by denying Tranxition every reasonable, favorable inference, the District Court effectively shifted the burden of proof to Tranxition to demonstrate that the claims have inventive concepts when, instead, Lenovo carried the burden of proving, as a matter of law, that no reading of the Patents-in-Suit could possibly reveal any inventive concepts. *Cf. A Pty Ltd. v. Facebook, Inc.*, No. 1-15-CV-156 RP, 2015 WL 5883331, at *6 (W.D. Tex. Oct. 8, 2015) (JA5024) ; *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. SA CV 14-0347-DOC, 2015 WL 1239992, at *9 (C.D. Cal. Mar. 17, 2015) (JA5237).

### 1. The District Court Conclusorily Read The Claim Elements In Isolation – Not As An Ordered Combination.

Step Two of the *Alice* analysis is to determine "whether the elements of each claim, either individually ***or as an ordered combination***, state an 'inventive concept' . . . ." (emphasis added) (JA0018.) The District Court initially stated, but then completely ignored its own explanation of the controlling law.

For example, when it analyzed Claim 1 of the '877 Patent, the District Court addressed isolated portions of claim elements, quoting less and less of the actual claim element as it progressed further into its analysis. (*See* JA0019.) For the first step of Claim 1, the District Court conclusorily likened the step to "data gathering." (*Id.*) But, "data gathering" is not what is claimed. And, despite citing its construction of the term "extraction plan" as a "plan . . . that includes a full list. . . ," the District Court dismissively boiled down the "generating an extraction plan" step to "making a list." (*Id.*) The Court then glossed over the remaining steps without discussing the entire claim element: "[t]he other claimed limitations such as 'extracting,' 'retrieving,' and 'transitioning' similarly fail to state an inventive concept." (*Id.*) Importantly, the District Court's reasoning was undercut by its own claim construction ruling.

Claim 1 not only discloses meaningful limitations, like the claims in *Smartflash LLC v. Apple Inc.*, 6:13CV447-JRG-KNM, 2015 WL 661174, at *8-9 (E.D. Tex. Feb. 13, 2015) (JA5394-95) (holding claims relating data storage and access systems for paying for and downloading digital content not invalid), but also discloses unconventional steps, as in *CalTech*, for "preparing configuration settings" that include: "providing configuration information about configuration settings"; "generating an extraction plan that identifies configuration settings to be extracted from the source computing system"; "extracting the active configuration

settings of the extraction plan from the source computing system"; "generating a transition plan that identifies configuration settings to be transferred from the source computing system to the target computing system"; "retrieving the extracted configuration settings" and "transitioning one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system." (*See* JA0090, '877 Patent, col. 17, ll. 31-62.)

The District Court simply overlooked, ignored or misunderstood the distinction between migrating computer settings generally and the specific transitioning limitations comprising the methods and systems claimed in the Patents-in-Suit. Migrating without transitioning would create (in many cases) configuration settings on the target system that do not work in the same manner as in the source computer, causing many to revert to their default settings and in some cases the software applications themselves to potentially not work at all. These "broken settings" would clearly cause the applications and/or operating system on the target computer to work differently than on the source.

The District Court also committed the error rejected by the court in *Smartflash*, arbitrarily "boil[ing] down the claims" to something generic. 2015 WL 661174, at *8 (JA5393). Specifically, the District Court boiled down Claim 1 to "locat[ing] the settings he or she wanted to transfer from the old computer";

48

"'extract[ing]' those settings from the old computer, and then turn[ing] to the new

computer and locate where the similar setting is stored there"; and

"'transition[ing]" the old setting to the new system by applying it and concluding

that "this is exactly the process described in Tranxition's patents." (JA0022.)

However, the District Court's reasoning is completely divorced from the claim

language itself; rather than quote, or even cite Claim 1, the court only referenced

the *specification* – i.e., the '877 Patent generally. (*Id.*)

Importantly, the District Court failed to apply controlling Supreme Court

authority requiring courts to *search* for an inventive concept in the elements "as an

ordered combination." (*See* JA0018.) Even when the District Court found

(errantly) that each element individually lacked an inventive concept, it had the

responsibility to search for the inventive concept in the ordered combination of

each of the claims. *See Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1298,

1297); *DDR Holdings*, 773 F.3d at 1259. "When viewing claim elements as an

ordered combination, the court should not ignore the presence of any element, even

if the element, viewed separately, is abstract." *CalTech.*, 59 F. Supp. 3d at 980

(JA5030). "[C]ourts should remember that a series of conventional elements may

together form an unconventional, patentable combination." *Id.*

The District Court also mistakenly concluded that claims 2-10 "merely

describe in generic and abstract terms how to perform the first steps in the manual

migration process." (JA0024.)  Similarly, the District Court dismissed claims 11, 12 and 15 as "generic." (JA0024-25.)  Rather than repeat Claim 1, however, dependent claims 2-12 and 15 add greater specificity to Claim 1, detailing a specific implementation, settings to be transitioned, and the types of settings. *Intellectual. Ventures I, LLC v. Motorola Mobility LLC*, 81 F. Supp. 3d 356, 369 (D. Del. 2015), *aff'd* 792 F.3d 1363 (Fed. Cir. 2015) (JA5194).  In fact, Claims 2-12 and 15 disclose inventive concepts by transforming the method of Claim 1 into an inventive ***application*** of known concepts.  *See Alice*, 134 S. Ct. at 2358.

The District Court performed the same superficial analysis on Claims 16-26 and 29, selectively focusing on claim terms rather than the considering the entire claim and all of its elements as an ordered combination.  Although Claim 16 recites three applications that each performs specific operations, the District Court errantly concluded that the applications are "generic applications" without providing a basis for characterizing them as "generic." (JA0025.)  The District Court also repeated the same error it committed with Claim 1; the actual claim language of Claim 16, and its dependent claims, recites applications that perform particular steps, which are specific elements ignored by the District Court.  *See Fairfield Indus., Inc. v. Wireless Seismic, Inc.*, No. 4:14–CV–2972, 2014 WL 7342525, at *5-6 (S.D. Tex. Dec. 23, 2014) (JA5163-4).

Viewed as an ordered combination of elements, Claim 30 recites a unique data structure containing a very particular set of configuration settings to be transitioned to the target computer:  settings for "user preferences that affect the appearance and operation of a basic windowed user interface"; "visual elements, user interface hardware settings, and windows preferences configuration information"; "service providers, services, clients, and domains configuration information"; "accounts, browser, and network addresses configuration information"; "mail application and mail application settings configuration information"; "application and application settings configuration information"; and "registry settings configuration information."  (JA0091, col. 20, ll. 18-34.)  The Patents-in Suit describe a data-driven application that processes computer-setting-information.  Claim 30 structures and defines the principal data to feed the application.

Claim 30 is similar to the claim in *DataTern, Inc. v. Microstrategy, Inc.*, where the court found that the patent at issue was directed to solving a specific problem arising in the realm of computers, reasoning that "object-oriented programs exist only in the realm of computers, and relational databases are utilized primarily, if not exclusively, on computers."  No. CV 11-11970-FDS, 2015 WL 5190715, at *8 (D. Mass. Sept. 4, 2015) (JA5104).  The Claim 30 data structure

allows the transition rules to be flexible and comprehensive, changing as computers change.[9]

The District Court, however, erroneously found that none of the claims in the '766 Patent contain an inventive concept with only a single sentence of analysis. (*See* JA0026.) Furthermore, the District Court focused solely on the verbs in the claims, ignoring the claims as a whole or as an ordered combination.

>    **2.    The Most Directly On-Point Case Is *DDR Holdings, LLC V. Hotels.Com, L.P.*, Which The District Court Attempted To Distinguish By Relying On Conclusory, Unsupported Factual Inferences In Favor Of Lenovo And Novell.**

Not only did it ignore the actual claim language, the District Court misapplied Step Two of *Alice* (which it should not have needed at all) by focusing on the District Court's perception of an abstract idea as opposed to actual and legitimate limitations of the Asserted Claims, mistakenly believing that "[t]he activity at issue in *DDR Holdings* [ ] could only be performed by a computer. The process was 'necessarily rooted in computer technology' because there is no manual process that could achieve the same result—there is no way for a person to display a hybrid website." (JA0022.)

---

[9] The District Court also applied the wrong analysis to Claim 30, conflating Step One with Step Two. (*See* JA0026.) The District Court cited *Content Extraction* for the proposition that Claim 30 lacked an inventive concept; yet, in the text quoted, the court was only addressing Step One – determining whether a claim was directed to an abstract idea. *See Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 ("Applying Mayo/Alice step one, . . . .").

In *DDR Holdings, supra*, the Federal Circuit, closely adhering to *Alice*'s limited holding, upheld the patent eligibility of claims directed to a computer solution "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." 773 F.3d at 1257. This decision confirms that an inventive concept can be established by something that targets and improves existing technological processes for a specific problem in a variety of fields of invention. *Id.* Tranxition not only improved an existing process, but Tranxition's process replaces as obsolete any previous process with the claimed process. Like the claims in *DDR Holdings*, the Asserted Claims in the Patents-in-Suit recite specific ways to automate the transitioning of multiple active configuration settings on a source computer to be transferred to a target computer in order to solve a problem faced by computer users using multiple computers (*e.g.*, an old computer and a new computer).

The District Court, however, declined to follow *DDR Holdings*, maintaining that there was "a key difference between Tranxition's claims to an automatic migration process and the claims in *DDR Holdings*." (JA0021.) However, the District Court's conclusory attempt to distinguish *DDR Holdings* ignored the actual claims in the Patents-in-Suit. In concluding that "[t]here is, however, a way for a human being to manually transfer settings from one computer to another" (JA0022 ), the District Court focused on its own conclusion of abstractness rather

than the actual claims of the patents.  (*Id.*)  The District Court never addressed how *the actual claim language* could be performed "manually," which is where the parallels to *DDR Holdings* lie.  The District Court's distinction between the claims in *DDR Holdings* in the Patents-in-Suit was arbitrary and unsupported, exacerbating the court's errors in failing to find inventive concepts in any of the Asserted Claims.

### 3. The Court Selectively Discussed Portions Of The Two Mackin Declarations But Ignored Other Portions Creating Issues Of Material Fact As To Whether Migration Was A Long-Standing Practice.

The District Court also committed reversible error by failing to apply the clear and convincing standard when faced with factual issues.  By abandoning the clear and convincing standard, the District Court improperly rejected Ms. Mackin's unrebutted explanation[10] of the state of transitioning in order to conclude that the claims were nothing more than "well-understood, routine, conventional activity, previously engaged in by those in the field."  *See Mayo*, 132 S. Ct. at 1299.

The Court ignored a multitude of facts demonstrating that the Asserted Claims were not "well-known, conventional, and routine" at the time of the invention:

---

[10] The District Court acknowledged at the hearing at the Mackin Declaration provided relevant evidence regarding "the state of technology" at the time of the invention.  (JA4260, Hr. Tr. 56:17-24.)

- "A person of skill in the art would understand that, because this is a computer solution to a computer problem, the claims in the Patents-in-Suit cannot be entirely performed manually but require the use of a computer." (JA3174, ¶ 15.)
- "The Asserted Claims teach using methods and systems to migrate a computer personality using rules that are selected and executed based upon the computer's individual personality. Neither these steps nor the technology itself were -purely conventional" at the time of Patents-in-Suit. (*Id.* at ¶ 17.)
- "The Patents-in-Suit teach selecting and implementing transition rules based upon a combination of the unique settings of a particular source computer. Only a computer that has been specially programmed with specific applications can carry out the method and systems that are claimed. Without this special programming, a general purpose computer cannot carry out the claimed methods and systems." (*Id.* at ¶ 18.)
- "The Patents-in-Suit transform the settings into different data." (*Id.* at ¶ 19.)
- "The Patents-in-Suit extract and transform configuration settings, some of which are unreadable to a person that is not highly-trained in computers, from a source computing system into a format that is used to create a translation package which, in turn, infuses a target computing system with the extracted and transformed configuration settings." (JA3154, ¶ 20.)

Here, the claimed inventions in the Patents-in-Suit are "more complex than what could be done by humans and transforms the claimed invention from an abstract idea simply automated by a computer into an inventive concept." *Veracode, Inc. v. Appthority, Inc.*, No. CV 12-10487-DPW, 2015 WL 5749435, at *16 (D. Mass. Sept. 30, 2015) (JA5280). The claimed inventions also exceed "mere automation of a well-known process by harnessing and improving upon the unique properties and complex capacities of computer technology" resulting in a transformation that was unobtainable using existing methods. *Id.* at *17.

Accordingly, the District Court erred by ignoring evidence of inventive concepts. *See StoneEagle*, 2015 WL 4042097, at *4 (JA5249).

Moreover, the District Court erred in interpreting Ms. Mackin's declarations, denying Tranxition the favorable inferences to which it is entitled as a matter of law and instead arriving at an internally inconsistent conclusion. The District Court failed to give Ms. Mackin's factual averments any weight whatsoever, dismissing her testimonial evidence based on the assumption that "the asserted claims do not require that level of complexity." (JA0015.) The District Court reasoned that "[w]hatever complexity Tranxition and Ms. Mackin believes [*sic*] its patents may have envisioned, the patents plainly lay claim to a simple migration involving *only one setting*." (*Id.* (emphasis added original).)

First, the District Court misread Claim 1 as being limited to "only one setting" (*id.*) while the actual claim language claims "at least one" (*see* JA0090, '877 Patent, col. 17, ll. 29-62). The District Court's error cannot be overstated – the court afforded ***no weight*** to Ms. Mackin's testimony regarding the complexity of the Patents-in-Suit because it erroneously concluded that the patents claimed nothing more than simple migration of only one setting. Moreover, by misreading the Patents-in-Suit as limited to migrating one setting, the District Court failed to acknowledge the complexity of methods and systems capable of transitioning not only one, but manifold settings buried in applications and operating systems.

56

The District Court's second error – reliance on *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014) (JA5240) – cascades from its first error.  Unlike Claim 1, which, in part, defines the *minimum* number of settings required, the claims in *Planet Bingo* were found by this Court to define a *maximum*: "[a]t most, the claims require[d] 'two sets of Bingo numbers,' 'a player,' and 'a manager.'"  *Id.* (internal citation omitted).  Moreover, unlike in *Planet Bingo*, the dynamic nature of Patents-in-Suit teaches self-awareness as to the number of computer settings, which is determined when the various lists are generated.  Thus, the District Court's conclusion that Claim 1 lacks an inventive concept was based on a misreading of Claim 1 and a flawed application of the law.

With respect to the standard for deciding summary judgment motions, the factual proffer provided by Ms. Mackin demonstrates that it is sufficiently plausible that the Asserted Claims go beyond requiring a generic computer to perform generic computer functions and, therefore, the record below presented issues of fact on patent eligibility.  *See Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, No. CIV.A. 12-10943-FDS, 2015 WL 1943826, at *7 (D. Mass. Apr. 28, 2015) (JA5203); *TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180-WCB, 2014 WL 651935, at *5 (E.D. Tex. Feb. 19, 2014) (JA5260) (". . . TQP has offered evidence to the contrary, in the form of an expert's declaration stating that a person of skill in the art would understand that the claimed method could not be performed in the

mind but would require the use of a machine.  That factual dispute by itself is enough to foreclose the entry of summary judgment in the defendants' favor on the present record.").  Summary judgment should have been denied based on the factual disputes alone regarding inventive concepts.

> **4.    Moreover, The Patents-In-Suit Comply And Are Consistent With The USPTO's July 2015 Update On Subject Matter Eligibility With Respect To Step Two.**

As with showing that the Asserted Claims are ***not*** directed to abstract ideas, recent USPTO guidance confirms that the Asserted Claims indeed contain inventive concepts as well as highlights the District Court's error in failing to view claim elements as an ordered combination: "when looking at the additional limitations as an ordered combination, the invention as a whole amounts to significantly more than simply organizing and comparing data."  (JA5349-50.)

As discussed above, prior to the Patents-in-Suit, the problems with transferring settings, or in shorthand "personality," were manifold.  When evaluated based upon what the claims actually recite, not merely with respect to the purported ideas upon which they are premised, it is clear that the Asserted Claims "as a whole amount[] to significantly more than simply organizing and comparing data"; they are directed to achieving a ***better*** result – transitioning a computer's personality more deeply from a source computer to a target computer in a specific manner – rather than simply reproducing the ***same*** result as human

activity, but more quickly.  Thus, the Asserted Claims withstand *Alice's* narrow holding because they claim a solution necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computers. Construing the Asserted Claims as an ordered combination, the Patents-in-Suit clearly provide an inventive solution to the problem of transitioning configuration settings entirely consistent with the USPTO's most recent post-*Alice* guidance.

### H. While Not Dispositive, The Machine-Or-Transformation Test Confirms That The Patents-In-Suit Cover Patent-Eligible Subject Matter.

Although raised by Lenovo, the District Court did not reach its conclusions regarding § 101 based on the machine-or-transformation test.  Had the District Court applied this test, it would have confirmed that the Patents-in-Suit cover patent eligible subject matter.

Under the "machine-or-transformation" test, "[a] claimed process would only be patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus; or (2) it transforms a particular article into a different state or thing." *Bilski*, 561 U.S. at 600 (internal citation omitted).  The Patents-in-Suit satisfy this test under either prong.

The Federal Circuit has expressed the view that data structures can represent a "machine."  *CyberSource Corp. v. Retail Decisions, Inc,* 620 F. Supp. 2d 1068, 1079 (C.D. Cal. Mar. 27, 2009) (JA5094-5).   Further, in *Lowry*, the Federal

Circuit panel expressly explained that data structures on computers are physical entities based on the electronic or magnetic arrangement in computer memory. *In re Lowry*, 32 F.3d 1579, 1583-84 (Fed. Cir. 1994). The *Lowry* panel also cautioned against the very mistake that District Court committed: "The fact that these physical changes are invisible to the eye should not tempt us to conclude that the machine has not been changed." *Lowry*, 32 F.3d at 1583 (quoting *In re Bernhart*, 417 F.2d 1395, 1400 (C.C.P.A. 1969)).

As for the second part of the test, "transformation" occurs when the claimed invention effects a physical transformation of "physical objects or substances," or at the very least things that are "representative of physical objects or substances." *See Ultramercial*, 772 F.3d at 717 (quoting *In re Bilsk*i, 545 F.3d 943, 963 (Fed. Cir. 2008)) (en banc), *aff'd* on other grounds, 561 U.S. 593).

Here, the Patents-in-Suit satisfy the transformation prong by transforming a target computer into a computer that looks and behaves in many respects like the source computer. For example, transformation occurs in Claim 1 of the '877 Patent: "transitioning one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system," col. 17, ll. 59-62, which takes configuration settings on a source computer and reproduces those settings on a target computer in the format needed to properly use the setting. (JA0090.)

Thus, under either the mainstay § 101 framework under *Mayo/Alice* or the

ancillary machine-or-transformation test, the Patents-in-Suit pass muster for

subject matter eligibility.  *See Abstrax, Inc. v. Dell, Inc.*, No. CIV.A.

2:07CV221DFCE, 2009 WL 3255085, at *3 (E.D. Tex. Oct. 7, 2009) (JA5370-71);

*Chamberlain Grp., Inc. v. Linear LLC*, No. 14-CV-05197, 2015 WL 4111456, at

*10 (N.D. Ill. July 7, 2015) (JA5082-83).

## I.    The District Court Improperly Concluded That The Patents-In-Suit Create Broad Preemption Concerns.

The District Court committed reversible error by relying on an inaccurate

and unfounded attorney argument to conclude that the Patents-In-Suit "risk[]

preempting the abstract idea of migrating settings from one computer to the other."

(JA0029, Opinion, p. 29.)  When the patent claims are considered together and in-

context, it is clear that they do not preempt the entire field of transitioning settings

among computers, but instead appropriately narrow forms and applications.

Indeed, the Patents-in-suit recite specific methods and systems, with appropriate

limitations, to transition a computer's personality from a source computer to a

target computer.  *See France Telecom S.A. v. Marvell Semiconductor Inc.*, 39

F.Supp.3d 1080, 1092 (JA5176); *see also CalTech*, 59 F.Supp.3d at 996 (JA5041).

Furthermore, the dependent claims in the Patents-in-Suit include "'additional

features' that ensure the claims are 'more than a drafting effort designed to

monopolize the [abstract idea].'" *See DDR Holdings*, 773 F.3d at 1259 (quoting

*Alice*, 134 S. Ct. at 2357).

### 1.    The District Court Improperly Relied On Inaccurate Attorney Argument In Finding That The Patents-In-Suit Pose Broad Preemption Risks.

The District Court concluded "the claims in Tranxition's patents not only

threaten to preempt the 'migration process' generally, but they are so broad that

they could preempt the entire field of computer data backup and restore, at least

insofar as the programs written to implement backup and restore are capable of

taking settings from one computer and applying them to another." (JA0030-31.)

However, the District Court erred in supporting this conclusion with Lenovo's

*attorney's* description of the functionality of Lenovo's product Rescue and

Recovery. (JA0030.) As Tranxition amply established in its Motion to Strike,

these unsupported attorney statements upon which the District Court relied were

wholly inaccurate. (JA2544.)

The District Court erroneously concluded that the Patents-in-Suit threaten to

"preempt the entire field of computer data backup and restore . . . ." (JA0030-31.)

However, rather than broadly claiming that the accused Rescue and Recovery

infringes the Patents-in-Suit merely because it restores computer settings,

Tranxition specified certain components and features that infringe the Patents-in-

Suit. In particular, Tranxition cited to SMA Lite "which is integrated into Rescue

and Recovery, to access configuration settings, such as registry settings" and allows for the migration of those settings, as evidence that Rescue and Recovery infringes the Patents-in-Suit. (JA4074.)  In other words, as is clear and unrebutted in the record, Lenovo's accused "Rescue and Recovery" is included in the instant suit because it integrates an infringing "Lite" version of Lenovo's accused computer personality-transitioning software.  There is nothing in the record to indicate that any other recovery programs do the same.

In any event, attorney argument is not evidence, and, therefore, is irrelevant to preemption analysis, or any other factual issue.  *Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 595 (Fed. Cir. 1997); *Rus v. Gonzales*, 180 Fed. Appx. 711, 712 (9th Cir. 2006) (JA5243).  Accordingly, the District Court's preemption concerns, based on Lenovo's attorney argument, were unfounded.

### 2. The Coexistence Of Other Patents Claiming Methods And Systems For Transitioning Settings Demonstrates That The Patents-In-Suit Do Not Preempt The Entire Field.

Prior art referenced in the '766 Patent's file history and even a Lenovo patent affirm that the Patents-in-Suit do not monopolize the entire field of transitioning computer settings—but rather only claim a particular method of doing so.

In prosecuting the patent, Tranxition successfully distinguished the Hunter reference from the '766 Patent claims, despite the fact that the Hunter reference, as

explained in applicants' remarks, "describes a way to transfer application settings (e.g. template files and toolbar-related settings) from a first computer to a second computer." (JA0324.) Specifically, as Tranxition argued, the Hunter reference only "generally describes transferring settings from a first computer to a second computer using environment variables and/or tokens, [but] Hunter fails to teach or suggest manipulating or calculating configuration settings." (JA0324.)

The fact that the '766 Patent issued despite the fact that this USPTO had to reconcile the claims with those of another patent that claimed transferring settings illustrates how the Patents-in-Suit are limited to only specific methods of transitioning settings claimed and do not risk preventing others from finding new, innovative methods for transitioning settings.

Similarly, U.S. Patent No. 6,182,212 (the '212 Patent), asserted by Lenovo in a related matter, by its own title, is directed to the field of migrating settings: "Method and System for Automated Migration of User Setting to a Replacement Computer System." The fact that the USPTO issued the Hunter reference and the '212 Patent before issuing the Patents-in-Suit demonstrates that the Patents-in-Suit do not "risk[] preempting the abstract idea of migrating settings from one computer to the other." (JA0029.) It stands to reason that, if the Patents-in-Suit did so, they would not be distinguishable from the Hunter reference and the '212 Patent, and

therefore, the USPTO would have rejected the Patents-in-Suit as either anticipated or obvious.

## VIII.  <u>CONCLUSION</u>

Based on the foregoing, Tranxition respectfully requests that the Federal Circuit enter an order vacating the District Court's Invalidity Orders, affirming the validity of the Patents-in-Suit under § 101, construing the disputed terms as specified herein, and remanding the Lenovo and Novell Actions to the District Court for further proceedings.

Dated:  November 18, 2015          Respectfully submitted,

Arent Fox LLLP


By:    */s/ Arthur S. Beeman*
        Arthur S. Beeman

Arthur S. Beeman
arthur.beeman@arentfox.com
Joel T. Muchmore
joel.muchmore@arentfox.com
Arent Fox LLP
55 2nd Street, 21th Floor
San Francisco, CA  94105
Telephone: (415) 757-5500

Dayna J. Christian
dayna.christian@immixlaw.com
Immix Law Group PC
121 S.W. Salmon Street, Suite 1000
Portland, OR  97204
Telephone: (503) 802-5533

ATTORNEYS FOR APPELLANT
TRANXITION, INC.

## CERTIFICATE OF SERVICE

I certify that on November 18, 2015, the foregoing **APPELLANT'S CORRECTED OPENING BRIEF IN SUPPORT OF ITS APPEALS OF THE DISTRICT COURT'S ORDERS ON CLAIM CONTRUCTION AND ORDERS INVALIDATING THE PATENTS-IN-SUIT AS "ABSTRACT" PURSUANT TO SECTION 101 OF THE PATENT ACT** was filed electronically using the Court's CM/ECF system, which will give notice of the filing to counsel for the Appellees.


_/s/    Arthur S. Beeman_
Arthur S. Beeman
Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because Section II to VIII of this brief contains 13,904 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman font size 14.

  /s/    *Arthur S. Beeman*
Arthur S. Beeman
Attorney for Appellant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TRANXITION, INC.,
a Delaware corporation,

                Plaintiff,

    v.

LENOVO (UNITED STATES) INC.,
a Delaware corporation,

             Defendant.

No. 3:12-cv-01065-HZ

OPINION & ORDER

Arthur S. Beeman
Joel T. Muchmore
Arent Fox LLP
55 Second St., 21st Floor
San Francisco, CA 94105

Dayna J. Christian
Nicholas M.M. Drum
Immix Law Group
121 SW Salmon St., Ste. 1000
Portland, OR 97204

      Attorneys for Plaintiff

1 – OPINION & ORDER

Eric J. Klein
Todd E. Landis
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Ave., Ste. 4100
Dallas, TX 75201

Fred I. Williams
Akin Gump Strauss Hauer & Feld LLP
600 Congress Ave., Ste. 1350
Austin, TX 78701

Kenneth L. Walhood
Blunck & Walhood LLC
2350 Willamette Falls Dr.
West Linn, OR 97068

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Plaintiff Tranxition, Inc. owns U.S. Patent Nos. 6,728,877 (the " '877 patent") and

7,346,766 (the " '766 patent"). The claims generally recite a software method for transferring

customized user settings from an old computer to a new computer. Tranxition filed the present

infringement action against Defendant Lenovo (United States) Inc. and a separate action against

Novell, Inc. that is also before this Court (Case No. 3:12-cv-01404-HZ). The parties in the

Novell case have agreed to allow the merits of this case to proceed first.

     Currently before the Court are two motions from Lenovo seeking summary judgment of

invalidity under Section 101 of the Patent Act. Lenovo's motion for partial summary judgment

[229] attacks one specific claim in the '877 patent, while Lenovo's motion for summary

judgment [234] is broader in scope, as it attacks all of the remaining independent claims in both

of Tranxition's patents-in-suit.

     For reasons explained below, the Court finds that Tranxition's patents are aimed at a

patent-ineligible abstract idea. Neither of the patent's claims, whether read singly or in

2 – OPINION & ORDER

combination, state an inventive concept sufficient to satisfy the Supreme Court's test for

patentability of an abstract idea under Section 101 of the Patent Act. Therefore, Lenovo's

motions for summary judgment are granted, and Tranxition's '877 and '766 patents are invalid.

## BACKGROUND

The patents at issue recite the same concept: "a method and system for automatic

transitioning of configuration settings among computer systems." '877 patent, col. 1, ll. 18–21.[1]

Tranxition calls this "the migration process." '877 patent, col. 1, ll. 6–7. "In today's world," the

patents explain, "technology changes very quickly, [and] it is very common to replace an old

computer system every few years with a new computing system." '877 patent, col. 1, ll. 24–26.

A major problem with this change-over is that computer users often spend significant time

customizing the settings on their old computers, and would like to transfer many of those settings

to their new computers. The transferred settings could be simple, such as a custom desktop

wallpaper, or sophisticated, such as network settings. '877 patent, col. 1, ll. 36–47. As the

complexity of computers grows, the number of possible configuration settings and the places

they might be located increases. It can take significant time and effort to find the old settings,

identify where on the new system those settings are located, and then change the new system to

match the old one. '877 patent, col. 1, ll. 48–62. The patents claim that "[m]any users often

decide to stick with an obsolete old computer system rather than wrestle migration and manual

reconfiguration required for a new computer system." '877 patent, col. 2, ll. 9–13. And, like any

human process, this "transitioning" of settings from one system to the other is "prone to errors

that lead to user frustration." '877 patent, col. 2, ll. 19–21.

---

[1] The two patents share a history—the '766 patent is a continuation of the patent application that later
became the '877 patent—and the same title, abstract, and specification. For background purposes, the
Court cites only to the '877 patent, and refers the reader to the same columns and lines of the '766 patent
without a duplicate parallel citation.

• • • • •• • •• •• • • • • •• • ••••• • • • • • • ••• •• ••••• ••• • •• • •• • ••••• • • • •• •• ••• •

The patents aim to address this problem by "automatically determin[ing] configuration settings customized by a user or network administrator on a[n] old computer system," and providing "an automatic migration of configuration settings from an old computer system to a new computing system without using a time consuming manual migration process." '877 patent, col. 2, ll. 38–44.

The method and system claims that make up the patents describe how the invention achieves automatic migration. First, it identifies the various configuration settings, which include Internet browser settings, a desktop "look and feel," user preferences, e-mail address books, folder names and locations, passwords, registry settings, and more. '877 patent, col. 17, ll. 65–67; col. 18, ll. 1–23. It then identifies the locations of these various settings, and allows the user to select the settings he or she would like to transfer to the new computer. '766 patent, col. 17, ll. 56–62. Next, the invention retrieves the chosen settings, and completes the personality transfer by "manipulating" and "transitioning" the configuration settings to the new computer system. '877 patent, col. 17, ll. 55–62; '766 patent, col. 17, ll. 63–67; col. 18, ll. 1–3.

Between the '877 patent and the '766 patent, there are five independent claims that describe the invention's technological concepts—Claims 1, 16, and 30 of the '877 patent, and Claims 1 and 42 of the '766 patent. The remaining claims that are the subject of Lenovo's motions and this Opinion & Order are dependent, either directly or indirectly, of those claims. Plaintiff's Response to Defendant's Motion for Summary Judgment II ("Pl. Resp. II"), ECF No. 250, at 4–5.

In total, Lenovo asks for summary judgment of invalidity on claims 1–12, 15–26, 29, and 30 of the '877 patent, and claims 1–3, 5–11, 15, and 42–44 of the '766 patent. Lenovo moved separately for summary judgment of invalidity against Claim 30 of the '877 patent, see

4 – OPINION & ORDER

Defendant's Motion for Summary Judgment ("Def. Mot. I"), ECF No. 229, and against the other

claims (hereinafter the "Primary Claims"). See Defendant's Motion for Summary Judgment

("Def. Mot. II"), ECF No. 234. Lenovo's asserted grounds for invalidity are the same, however,

against both the Primary Claims and Claim 30. Lenovo argues that the claims are unpatentable

under Section 101 of the Patent Act because they are directed at an abstract idea and they do not

contain an "inventive concept sufficient to transform the claimed abstract idea into a patent-

eligible subject matter." Def. Mot. II at 1 (quoting Alice Corp. Pty. Ltd. v. CLS Bank, Int'l, 134

S. Ct. 2347, 2357 (2014)). Tranxition contends that the patents disclose a "computer-based

solution to a uniquely computer problem," which is either not abstract, or is sufficiently

inventive to be worthy of patent protection. Pl. Resp. II at 1–2.

Since the law governing the two motions is the same, this Opinion & Order resolves both

of Lenovo's motions.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of " 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

(quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927–28

5 – OPINION & ORDER

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v.

Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d

1108, 1112 (9th Cir. 2011).

## DISCUSSION

### 1. Applicable Law

Section 101 of the Patent Act is the starting point for patentability, and provides that

"[w]hoever invents or discovers any new and useful process, machine, manufacture, or

composition of matter, or any new and useful improvement thereof, may obtain a patent therefor,

subject to the conditions and requirements of this title." 35 U.S.C. § 101. From this sweeping

statute, the Supreme Court has carved out as not patentable three broad subjects: "laws of nature,

natural phenomena, and abstract ideas." Bilski v. Kappos, 561 U.S. 593, 601 (2010) (quoting

Diamond v. Chakrabarty, 447 U.S. 303, 308 (1980)). Allowing patents over these "basic tools of

scientific and technological work" would impede, not promote innovation. Alice,134 S. Ct. at

2354 (quotation marks omitted); see also U.S. CONST. ART. I, § 8, cl. 8 (granting Congress the

power to "promote the Progress of Science and useful Arts"). The High Court has "repeatedly

emphasized this . . . concern that patent law not inhibit further discovery by improperly tying up

the future use of these building blocks of human ingenuity." Alice, 134 S. Ct. at 2354 (quotation

marks omitted).

6 – OPINION & ORDER

But courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law" because, "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." Id. (citing Mayo, 132 S. Ct. at 1293) (quotation marks omitted). An invention that involves or invokes an abstract concept can be patentable, so long as it applies such a concept "to a new and useful end" or integrates these "building blocks into something more." Id. (quotation marks omitted).

The Supreme Court in Mayo and Alice set out a two-step analytical framework for "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." Alice, 134 S. Ct. at 2355 (citing Mayo, 132 S. Ct. at 1293–94). First, the court must "determine whether the claims at issue are directed to one of the patent-ineligible" categories. DDR Holding, LLC v. Hotels.com L.P., 773 F.3d 1245, 1255 (Fed. Cir. 2014) (citing Alice, 134 S. Ct. at 2355). If so, the court then examines "the elements of each claim—both individually and as an ordered combination—to determine whether the additional elements transform the nature of the claim into a patent-eligible application of that abstract idea." Id. (citing Alice, 134 S. Ct. at 2355). This second step is the search for an "inventive concept," or some "element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' that a patent on an ineligible concept." Id. (quoting Alice, 134 S. Ct. 2355). A claim that recites an abstract idea must include "additional features" to ensure "that the [claim] is more than a drafting effort designed to monopolize" the abstract idea. Alice, 134 S. Ct. at 2357 (quoting Mayo, 132 S. Ct. at 1297).

Distinguishing between a patent-eligible claim and an ineligible one can be difficult, especially in the realm of computer technology and software patents. Id.; see also Intellectual Ventures II LLC v. JP Morgan Chase & Co., No. 13-cv-3777 (AKH), 2015 WL 1941331 at *5

(S.D.N.Y. Apr. 28, 2015) (explaining that in analyzing software patents, courts must "be careful not to mistake a difficulty in conceptualizing an esoteric-but potentially patent-eligible invention with a patent-ineligible abstraction.").

### 2. Presumption of Validity & Evidentiary Standard

Before analyzing the merits of the claims, the Court first addresses Tranxition's contention that "a party seeking to invalidate a patent must overcome the strong presumption of validity with clear and convincing evidence." Pl. Resp. II at 5 (citing United States Gypsum Co. v. Nat'l Gypsum Co., 74 F.3d 1209, 1212 (Fed. Cir. 1996)) (additional citations omitted). Tranxition criticizes Lenovo for only offering "conclusory attorney argument" in support of its motion, and argues that Lenovo "falls far short of its burden to establish by clear and convincing evidence that Patents-in-Suit are invalid as abstract." Pl. Resp. II at 1–2, 34.

Tranxition's argument fails for two reasons. First, the Federal Circuit has explained that the presumption of validity is now "unwarranted" when "assessing whether claims meet the demands of Section 101." Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 720 (Fed. Cir. 2014). The presumption of patent validity is based on deference to the United States Patent and Trademark Office's expertise in approving the claim as patentable. Id. However, in light of recent Supreme Court decisions in Mayo and Alice that have "unequivocally repudiated the overly expansive approach to patent eligibility" under Section 101, the Federal Circuit has explicitly stated that "while the presumption of validity attaches in many contexts, no equivalent presumption of eligibility applies in the Section 101 calculus." Id. at 720–21 (citing Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238, 2243–47 (2011)); see also Modern Telecom Sys. LLC v. Earthlink, Inc., No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7 (C.D. Cal. Mar. 17, 2015) (declining to apply presumption of validity under Section 101); Wireless Media

8 – OPINION & ORDER

• • • •• •• • •• •• • • •• • ••••• •••• • •• ••• •• ••••• ••• • •• • •• • ••••• • • • •• ••• •

Innovations, LLC v. Maher Terminals, LLC, No. CIV.A. 14-7004, 2015 WL 1810378, at *5–6

(D.N.J. Apr. 20, 2015) (same).

Second, the Court fails to see how the "clear and convincing" standard applies to the

validity analysis under Section 101 in this case. The Federal Circuit has held that "any attack on

an issued patent based on a challenge to the eligibility of the subject matter must be proven by

clear and convincing evidence." CLS Bank Int'l v. Alice Corp. Pty., 717 F.3d 1269, 1304 (Fed.

Cir. 2013) cert. granted, 134 S. Ct. 734 (2013) and aff'd, 134 S. Ct. 2347 (2014). However, the

application of that standard was based on the presumption of validity that previously attached to

patents challenged under Section 101 which, as explained above, is now "unwarranted" in light

of more recent Supreme Court decisions. See id. ("Because we believe the presumption of

validity applies to all challenges to patentability, including those under Section 101 . . . we find

that any attack on an issued patent based on a challenge to the eligibility of the subject matter

must be proven by clear and convincing evidence.").

Furthermore, recent decisions from the Supreme Court and the Federal Circuit

invalidating patents under Section 101 have not mentioned or applied the "clear and convincing

standard" in analysis. See Alice, 134 S. Ct. at 2359–60; Internet Patents Corp. v. Active

Network, Inc., No. 2014-1048, 2015 WL 3852975, at *2–*6 (Fed. Cir. June 23, 2015); DDR

Holdings, 773 F.3d at 1255–57. Lower courts are split whether the "clear and convincing"

standard applies to eligibility challenges under Section 101. Affinity Labs of Texas, LLC v.

Amazon.Com, Inc., No. 6:15-CV-0029-WSS-JCM, 2015 WL 3757497, at *5 n.4 (W.D. Tex.

June 12, 2015) (collecting cases).

The parties have not raised any factual disputes in this case for the Court to resolve. In

analyzing Lenovo's motions and Tranxition's patents, the Court relies on the undisputed historic

9 – OPINION & ORDER

facts set out in the patents themselves, as well as the language of Section 101 and case law interpreting it. Where the question of invalidity depends "not upon factual disputes, but upon how the law applies to facts as given," the clear and convincing evidentiary standard simply does not come into play. Microsoft Corp., 131 S. Ct. at 2253 (Breyer, J., concurring).

### 3. Analysis

#### a. Step One of the Mayo/Alice Test

The first step of the § 101 analysis is to determine "whether the claims at issue are directed to a patent-ineligible concept." Alice, 134 S. Ct. at 2355. Given the nature of the invention at issue in this case, the question is whether the claimed invention is an abstract idea. "The 'abstract ideas' category 'embodies the longstanding rule that an idea of itself is not patentable.' " Id. (quoting Gottschalk v. Benson, 409 U.S. 63, 67 (1972)) (some quotation marks omitted). The Supreme Court has not precisely defined the contours of the category, but it at least includes a "preexisting, fundamental truth . . . about the natural world that has always existed," or a "method of organizing human activity" (e.g., a longstanding commercial practice such as risk hedging). Id. at 2356–57 (citing Bilski, 561 U.S. at 599; Parker v. Flook, 437 U.S. 584, 593 (1978)).

The first step of the Mayo/Alice analysis essentially requires the Court to ask: what are the claims generally trying to achieve? California Inst. of Tech. v. Hughes Commc'ns Inc., 59 F. Supp. 3d 974, 993 (C.D. Cal. 2014) (hereinafter "CalTech"); see also Smartflash LLC v. Apple Inc., No. 6:13CV447-JRG-KNM, 2015 WL 661174, at *8 (E.D. Tex. Feb. 13, 2015) ("The court must first determine the purposes of the claimed inventions."). The "Alice step one analysis can turn on how far a court goes in peeling back a claim's limitations while trying to divine what the claim is really directed to," TriPlay, Inc. v. WhatsApp Inc., No. CV 13-1703-LPS, 2015 WL

10 – OPINION & ORDER

1927696, at *9 (D. Del. Apr. 28, 2015), but the claim's purpose should be stated at a "reasonably high level of generality." Open Text S.A. v. Box, Inc., No. 13-CV-04910-JD, 2015 WL 269036, at *2 (N.D. Cal. Jan. 20, 2015) (citation omitted); see also Ultramercial, 772 F.3d at 715 (holding that "the concept. . . describes only the abstract idea of showing an advertisement before delivering free content" despite presence of other limitations); Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (characterizing abstract idea as "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" despite claim's recitation of specific limitations, such as a scanner).

The purpose of the Primary Claims and Claim 30 is to move a user's custom configuration settings from one computer to another computer. As explained more fully below, this "migration" was a fundamental and widely-utilized process that was performed manually at the time of the invention. Accordingly, the Court finds that both the Primary Claims and Claim 30 are directed at an abstract idea.

Tranxition argues that its invention is more specific than the "abstract idea of transferring settings," Pl. Resp. II at 8–9, but if one looks past the dense language in the patents, it is apparent that the patents describe in very generic and abstract terms the process of transferring settings between computers. See In re TLI Communications LLC Patent Litigation, 2015 WL 627858 at *6 (E.D. Va. Feb. 6, 2015) (explaining that "court must be careful to avoid allowing the typically convoluted language—'patent-ese'—to obfuscate the general purpose and real essence of software patent claims.").

Claim 1 of the '877 patent discloses a method for transferring settings between computers comprising the following steps:

11 – OPINION & ORDER

**providing configuration information** about configuration settings on the source computing system, the configuration information including a name and location of each configuration setting;

generating an extraction plan that **identifies configuration settings to be extracted** from the source computing system, the generating including **providing a list of configuration settings** known to the source computing system and including identifying active configuration settings out of the provided list of configuration settings to be extracted from the source computing system;

**extracting the active configuration settings** of the extraction plan from the source computing system, the extracted configuration settings being located using the provided configuration information;

generating a transition plan that **identifies configuration settings to be transferred** from the source computing system to the target computing system, the generating including providing active configuration settings of the extraction plan and including identifying from the active configuration settings of the extraction plan active configuration settings to be transferred from the source computing system to the target computing; and

for each active configuration setting of the transition plan,
    **retrieving the extracted configuration settings** identified as active configuration settings of the transition plan; and

    **transitioning[2] one or more of the retrieved configuration** settings from a format used on the source computing system to a format used on the target computing system.

'877 patent, col. 17, ll. 28–62 (emphasis added).

Contrary to Tranxition's assertions, there is nothing at all "specific" about claim 1. Despite its dense language, claim 1 is a sweeping general description of the migration process— it is devoid of any detail describing how Tranxition's claimed invention works. In plain terms, this claim describes the steps any user would take to perform the abstract idea of "migrating" settings between computers: identify where configuration settings are stored, build a list of

---

[2] At the <u>Markman</u> claim construction hearing, the Court construed "transitioning" as meaning "changing the arrangement of data." Transcript of <u>Markman</u> Hearing, ECF No. 166, at 43.

settings to transfer, fetch the settings from the old computer, and then manipulate the settings to match the format of the new computer. Claim 1 is the very essence of an "ordered combination of steps. . . having no particular concrete or tangible form." Ultramercial, 772 F.3d at 715 (finding the patent's claimed eleven-step process for "displaying an advertisement in exchange for access to copyrighted media" recited an abstract idea).

Tranxition argues that its claims "disclose a computer-based solution to a uniquely computer problem—the migration of a computer's complex personality from a source computer to a target computer," a concept that is "far from a naturally existing abstract concept employed on a general purpose machine[.]" Pl. Response II at 1. The Supreme Court, Federal Circuit, and many district courts have often relied on analogies to familiar "real-world" concepts to find that a software patent embraced an abstract idea. See Alice, 134 S. Ct. at 2356 (finding the patent at issue embraced the abstract idea of "using a third-party intermediary to mitigate settlement risk."); buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1355 (Fed. Cir. 2014) (holding that the creation of a third-party transaction guarantee was an abstract idea that was "beyond question of ancient lineage."); Ultramercial, 772 F.3d at 715 ("showing an advertisement before delivering free content."); DietGoal Innovations, Inc. v. Bravo Media LLC, 33 F. Supp. 3d 271 (S.D.N.Y. 2014) ("meal planning").

But there is no requirement that the idea be "directed to long-standing, pre-technology, conventional tasks," Pl. Resp. II at 11, before it can be found as "abstract" under step one of the Alice test. See Internet Patents Corp., 2015 WL 3852975 at *5 (Fed. Cir. June 23, 2015) (holding that the claimed "idea of retaining information in the navigation of online forms" was abstract); Smartflash LLC, 2015 WL 661174 at *8 (finding that "conditioning and controlling access to data based on payment [] is abstract and a fundamental building block of the economy in the

13 – OPINION & ORDER

digital age."); CalTech, 59 F. Supp. 3d 974, 977, 993 (C.D. Cal. 2014) (holding that the general

purpose of the "claims—encoding and decoding data for error correction—[was] abstract"

because the ideas existed before the patents and were well known in the field of binary coding

for modern electronic systems).

Much like the claims at issue in Internet Patents Corp., Smartflash, and CalTech, the

concept of migrating custom settings from an old computer to a new computer existed before

Tranxition's invention; the patents themselves admit as much. The "Background of the

Invention" section states that, at the time of the invention in 2004, consumers purchased

approximately 80,000,000 computers each year to replace old computers systems. See '877

patent, col. 1, ll. 27–30. "When a new computer system is used," the patents explain, "a user or a

user's agent typically has to re-configure the new computing system to include configuration

settings that were used on an old computer system. **All but the most rudimentary pieces of 'the**

**migration process' are done by hand. This requires many hours of hands-on time**[.]" '877

patent, col. 2, ll. 2–8. By necessary implication, a significant number of users were manually

migrating settings between an old computer and a new computer.[3] Tranxition's claimed

invention is directed at a practice that was well-known, conventional, and routine at the time of

the invention, and is therefore not directed to patent-eligible subject matter. Internet Patents

Corp., 2015 WL 3852975 at *5.

Tranxition argues that the migration process is not a manual one because the "many

hundreds of settings potentially captured and transferred *cannot*, as a practical matter, be

migrated manually." Pl. Resp. II at 2. Kelly Mackin, one of the inventors, also opined that "[i]t

---

[3] Furthermore, that passage suggests that at least some of the "rudimentary pieces" of the migration process were already being completed automatically, which is the primary claimed innovation disclosed in Tranxition's patents. Not only was manual migration well-known and widely practiced at the time of the invention, but arguably automatic migration was as well.

would be impossible in a practical sense to perform a migration of configuration settings to the same extent contemplated by the invention . . . ranging from, depending on the system, 700-10,000 or more settings." Mackin Declaration ("Decl."), ECF No. 238, at ¶ 13. It may be true that a human could not migrate ten thousand settings by hand, but the asserted claims do not require that level of complexity. Claim 1 of the '877 patent claims only "transitioning *one or more* of the retrieved configuration settings." '877 patent, col. 17, ll. 59–62 (emphasis added). The other independent claims similarly claim only "manipulating *at least one* of the extracted configuration settings," '766 patent, col. 17, ll. 66–67 (emphasis added), and "manipulating the (sic) *at least one* extracted program configuration setting." '766 patent, col. 21, ll. 3–4 (emphasis added).

There is no dispute that, prior to the patents, users were engaged in a manual migration process involving at least one configuration setting—as mentioned above, the background of the patents explains that at the time of the invention, "[a]ll but the most rudimentary pieces of 'the migration process' are done by hand." '877 patent, col. 2, ll. 6–8. Whatever complexity Tranxition and Ms. Mackin believes its patents may have envisioned, the patents plainly lay claim to a simple migration involving only one setting. See Planet Bingo, LLC v. VKGS LLC, 576 F. App'x 1005, 1008 (Fed. Cir. 2014) (rejecting argument that unclaimed complexity could impart patent eligibility: "At most, the claims require 'two sets of Bingo numbers,' 'a player,' and 'a manager.' . . . [T]he claims fall far short of capturing an invention that necessarily handles 'thousands, if not millions' of bingo numbers or players.").

Dependent Claim 2 of the '877 patent is also aimed at an abstract idea. It claims "[t]he method of claim 1 where the provided configuration information is stored in a personality object." At the Markman hearing, the Court construed "personality object" as

15 – OPINION & ORDER

an object-oriented programming object . . . which, one, is not directly associated
with an initialization file; and, two, is not a wizard or other programming module
capable of reading and writing settings containing; three, at least one object with
information about configuration settings; and, four, multiple transition rules for
locating configuration settings.

Transcript of Markman Hearing, ECF No. 166, at 44.

Collecting configuration setting into an "object-oriented programming object" is a

complicated way of describing the abstract idea of collecting computer-readable data into a

group. A "Personality object" is simply the name given to that particular collection of data.

Dependent claims 3 through 10 are different descriptions of the type of information that could be

included in this collection of data. E.g., '877 patent, col 18, ll. 65–67 ("The method of claim 2

wherein the personality object includes desktop, network, Internet, mail, and applications

configuration information."). Again, once one cuts through the "patent-ese," claims 2 and 3

through 10 describe the abstract idea of collecting and organizing generic data in a computer-

readable format. See Cyberfone Sys., LLC v. CNN Interactive Grp., Inc., 558 F. App'x 988, 992

(Fed. Cir. 2014) ("the well-known concept of categorical data storage, i.e., the idea of collecting

information in classified form, then separating and transmitting that information according to its

classification, is an abstract idea that is not patent-eligible."); CyberSource Corp. v. Retail

Decisions, Inc., 645 F.3d 1366, 1375 (Fed. Cir. 2011) (holding that the claimed process to

"manipulate data to organize it in a logical way" was not sufficiently transformative to state a

patent eligible invention).

Claim 11 describes the abstract process of a generic computer installation. '877 patent,

col. 18, ll. 23–27 ("The method of claim 1 including providing the transitioned configuration

settings to a target computing system for installation of the configuration settings on the target

computing system."). Claim 12 actually describes that nothing happens. '877 patent, col. 18, ll.

16 – OPINION & ORDER

28–31 ("The method of claim 11 wherein when an application is not installed on the target computing system, the configuration settings for that application are not installed on the target computing system."). Finally, claim 15 is a generic and abstract description of data and data organization. '877 patent, col. 18, ll. 38–41 ("The method of claim 1 wherein the extraction plan includes an inclusion list of configuration settings to be extracted."). All of these dependent claims recite abstract ideas with "no particular concrete or tangible form." <u>Ultramercial</u>, 772 F.3d at 715.

The other independent claims fare no better, and the Court finds they are directed at the same abstract ideas of claim 1 of the '877 patent. Claim 16 of the '877 patent re-hashes the identical abstract language of claim 1 for transitioning settings between computers, but adds the additional abstractions of an unspecified "user interface application," "an extraction application," and a "transition application." '877 patent, col. 18, ll. 42–67; col. 19, ll. 1–3. The dependent claims of claim 16, including claims 17–26 and 28–29, are identical to the claims dependent of claim 1 in all material respects and fail for the same reasons. Claim 1 of the '766 patent and its dependent claims describe essentially the same process of the claim 1 of the '877 patent with different generic verbs. '766 patent, col. 17, ll. 51–67; col. 18, ll. 1–9 (e.g. "displaying," "receiving," and "storing"). Finally, claim 42 of the '766 patent and its dependent claims describes the same abstract processes as claim 1 of the '877 patent and its dependent claims, as applied to the situation where the operating systems of the two computers are different.

Claim 30 of the '877 patent recites a "computer readable medium containing a data structure" comprised of "information for locating" the various configuration settings that a user might desire to migrate to a new computer system. '877 patent, col. 20, ll. 16–34 (e.g. "information for locating of user preference that affect the appearance and operation of a basic

windowed interface"). Whether read alone or in context, claim 30 is directed at the abstract idea of gathering and organizing data. See Cyberfone, 558 F. App'x at 992 ("the well-known concept of categorical data storage, *i.e.,* the idea of collecting information in classified form, then separating and transmitting that information according to its classification, is an abstract idea that is not patent-eligible.").

### b. Step Two of the Mayo/Alice Test

Having found that both the Primary Claims and Claim 30 are directed at abstract ideas, the analysis moves to Alice step two. The question here is whether the elements of each claim, either individually or as an ordered combination, state an "inventive concept" sufficient to "ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept." DDR Holdings, 773 F.3d at 1256 (citing Alice, 134 S. Ct. at 2355).

"To transform an unpatentable law of nature into a patent-eligible *application* of such a law, one must do more than simply state the law of nature while adding the words 'apply it.' " Mayo, 132 S. Ct. at 1294. Additional steps consisting of "well-understood, routine, conventional activity" will not save an otherwise patent ineligible claim. Id. at 1298. "Further, the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant postsolution activity." Intellectual Ventures II, 2015 WL 1941331 at *5 (quoting Bilski, 561 U.S. at 610–11). "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional feature' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.' " Alice, 134 S. Ct. at 2358 (quoting Mayo, 132 S. Ct. at 1297) (internal citation omitted).

The claims of the '877 and '766 patents, considered both individually and as an ordered combination, fail to state an additional feature that transforms the abstract idea of migrating settings from one computer to another into a patent-eligible invention.

To start, there is little more to claim 1 of the '877 patent than the abstract idea itself. Tranxition insists that claim 1 discloses both meaningful limitations and unconventional steps, but the Court disagrees. The steps described in claim 1 are nothing more than abstract descriptions of rudimentary computer operations that add "nothing of practical significance to the underlying abstract idea." Ultramercial, 772 F.3d at 716 (citing Cybersouce, 654 F.3d at 1370). For instance, "providing configuration information about configuration settings" is simply data gathering. Content Extraction, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions."). The step of "generating an extraction plan[4] that identifies configuration settings to be extracted from the source computing system" essentially describes making a list. The other claimed limitations such as "extracting," "retrieving," and "transitioning" similarly fail to state an inventive concept. See TLI Communications, 2015 WL 627858 at *12 (explaining that "extraction of . . . information amounts to manipulating data based on inputs from the user, which is yet another conventional computer task.") (citing DietGoal, 33 F. Supp. 3d at 287) (quotation marks omitted).

The primary problem with this claim is representative of the problem with all of the claims in Tranxition's patents at issue here: it is entirely devoid of any detail about how the invention works. Despite Tranxition's insistence that its patents disclose "specific application of concepts for migrating a computer's personality," Pl. Resp. II at 8, upon close examination, the

---

[4] At the Markman hearing, the Court construed "extraction plan" as "a plan for extracting configuration settings that includes a full list of identity units to be located and an exclusion list and an inclusion list." Transcript of Markman hearing, ECF No. 166, at 43.

19 – OPINION & ORDER

claims are comprised of little more than synonyms for generic conventional computer processing steps. Nowhere in Tranxition's patents is there an "additional feature[e] that provides any practical assurance" that the method and system it claims to have invented is anything "more than a drafting effort designed to monopolize the [abstract] idea itself." Alice, 134 S. Ct. at 2358 (citing Mayo, 132 S. Ct. at 1297) (internal quotation marks omitted). The claimed limitations are generic conventional computer processing steps stated at a high level of generality, and therefore do not state an inventive concept. Alice, 134 S. Ct. 2357 ("Simply appending conventional steps, specified at a high level of generality [is] not enough to supply an inventive concept.") (citations and quotation marks omitted).

Tranxition's oft-repeated argument that it invented a "computer solution to a computer problem" which is entitled to patent protection is unavailing. See, e.g., Pl. Resp. II at 2, 4, 9, 12–16. Tranxition relies heavily on DDR Holdings, a Federal Circuit case in which that court upheld as valid a patent that recited a method to retain website visitors who clicked on a third party advertisement. DDR Holdings, LLC v. Hotels.com, L.P.,773 F.3d 1245, 1258–59 (Fed. Cir. 2014). The patents described a process where a user clicked an advertisement, but rather than transporting immediately to the third-party's webpage, the primary site's web servers displayed a hybrid page that maintained the "look and feel" of the main website while simultaneously displaying information about the advertisement's subject. Id. 1257–58. The Federal Circuit found the claims did not "broadly and generically claim 'use of the Internet' to perform an abstract business practice[.]" Id. at 1258. Instead, the claims specified "how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." Id. The invention was patentable because it was "not merely the routine or conventional use of the Internet," but was

20 – OPINION & ORDER

instead "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." Id. at 1257, 1259.

First, the mere fact that Tranxition's patents claim to solve a computer technology problem does not automatically qualify its invention for patent eligibility under DDR Holdings. See id. at 1258 ("We caution, however, that not all claims purporting to address Internet-centric challenges are eligible for patent.").

Second, and more importantly, there is a key difference between Tranxition's claims to an automatic migration process and the claims in DDR Holdings. Tranxition's invention is not "necessarily rooted in computer technology" in the same sense as a server computer specially programmed to display a hybrid web page. True, the problem of transferring user settings from one computer to another did not arise until computers were invented. And true, Tranxition's invention necessarily requires a "source computing system" and a "targeting computing system." The nature of the process that Tranxition's invention claims, however, is a human one. As explained above, the patents themselves explain that migration is a manual process predating the invention:

> Another problem is that there is no easy way to transfer old configuration settings to a new computing system. **When a new computer system is used, a user or a user's agent typically has to re-configure the new computing system to include configuration settings that were used on an old computer system.** All but the most rudimentary pieces of "the migration process" are **done by hand. This requires many hours of hands-on time** with lost productivity and a "start from scratch" resignation.
>
> . . .
>
> Yet another problem is that configurations settings on an old computing system may be stored in a new location, in a new file, or in new format on a new computing system. **An old configuration setting may have to be translated or otherwise modified** to provide the same results on the target computing system. **Such translation and/or modifications are typically completed by hand and are prone to errors that lead to user frustration.**

21 – OPINION & ORDER

'877 patent, col. 2, ll. 1–9, 13–20. The patents then claim to perform the manual migration "automatically":

> It is . . . **desirable to provide an automatic migration** of configuration settings from an old computing system to a new computing system **without using a time consuming manual migration process**.

'877 patent, col. 2, ll. 38–44.

The activity at issue in <u>DDR Holdings</u>, by contrast, could only be performed by a computer. The process was "necessarily rooted in computer technology" because there is no manual process that could achieve the same result—there is no way for a person to display a hybrid website.

There is, however, a way for a human being to manually transfer settings from one computer to another. First, the user would locate the settings he or she wanted to transfer from the old computer. Next, he or she would "extract" those settings from the old computer, and then turn to the new computer and locate where the similar setting is stored there. Finally, the user would "transition" the old setting to the new system by applying it.

Of course, this is exactly the process described in Tranxition's patents, except Tranxition claims to perform the migration "automatically" with a computer. '877 patent, col. 2, ll. 38–44; col. 17, ll. 28–31. Stating a manual process and then claiming to "do it with a computer" is not an inventive concept that can confer patent eligibility. <u>Alice</u>, 134 S. Ct. at 2358 (holding that the addition of an "instruction to 'implemen[t]' an abstract idea 'on a computer' . . . cannot impart patent eligibility."); <u>see also</u> <u>DDR Holdings</u>, 773 F.3d at 1259 (explaining that the claims were patentable because "they do not broadly and generically claim 'use of the Internet' to perform" a long-standing practice).

Tranxition's patents explain that one of primary problems with the manual migration process is that it can take a long time. <u>E.g.</u> '877 patent, col. 1, ll. 58–61 ("The average user . . .

22 – OPINION & ORDER

• • • • •• • •• • •• • • • •• • •••• • • • •  • • • ••• •• ••••• ••• • •• • •• • •• • ••••• • • • •• • ••• •

may have to spend large amounts of time reading documentation or help screens to figure out where the configuration settings are stored"); '877 patent, col. 2, ll. 6–9 (performing the migration process "by hand . . . requires many hours of hands-on time with lost productivity"). The other problem is that the potential complexity of the migration could lead to errors. '877 patent, col. 2, ll. 18–20 ("Such translation and/or modifications are typically completed by hand and are prone to errors that lead to user frustration."); '877 patent, col. 2, ll. 28–31 ("a manual migration process . . . can decrease quality of service on the new computing system since one or more configuration settings may be missed . . . and not be transferred"). Thus, the patents explain, "[i]t is . . . desirable to provide an automatic migration of configuration settings . . . without using a time consuming manual migration process." '877 patent, col. 2, ll. 41–45.

    Using a generic computer to perform a manual task more efficiently and accurately than a human could is not a patentable idea, and courts have routinely invalidated patents asserting such claims. See, e.g., MySpace, Inc. v. GraphOn Corp., 672 F.3d 1250, 1267 (Fed. Cir. 2012) ("While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101."); E. Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc., No. 12-CV-517-LM, 2015 WL 226084, at *7 (D.N.H. Jan. 15, 2015) amended in part, No. 12-CV-517-LM, 2015 WL 925614 (D.N.H. Mar. 3, 2015) ("The lesson of Alice and . . . other cases . . . is that when the alleged innovation involves the use of a generic computer to do what such computers typically do, i.e., speed up a process by eliminating the need for human activity, that innovation is not an invention eligible for patent protection."); Tenon & Groove, LLC v. Plusgrade S.E.C., No. CV12-1118-GMS-SRF, 2015 WL 82531, at *5 (D. Del. Jan. 6, 2015) report and recommendation adopted, No. CV 12-1118-GMS-SRF, 2015 WL 1133213 (D.

23 – OPINION & ORDER

Del. Mar. 11, 2015) ("However, the specifications themselves reveal that the processes may be performed mentally by a human, expressly stating that the inventions "eliminate [ ] manual, time-consuming processes and replace [ ] those with an efficient, automatic process. . . . The Federal Circuit has stressed that merely using a computer to perform more efficiently what could otherwise be accomplished manually does not confer patent-eligibility.") (citing Bancorp Servs. LLC v. Sun Life Assur. Co. of Can., 687 F.3d 1266, 1279 (Fed. Cir. 2012) (additional citation and quotation marks omitted).

The claims dependent on claim 1 similarly fail to disclose an inventive concept. Claim 2 discloses "[t]he method of claim 1 where the provided configuration information is stored in a personality object." '877 patent, col. 17, ll 63–64. Claims 3 through 10 then disclose the types of data that could be stored in this "personality object," including user preferences, email settings, and application configuration information. '877 patent, col. 17, ll. 65–67; col. 18, ll. 1–23. These claims, when read together, disclose the creation a list of where configuration information can be found, and grouping that information as a collection of data (i.e., an "object") that the programmer can manipulate through software. These claims fail to state an inventive concept because they merely describe in generic and abstract terms how to perform the first steps in the manual migration process—locate user settings to transfer and collect that information for later use—on a computer. Alice, 134 S. Ct. at 2358 (the addition of an "instruction to 'implemen[t]' an abstract idea 'on a computer' . . . cannot impart patent eligibility."); CyberSource, 654 F.3d at 1370 (holding the claimed limitation was "mere collection and organization of data," and was not sufficient to confer patent eligibility).

The other claims dependent on claim 1 similarly do not provide an inventive concept. Claim 11 describes a generic installation; claim 12 actually describes a situation where no

24 – OPINION & ORDER

settings are transferred at all; claim 15 is another generic list of "configuration settings to be extracted." '877 patent, col. 18, ll. 23–41.

Independent claim 16 of the '877 patent discloses a "computer system" for implementing the method claim of claim 1. The language of claim 16 is nearly identical to the language in claim 1 and recites the same abstract ideas at a high level of generality (e.g. "extracting the active configuration settings," "transitions one or more of the retrieved settings"), except that claim 16 adds "a user interface application," "an extraction application," and a "transition application." '877 patent, col. 18, ll 42–67; col. 19, ll. 1–3. The disclosure of these generic applications does not add any meaningful, practical limitation to the abstract idea of performing an existing manual migration process on a computer. Alice, 134 S. Ct. at 2360 ("[T]he system claims are no different from the method claims in substance. The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea."). The claims dependent on claim 16 are identical in all material respects to the claims dependent on claim 1, and thus they fail to state an inventive concept for reasons previously explained.

Independent claim 30 of the '877 patent recites a "data structure" that contains "information for locating" the various configuration settings to be transferred. '877 patent, col. 20, ll. 16–34. This disclosed activity is, again, nothing more than data gathering and organization—a wholly conventional and widely-practiced computer function that does not add an inventive concept. E.g., Content Extraction, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").

Tranxition offered the declaration of Kelly Mackin in an effort to show an inventive concept. Ms. Mackin opined that the "Personality object . . . [was] one of the central inventive

25 – OPINION & ORDER

contributions that the '877 patent provides. It was unique when the invention was conceived to use a data structure and the elements in Claim 30 in combination to store and apply information about locating multiple, disparate, and non-uniform-in-format configuration settings." Mackin Declaration ("Decl."), ECF No. 251, at ¶ 9. She also claims that the "Personality object carries the critical responsibility of bridging know how (for locating the configuration settings) and the application's data engine (the automatic transition system)." Id. at ¶ 8. But there is nothing unique or inventive about using a "data structure" to organize a collection of information—that is what a computer does. As cited throughout this Opinion, courts have repeatedly rejected the idea that merely "organizing" or "manipulating" data on a computer is somehow inventive.

Ms. Mackin's assertion that the personality object "bridged" the gap between the information and the software is similarly unhelpful. Like the claims in the patents, it is a broadly sweeping abstract assertion devoid of any detail explaining how the claimed invention works. Her declaration is another iteration of the same idea: performing the previously-practiced manual migration of settings between computers more quickly and efficiently with a computer. That is not an inventive concept. MySpace, 672 F.3d at 1267 ("While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101.").

The independent and dependent claims of the '766 patent also fail to state an inventive concept. Claim 1 of the '766 patent is essentially the same as claim 1 of the '877 patent, except that the '766 patent uses slightly different verbiage, such as "*displaying* an indication of the configuration settings that can be extracted," "*receiving* a selection," "*manipulating* at least one of the extracted settings," and "*storing* the extracted configuration settings." '766 patent, col. 17, ll. 51–67; col. 18, ll. 1–9 (emphasis added). These are routine, conventional processing steps that

26 – OPINION & ORDER

any generic computer can perform, and are not, therefore, an inventive concept. See CyberSource, 654 F.3d at 1375 (claims that recited "mere manipulation or reorganization of data" were not sufficient to confer patent eligibility); TLI Communications, 2015 WL 627858 at *12 (holding that receiving, extracting, and storing data was conventional computer activity and not an inventive concept.). Dependent claims 2 and 3 disclose a generic installation, and dependent claims 5 through 11 simply describe different types of configuration data (e.g. "7. The method of claim 1 wherein the extracted configuration settings include browser bookmarks"), and those too fail to state an inventive concept. '766 patent, col. 18, ll. 8–14, 15–28, 36–37. Independent claim 42 describes the migration process using the same generic language as the other independent claims, but applies the migration to two computers with different operating systems; its dependent claims 43 and 44 simply describe different types of generic data. Again, the language in these claims is little more than an exercise in creatively re-naming conventional computer functions.

Tranxition points to an "exemplary embodiment" and other portions of Ms. Mackin's declaration to show more specific and concrete applications of the claimed invention. See Pl. Resp. II at 8–9, 22; Mackin Decl., at ¶ 10. But the analysis of patent eligibility under Section 101 must focus on the language of the claims themselves, not the additional detail set forth in the specification, or the inventor's testimony about the meaning of the patent claims. Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1334 (Fed. Cir. 2012) ("In considering patent eligibility under § 101, one must focus on the claims. This is because a claim may preempt only that which the claims encompass, not what is disclosed but left unclaimed."); Howmedica Osteonics Corp. v. Wright Medical Technology, Inc., 540 F.3d 1337, 1346–47 (Fed. Cir. 2008) (rejecting as irrelevant inventor testimony regarding the scope of the claim language).

Tranxition attempts to manufacture an inventive concept by characterizing the "source computing system" and "target computing system" described in its patents as "special purpose" computers programmed by its software to perform a specific function. Pl. Resp. II at 18–19 (citing In re Alappat, 33 F.3d 1526, 1545 (Fed. Cir. 1994)). There is nothing unique, innovative, or "special" about these computing systems. The "source" is the computer from which settings are taken, and the "target" is the computer to which those settings are applied. The systems themselves are passive in the process; they do not serve any particular purpose, much less a special one. The "source" and "target" systems are generic computers to which the abstract idea of migrating settings is applied, and that is not a patentable concept. See Alice, 134 S. Ct. at 2358 ("recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."). Moreover, if given effect, Tranxition's argument would essentially validate every software patent as a matter of course because all software requires computer implementation. See Intellectual Ventures II, 2015 WL 1941331, at *12 (rejecting same argument by patent-holder based on Alappat that "programming creates a new machine, because a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.").

### c. Preemption Concerns

There is an additional rationale that supports the Court's determination that Tranxition's patents are invalid. Underlying the threshold analysis of patentability under Section 101 is the need to protect the basic tools of discovery—natural phenomena, mental processes, and abstract ideas—from monopolization or preemption through patent. See Mayo, 132 S. Ct. at 1293–94, 1301; Alice, 134 S. Ct. at 2354 (stating that "the concern that drives" the exclusion of the "building blocks of human ingenuity" from patent eligibility is "one of preemption."); see also

Tenon & Groove, 2015 WL 1133213, at *4 (explaining that "[t]he focus on preemption goes hand-in-hand with the inventive concept requirement: they ensure that the patentee is not granted a disproportionate monopoly over the 'building blocks of human ingenuity.' ") (quoting Alice, 134 S. Ct. at 2354–55).

A patent over Tranxition's claimed process risks preempting the abstract idea of migrating settings from one computer to the other. The methods and processes described in Tranxition's patents are extraordinarily rudimentary and are stated at such a high level of generality that they threaten to foreclose any attempt to migrate settings between computers. As explained previously, the claimed invention only requires a *single* setting to be "transitioned" from the old computer to a new computer. In simple terms, Tranxition claims a patent over any method that locates configuration settings, makes a list of settings to change, and then applies one of those settings to the new system. The potential preemptive effect is sweeping.

Tranxition's claims that this is a "computer-only" problem does not alleviate the concern that the patent essentially seeks to foreclose innovation on an abstract idea in that particular field. Amdocs (Israel) Ltd. v. Openet Telecom, Inc., No. 1:10CV910 LMB/TRJ, 2014 WL 5430956, at *4 (E.D. Va. Oct. 24, 2014) ("The preemption concern must also be considered in light of the field to which the patent is directed. If the claimed abstract idea 'has no substantial practical application except in connection' with the particular field claimed, then allowing a claim to that idea, even if limited to a particular field, 'would wholly pre-empt' the idea and 'in practical effect would be a patent on the [idea] itself.' ") (quoting Gottschalk, 409 U.S. at 71–72).

Tranxition argues that its claimed invention does not present substantial preemption concerns because the claims "recite specific methods and systems to migrate a computer's personality from a source computer to a target computer." Pl. Resp. II at 33. However, as

29 – OPINION & ORDER

explained throughout this Opinion, the language in Tranxition's patents is not specific at all; it describes very basic computer functionality with generic, if somewhat complicated, terminology. The Court struggles to grasp what other process might be used to transfer settings from one computer to another, other than Tranxition's claimed method of identifying the available settings, choosing what settings to transfer, and then "transitioning" those settings to the other machine.

The potentially extensive preemptive scope of Tranxition's patents was demonstrated, at least in part, during the discovery process in this case. Not only did Tranxition seek information about Lenovo's products that were designed to perform the "migration" of settings between systems, but it also sought to discover information about Lenovo's "Rescue and Recovery" product. Pl. Mot. to Compel Discovery Regarding Lenovo's Infringing Product "Rescue and Recovery," ECF No. 248. Rescue and Recovery, Lenovo insisted, was designed as a "software tool used to back-up files from a computer hard disk so that they can be restored later if needed . . . . It is not designed to manipulate files from . . . a source computer to a . . . target computer." Def. Resp. to Pl. Mot. to Strike, ECF No. 257, at 21. Through an expert, Tranxition was able to demonstrate how a user could easily manipulate the Rescue and Recovery software program to migrate Internet browser application settings from one computer to another. Decl. of Ronen Levy, ECF No. 245, at 4–16. Although not designed for migration, it was clear that Rescue and Recovery could be used to migrate settings, and thus it might infringe Tranxition's patents.

The conclusion to draw is that the claims in Tranxition's patents not only threaten to preempt the "migration process" generally, but they are so broad that they could preempt the entire field of computer data backup and restore, at least insofar as the programs written to implement backup and restore are capable of taking settings from one computer and applying

30 – OPINION & ORDER

them to another. Without a sufficient "inventive concept" that limits Tranxition's patents to

something narrower than a claim to the abstract idea of migrating settings between computers,

Tranxition's '877 and '766 patents present substantial preemption concerns, and are, therefore,

invalid.

## ORDER

For the reasons stated, Lenovo's motion for partial summary judgment [229] and motion

for summary judgment [234] are granted. All other outstanding motions are denied as moot.

IT IS SO ORDERED.

Dated this _____ day of _____, 2015.

MARCO A. HERNÁNDEZ
United States District Judge

31 – OPINION & ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| TRANXITION, INC., a Delaware corporation | Case No. 3:12-cv-1065-HZ |
| Plaintiff, | **FINAL JUDGMENT** |
| v. | |
| LENOVO (UNITED STATES) INC., a Delaware corporation, | |
| Defendant. | |

In accordance with the Court's July 9, 2015 Order (Dkt. No. 294), granting Lenovo's motions for summary judgment of invalidity of U.S. Patent Nos. 6,728,877 (the "'877 patent") and 7,346,766 (the "'766 patent"), the Court hereby ORDERS, ADJUDGES, and DECREES that:

1.     FINAL JUDGMENT in accordance with the Court's July 28, 2015 Order (Dkt. No. 298), granting Lenovo's motion for entry of final judgment under Rule 54(b), is hereby entered in favor of Lenovo and against Tranxition on Lenovo's invalidity counterclaims (Dkt. No. 109 at Counts III & IV).

2.     Tranxition's claims for patent infringement (Dkt. No. 41 at Counts I & II) are hereby dismissed with prejudice.

3.     Lenovo's remaining counterclaims for non-infringement (Dkt. No. 109 at Counts I & II) and unenforceability of the '766 patent (Dkt. No. 109 at Count V) are hereby dismissed without prejudice.

IT IS SO ORDERED.


Dated this ⁀7 day of _August_, 2015.


_Marco Hernandez_
MARCO A. HERNANDEZ
United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TRANXITION, INC., a Delaware corporation,

          Plaintiff,

   v.

NOVELL, INC., a Delaware corporation,

          Defendant.

No. 3:12-cv-01404-HZ

OPINION & ORDER

Arthur S. Beeman
Joel T. Muchmore
Arent Fox LLP
55 2nd Street, 21st Floor
San Francisco, CA 94105

Dayna Jean Christian
Immix Law Group
121 SW Salmon Street
Suite 1000
Portland, OR 97204

     Attorneys for Plaintiff

1 - OPINION & ORDER

Daniel P. Larsen
Ater Wynne, LLP
1331 NW Lovejoy Street, Suite 900
Portland, OR 97209-3280

Jared J. Braithwaite
L. Rex Sears
Maschoff Brennan
201 South Main Street, Suite 600
Salt Lake City, UT 84111

Sterling A. Brennan
Maschoff Brennan
20 Pacifica, Suite 1130
Irvine, CA 92618

      Attorneys for Defendant


HERNÁNDEZ, District Judge:

      Plaintiff Tranxition, Inc. owns U.S. Patent Nos. 6,728,877 (the "'877 patent") and

7,346,766 (the "'766 patent"). The claims generally recite a software method for transferring

customized user settings from an old computer to a new computer. Tranxition filed the present

infringement action against Defendant Novell, Inc. and a separate action based on the same

patents against Lenovo (United States) Inc. that was also before this Court. Tranxition, Inc. v.

Lenovo (U.S.) Inc., No. 3:12–cv–1065–HZ. The parties in the Novell case agreed to allow the

merits of the Lenovo case proceed first.

      On July 9, 2015, the Court issued an Opinion & Order in the Lenovo case granting

summary judgment in favor of Defendant Lenovo and declaring the '877 and '766 patents

invalid under Section 101 of the Patent Act. Tranxition, Inc. v. Lenovo (U.S.) Inc., No. 3:12-CV-

01065-HZ, 2015 WL 4203469, at *19 (D. Or. July 9, 2015) (hereinafter "Lenovo Summary


2 - OPINION & ORDER

Judgment"). Currently before the Court is Novell's motion to adopt the invalidity opinion from the <u>Lenovo</u> case in this case and to enter judgment in favor of Novell.

The Court declared in <u>Lenovo</u> Summary Judgment that Tranxition's '877 patent and '766 patent were invalid under Section 101 of the Patent Act. 35 U.S.C. § 101. "[T]he Court finds that Tranxition's patents are aimed at a patent-ineligible abstract idea. Neither of the patent's claims, whether read singly or in combination, state an inventive concept sufficient to satisfy the Supreme Court's test for patentability of an abstract idea under Section 101 of the Patent Act." 2015 WL 4203469, at *1. Moreover, the Court found that the claims in Tranxition's patents were stated at a such a high level of generality that "[w]ithout a sufficient 'inventive concept' that limits Tranxition's patents to something narrower than a claim to the abstract idea of migrating settings between computers, Tranxition's '877 and '766 patents present substantial preemption concerns." <u>Id.</u> at *19. Accordingly, the Court declared Tranxition's '877 and '766 patents invalid. <u>Id.</u> at *1, 19.

The Court entered final judgment in favor of Lenovo and against Tranxition on Lenovo's counterclaims for invalidity, dismissed Tranxition's claims for patent infringement with prejudice, and dismissed without prejudice Lenovo's counterclaims for non-infringement and unenforceability. <u>Lenovo</u>, No. 3:12-cv-01065-HZ, Dkt. No. 303.

Now that the <u>Lenovo</u> Summary Judgment has become a final judgment, it carries issue-preclusive effect against Tranxition in this case. <u>Mendenhall v. Barber-Greene Co.</u>, 26 F.3d 1573, 1576 (Fed. Cir. 1994), <u>as corrected on reh'g</u> (Sept. 14, 1994) ("collateral estoppel . . . arises from the final judgment of invalidity . . . entered in a suit against a third party"). The patents upon which Tranxition's claims against Novell in this case are the same patents that the Court declared invalid in the <u>Lenovo</u> case. Since the Court has already ruled that those patents

3 - OPINION & ORDER

are invalid, there is no need to rule separately in this case on the issue of invalidity, or on

Novell's counterclaims against Tranxition seeking declarations of non-infringement of the '877

and '766 patents. Def. Answer and Counterclaims, ECF No. 56, at 5–6. Accordingly, the Court

takes judicial notice of the final judgment entered in <u>Tranxition, Inc. v. Lenovo (U.S.) Inc.</u>, No.

3:12–cv–1065–HZ, and finds that Tranxition is collaterally estopped from pursuing the claims in

its complaint against Novell, and that judgment should be entered in Novell's favor. <u>Cygnus

Telecommunications Tech., LLC v. Am. Int'l Telephonics, LLC</u>, 569 F. Supp. 2d 1035, 1038

(N.D. Cal. 2008) (granting defendant's motion to dismiss based on collateral estoppel after the

Court's ruled in a separate case that the patents at issue in both cases were invalid).

## CONCLUSION

Novell's motion [141] to adopt the invalidity opinion entered in related Case No. 3:12-

cv-1065-HZ, dismiss certain counter claims, and to enter final judgment is granted. All other

outstanding motions are denied as moot.

IT IS SO ORDERED.

Dated this ___19___ day of _____August_____, 2015.

MARCO A. HERNÁNDEZ
United States District Judge

4 - OPINION & ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TRANXITION, INC., a Delaware corporation,

    Plaintiff,

    v.

NOVELL, INC., a Delaware corporation

    Defendant.

No. 3:12-cv-01404-HZ

JUDGMENT

HERNÁNDEZ, District Judge:

    Based on the record, it is ORDERED AND ADJUDGED that:

1.  FINAL JUDGMENT is hereby entered in favor of Novell and against Tranxition on Novell's counterclaims for invalidity (Dkt. No. 56, Third and Fourth Claims for Relief).

2.  Tranxition's claims for patent infringement (Dkt. 21, Count I and Count II) are hereby dismissed with prejudice.

//

//

1 – JUDGMENT

JA0038

3.  Novell's remaining counterclaims for non-infringement (Dkt. No. 56, First and

Second Claims for Relief) are hereby dismissed without prejudice.

DATED this _____ day of _____, 2015.

MARCO A. HERNANDEZ
United States District Judge

2 – JUDGMENT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TRANXITION, INC.,

                Plaintiff,

   v.

LENOVO (UNITED STATES) INC.,

                Defendant.

No. 3:12-cv-01065-HZ

OPINION & ORDER

Dayna Jean Christian
Immix Law Group
121 SW Salmon St., Ste. 1000
Portland, OR 97204

Paul H. Beattie
Rimon, P.C.
7920 SE Steller Way
Snoqualmie, WA 98065-9004

      Attorneys for Plaintiff

Todd E. Landis
Eric J. Klein
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Ave., Ste. 4100
Dallas, TX 75201

1 - OPINION & ORDER

Marwan Elrakabawy
Fred I. Williams
Akin Gump Strauss Hauer & Feld LLP
600 Congress Ave., Ste. 1350
Austin, TX 78701

Kenneth L. Walhood
Blunck & Walhood LLC
2350 Willamette Falls Dr.
West Linn, OR 97068

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Plaintiff Tranxition, Inc. brings this patent infringement action against Defendant Lenovo

(United States), Inc., alleging infringement of its United States Patent Nos. 6,728,877 ('877

patent) and 7,346,766 ('766 patent), both of which are titled "Method and System for

Automatically Transitioning of Configuration Settings Among Computer Systems." Defendant

owns United States Patent No. 6,182,212 ('212 patent), titled "Method and System for

Automated Migration of User Settings to a Replacement Computer System." Defendant Lenovo

counterclaimed that Plaintiff Tranxition infringes its '212 patent.

     Plaintiff filed a motion for order construing terms [138] in the '877 and '766 patents; and

Defendant filed a motion for order construing terms [136] in the '212 patent. A two-day hearing

was held on August 26–27, 2014. At the conclusion of oral argument, the court resolved the

dispute as to all but two of the contested terms or phrases, which were taken under advisement:

(1) "format" in the '877 and '766 patents and (2) "adapter" in the '212 patent. On October 15,

2014, the parties submitted written expert testimony for the term "adapter."

     On Nov. 24, 2014, Defendant filed an unopposed motion to dismiss its counterclaim for

infringement of the '212 patent. The court granted the motion. Nov. 24, 2014 Order [194].

Because of the dismissal of the counterclaim, there is no need to construe the term "adapter"

2 - OPINION & ORDER

from the '212 patent. For the sole remaining term, the court construes "format" to mean "a specific arrangement of data." Therefore, Plaintiff's motion for order construing claims [138] is granted in part and denied in part, and Defendant's motion for order construing claims [136] is denied as moot.

## BACKGROUND

The '877 and '766 patents share a history. The '766 patent is a continuation of the patent application that later became the '877 patent. The two patents share the same title, abstract, and specification. In general, the invention is a method and system for transferring configuration settings, a computer's "personality," from an old computer system to a replacement computer system. The abstract describes the invention as follows:

> A method and system for automatically transitioning configuration settings among computer systems. Multiple configuration settings comprising a computer "personality" are located on a source computing system using multiple transition rules from a personality object. The computer personality includes customization choices, data files, electronic mail, system preferences, application customization choices, the network environment, browser information, etc. The configuration settings are extracted from multiple locations on the source computing system. The multiple extracted configuration settings are stored in a pre-determined transition format. The multiple extracted configuration settings are manipulated. A transition package is created from the multiple manipulated configuration settings. The transition package includes the multiple manipulated configuration settings. The transition package is sent to a target computing system. The transition package is infused on the target computing system to automatically transition configuration settings from the source computing system to the target computing system. The method and system may vastly reduce transition, configuration and deployment times for service providers, corporations, and end-users when a new computing system is deployed.

Compl. Ex. A ('877 patent) at 1, Ex. B ('766 patent) at 1. Plaintiff asserts that Defendant infringes at least claims 1 and 16 of the '877 patent. Compl. ¶¶ 8, 15. Claims 1 and 16 are shown below.

3 - OPINION & ORDER

**1.** A method in a computer system for preparing configuration settings for transfer from a source computing system to a target computing system, the method comprising:

      providing configuration information about configuration settings on the source computing system, the configuration information including a name and location of each configuration setting;

      generating an extraction plan that identifies configuration settings to be extracted from the source computing system, the generating including providing a list of configuration settings known to the source computing system and including identifying active configuration settings out of the provided list of configuration settings to be extracted from the source computing system;

      extracting the active configuration settings of the extraction plan from the source computing system, the extracted configuration settings being located using the provided configuration information;

      generating a transition plan that identifies configuration settings to be transferred from the source computing system to the target computing system, the generating including providing active configuration settings of the extraction plan and including identifying from the active configuration settings of the extraction plan active configuration settings to be transferred from the source computing system to the target computing; and

      for each active configuration setting of the transition plan,
            retrieving the extracted configuration settings identified as active configuration settings of the transition plan; and

            transitioning one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system.

'877 patent, 17:29–62.

**16.** A computer system for preparing configuration settings for transfer from a source computing system to a target computing system, comprising:

      configuration information about configuration settings on the source computing system, the configuration information including a name and location of each configuration setting;

      a user interface application for generating an extraction plan that identifies configuration settings to be extracted from the source computing system and a transition plan that identifies configuration settings to be transferred

4 - OPINION & ORDER

from the source computing system to the target computing system, the extraction plan identifying active configuration settings to be extracted from the source computing system, the transition plan identifying active configuration settings of the extraction plan to be transferred from the source computing system to the target computing;

an extraction application for extracting the active configuration settings of the extraction plan from the source computing system, the extracted configuration settings being located using the provided configuration information; and

an transition application that retrieves the extracted configuration settings identified as active configuration settings of the transition plan and transitions one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system.

Id. at 18:42–19:3.

Plaintiff also asserts that Defendant infringes at least claim 1 of the '766 patent, as stated

below.

**1**. A method for preparing configuration settings of a source computing system for transitioning for use by a target computing system, the method comprising:

providing information about configuration settings of the source computing system, the information identifying locations of configuration settings;

displaying an indication of the configuration settings that can be extracted from the source computing system;

receiving a selection of configuration settings to be extracted from the source computing system for use by the target computing system;

extracting the selected configuration settings from the locations of the source computing system indicated by the information;

manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format used on the target computing system; and

storing the extracted configuration settings and the at least one manipulated configuration settings on a storage device], wherein the

5 - OPINION & ORDER

> stored configuration settings can be used by the target computing system
> to control its operation.

'766 patent, 17:51–18:8.

## CLAIM CONSTRUCTION STANDARDS

I.      General Rules

"[T]he construction of a patent, including terms of art within its claim, is exclusively

within the province of the court." Markman v. Westview Instruments, Inc., 517 U.S. 370, 372

(1996). Claims are construed independently and not simply as a choice between the parties'

proposed constructions. Exxon Chem. Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1555 (Fed.

Cir. 1995). "[C]laims should be so construed, if possible, as to sustain their validity." ACS

Hosp. Sys., Inc. v. Montefiore Hosp., 732 F.2d 1572, 1577 (Fed. Cir. 1984) (citations omitted).

The claim language specifies "'the subject matter which the applicant regards as his invention.'"

Markman, 517 U.S. at 373 (citing and quoting 35 U.S.C. § 112).

To construe a patent claim, courts look to the language of the claims in the patent itself,

the description in the patent's specification, and the prosecution history of the patent, all of

which constitute a record "on which the public is entitled to rely." Vitronics Corp. v.

Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996); see also Dow Chem. Co. v. Sumitomo

Chem. Co., 257 F.3d 1364, 1372 (Fed. Cir. 2001). Claim language is given its "ordinary and

accustomed meaning as understood by one of ordinary skill in the art." Dow Chem. Co., 257

F.3d at 1372 (citation omitted). Courts cannot rewrite claims, but must "give effect to the terms

chosen by the patentee." K–2 Corp. v. Solomon S.A., 191 F.3d 1356, 1364 (Fed. Cir. 1999)

(citation omitted). In most cases, the court should be able to resolve ambiguous claim terms by

only analyzing the intrinsic evidence. See Phillips v. AWH Corp., 415 F.3d 1303, 1313–14 (Fed.

Cir. 2005) (en banc).

6 - OPINION & ORDER

II.     Claim Language

"The actual words of the claim are the controlling focus." Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998). The starting point for claim construction is a disputed term's ordinary meaning. Phillips, 415 F.3d at 1313. Ordinary meaning, in the patent claim construction context, is the meaning that a person of ordinary skill in the art would attribute to a claim term in the context of the entire patent at the time of the invention, i.e., as of the effective filing date of the patent application. ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1374 (Fed. Cir. 2009).

There is a "heavy presumption" that a claim term carries its "ordinary and customary meaning," and any party seeking to convince a court that a term has some other meaning "must, at the very least," point to statements in the written description that "affect the patent's scope." Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999) (quotation marks omitted). This may be accomplished if: (1) "a different meaning is clearly and deliberately set forth in the intrinsic materials" of the patent or (2) use of "the ordinary and accustomed meaning…would deprive the claim of clarity…." K–2 Corp., 191 F.3d at 1363. In making this assessment, the court should use common sense and "the understanding of those of ordinary skill in the art" of the patent at issue, unless the patent history supplies another meaning. Id. at 1365; Digital Biometrics, 149 F.3d at 1344.

"An accused infringer may overcome this 'heavy presumption' and narrow a claim term's ordinary meaning, but he cannot do so simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002). As clarified by the Federal Circuit:

> [A] court may constrict the ordinary meaning of a claim term in at least one of
> four ways. First, the claim term will not receive its ordinary meaning if the

7 - OPINION & ORDER

patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history.  Second, a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention.

Third,…a claim term also will not have its ordinary meaning if the term chosen by the patentee so deprive[s] the claim of clarity as to require resort to the other intrinsic evidence for a definite meaning.  Last, as a matter of statutory authority, a claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto, if the patentee phrased the claim in step- or means-plus-function format.

Id. at 1366–67 (quotation marks omitted).

III.    The Patent's Specification

"[C]laims are always construed in light of the specification, of which they are a part."

Netword LLC v. Centraal Corp., 242 F.3d 1347, 1352 (Fed. Cir. 2001).  "That claims are

interpreted in light of the specification does not mean that everything expressed in the

specification must be read into all the claims."  SRI Int'l v. Matsushita Elec. Corp. of Am., 775

F.2d 1107, 1121 (Fed. Cir. 1985) (quotations omitted).  It is improper to import, or "read in" to a

claim, a limitation from the specification's general discussion, embodiments, and examples.

E.g., Enercon GmbH v. Int'l Trade Comm'n, 151 F.3d 1376, 1384 (Fed. Cir. 1998); Intel Corp.

v. United States Int'l Trade Comm'n, 946 F.2d 821, 836 (Fed. Cir. 1991) (holding that "[w]here

a specification does not require a limitation, that limitation should not be read from the

specification into the claims."); Constant v. Advanced Micro–Devices, Inc., 848 F.2d 1560, 1571

(Fed. Cir. 1988) (finding that "[a]lthough the specification may aid the court in interpreting the

meaning of disputed language in the claims, particular embodiments and examples appearing in

the specification will not generally be read into the claims.").

Still, "[c]laims are not interpreted in a vacuum." Slimfold Mfg. Co. v. Kinkead Indus.,
Inc., 810 F.2d 1113, 1116 (Fed. Cir. 1987). "[T]he specification is always highly relevant to the
claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of
a disputed term." Vitronics, 90 F.3d at 1582. Thus, it is improper to eliminate, ignore, or "read
out" a claim limitation in order to extend a patent to subject matter disclosed, but not claimed.
See, e.g., Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp., 93 F.3d 1572, 1582–83 (Fed. Cir.
1996).

Claims may not "enlarge what is patented beyond what the inventor has described as the
invention." Netword, LLC, 242 F.3d at 1352. For example, when the patent specification
describes the invention as including a feature, the claims should be construed to require that
feature. See, e.g., Watts v. XL Sys., Inc., 232 F.3d 877, 883 (Fed. Cir. 2000). Similarly, when
the specification criticizes or disclaims certain features in the prior art, the claims should not be
read to encompass the criticized features. SciMed Life Sys., Inc. v. Advanced Cardiovascular
Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001) (finding that the criticism of one type of
"lumen" in patent excluded that type from construction of the claim term).

Finally, claims should not be limited to the preferred embodiment. CVI/Beta Ventures,
Inc. v. Tura LP, 112 F.3d 1146, 1158 (Fed. Cir. 1997); see also Amhil Enter., Ltd. v. Wawa, Inc.,
81 F.3d 1554, 1559 (Fed. Cir. 1996) (holding that "[a] preferred embodiment…is just that, and
the scope of a patentee's claims is not necessarily or automatically limited to the preferred
embodiment").

"[T]he distinction between using the specification to interpret the meaning of a claim and
importing limitations from the specification into the claim can be a difficult one to apply in
practice." Phillips, 415 F.3d at 1323. "[T]here is sometimes a fine line between reading a claim

9 - OPINION & ORDER

in light of the specification, and reading a limitation into the claim from the specification."

Decisioning.com, Inc. v. Federated Dep't Stores, Inc., 527 F.3d 1300, 1307-08 (Fed. Cir. 2008)

(quotation marks omitted).  "[A]ttempting to resolve that problem in the context of the particular

patent is likely to capture the scope of the actual invention more accurately than either strictly

limiting the scope of the claims to the embodiments disclosed in the specification or divorcing

the claim language from the specification."  Id. at 1308.  There is therefore "no magic formula or

catechism for conducting claim construction," and the court must "read the specification in light

of its purposes in order to determine whether the patentee is setting out specific examples of the

invention to accomplish those goals, or whether the patentee instead intends for the claims and

the embodiments in the specification to be strictly coextensive."  Id. (quotation marks omitted).

In walking this "tightrope," Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1373

(Fed. Cir. 2007), the court hews to the question of "how a person of ordinary skill in the art

would understand the claim terms."  Phillips, 415 F.3d at 1323.

IV.    Prosecution History

Prosecution history of a patent with the United States Patent and Trademark Office

(USPTO) "limits the interpretation of claims so as to exclude any interpretation that may have

been disclaimed or disavowed during prosecution in order to obtain claim allowance."  Jonsson

v. Stanley Works, 903 F.2d 812, 817 (Fed. Cir. 1990) (quotation marks omitted).  The

prosecution "history contains the complete record of all the proceedings before the Patent and

Trademark Office, including any express representations made by the applicant regarding the

scope of the claims.  As such, the record before the Patent and Trademark Office is often of

critical significance in determining the meaning of the claims."  Vitronics, 90 F.3d at 1582–83.

Any statements or actions made in the prosecution history by the patentee characterizing what

the claimed invention includes or excludes provide notice to the public as to the scope of the claims and therefore are binding on the construction of the claims. See, e.g., Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc., 222 F.3d 951, 957 (Fed. Cir. 2000) (allowing patentee to erase actions in the prosecution history would be "inimical to the public notice function provided by the prosecution history.").

V.      Extrinsic Evidence

        Consideration of intrinsic evidence will resolve any claim term ambiguity in most circumstances. See Phillips, 415 F.3d at 1313–14. Where it does not, however, the court may consider certain "extrinsic evidence." See id. at 1317. Expert testimony, for example, may provide helpful background on the technology at issue, explain how an invention works, or establish that a claim term has a particular meaning in the relevant field. See id. at 1319. Dictionaries and treatises may also be helpful in this regard. Id. at 1318. However, precedent counsels against reliance on dictionary definitions at the expense of the specification because such reliance "focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." Id. at 1321; see also Nystrom v. Trex Co., 424 F.3d 1136, 1145 (Fed. Cir. 2005).

        In the end, the court's ultimate goal is to construe the disputed terms in a manner consistent with the way the inventor defined them and a person of ordinary skill in the art would understand them. j2 Global Commc'ns Inc. v. Captaris Inc., No. CV 09–04150 DDP (AJWx), 2011 WL 837923, at *2 (C.D. Cal. Mar. 4, 2011). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Phillips, 415 F.3d at 1316 (quotation marks omitted).

/ / /

11 - OPINION & ORDER

DISCUSSION

I.    Oral Argument Rulings

The following terms were construed for the '877 and '766 patents after the completion of the parties' oral argument.

| '877 and '766 PATENTS | |
|---|---|
| **Term** | **Ruling** |
| configuration settings | settings added and/or customized, but not including default settings |
| extraction plan | a plan for extracting configuration settings that includes a full list of identity units to be located, an exclusion list, and an inclusion list |
| (transitioning or transitions) one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system | (changing or changes) the arrangement of data of one or more retrieved configuration settings from a format used on the source computing system to a format used on the target computing system |
| value | data stored in a variable or constant that is distinct from location, name, and format |
| personality | collection of configuration settings |
| personality object | an object oriented programming object, which (1) is not directly associated with an initialization file and (2) is not a wizard or other programming module capable of reading and writing settings, containing (3) at least one object with information about configuration settings and (4) multiple transition rules for locating configuration settings |
| transition plan | a plan that identifies configuration settings to be transferred |
| means for providing the transitioned configuration settings to a target computing system for installation of the configuration settings on the target computing system | Functionality:  providing the transitioned configuration settings to a target computing system for installation of the configuration settings on the target computing system<br><br>Agreed Structure:  floppy disk, zip disk, CD-ROM, email, TCP/IP, FTP, or other network transfer mechanisms, and the equivalents thereof |

JA0051

| '877 and '766 PATENTS | |
| --- | --- |
| **Term** | **Ruling** |
| manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format used on the target computing system | changing at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, name, value, and format used on the target computing system |

In addition, the parties had previously agreed that the following terms would be given their plain and ordinary meaning: "providing," "application," "installation application," "information for locating," and "storing the extracted configuration settings and the at least one manipulated configuration settings on a storage device."

II.    "Format"

Plaintiff argues that "format" should be construed as "specific arrangement of data." Second Am. Joint Proposed Claim Constr. [135] at 4.  Initially, Defendant argued that the term was indefinite and not amenable to construction.  Id.  However at oral argument, Defendant withdrew its indefiniteness argument.  Defendant proposes that the term be construed as "the specific arrangement of data that is distinct from name, location, and value."  Id. at 4–5.

The court agrees with the parties that "format" involves the "specific arrangement of data."  The specification is replete with references to "format" as data that can be stored in multiple ways.  '877 patent, 3:20–28; 4:35–38; 7:18–22; 8:3–8; 13:14–25.  The remaining issue is whether "format" needs to be "distinct from name, location, and value."

Plaintiff and Defendant reference various pieces of evidence to support their arguments. Plaintiff points out that the specification discusses "format" in a broad sense, and that it is not distinguished from "name," "location," or "value."  Defendant directs the court to the claim

13 - OPINION & ORDER

language of the '766 patent in which "format" is claimed separately from "name," "location,"

and "value" and the prosecution history of the '766 patent to support its argument.

Of the independent claims in the '766 patent, only claims 1 and 16 use "format" and

"name," "location," and "value" together in the manipulation step. '766 patent, 17:66–18:3

(claim 1); 18:65–19:4 (claim 16). In the '766 patent, claim 1 involves the step of "manipulating

at least one of the extracted configuration settings from *a location, a name, a value, and a*

*format*" and claim 16 provides that "at least one of the extracted configuration settings is

manipulated from *a source location, a source name, a source value, and a source format*[.]" Id.

(emphasis added). Unlike the '766 patent, independent claims 1 and 16 of the '877 patent

describe transitioning only the "format" of the configuration setting. '877 patent, 17:59–62

(claim 1); 18:65–19:3 (claim 16). There is no mention of transitioning the location, name, or

value of the configuration settings in the '877 patent claims.

During the prosecution of the '766 patent, Defendant argues that the inventor

distinguished "format" from "name," "location," and "value" to obtain the patent. Def.'s Resp.

5. The USPTO had rejected claim 37 of the patent application (claim 1 of the '766 patent) in

light of "Hunter," a prior art reference. Klein Decl. Ex. B (May 1, 2007 Office Action) at 7–8.

To overcome the rejection in light of Hunter, the inventor amended claim 37 by adding the

underlined language:

> manipulating at least one of the extracted configuration settings from <u>a location, a name, a value, and</u> a format used on the source computing system to <u>a location, a name, a value, and</u> a format used on the target computing system…

Id. at 2. The inventor explained to the USPTO that Hunter did not "teach or suggest

manipulating…configuration settings." Id. at 14–15. The inventor argued that Hunter's use of

"tokens" is not the same as "manipulating the format" of the configuration setting. Klein Decl.

14 - OPINION & ORDER

Ex. C (Oct. 30, 2007 Request for Continued Examination) at 14.  As an example, in Hunter, the location of a configuration setting corresponds to a particular "path" identified by the token.  Id. The inventor argued that Hunter's use of tokens "corresponds to mapping a setting from a location on the first computer to a location on the second computer," which does not manipulate "the format of a setting."  Id. at 14–15.  In light of this last statement, Defendant argues that the inventor distinguished "format" from "location," i.e., that changing the "format" of a setting is different from changing the "location" of the setting.  Def.'s Resp. 6.  Defendant makes a similar argument that a change in the "name," i.e., the "path," of a configuration setting is not the same as changing the "format."  Id. at 5.  The inventor had argued to the USPTO that "the path [i.e., 'name'] of a setting does not correspond to the setting's format."  Klein Decl. Ex. C at 14.

There is no evidence that during the prosecution of the '877 patent, the inventor argued that changing the "format" is not the same as changing the "location" of a configuration setting. In other words, it appears that while "format" was used broadly in the '877 patent claims, "format" was used in a narrower sense in the '766 claims.

In light of the difference in claim language and prosecution histories in the '877 and '766 patents and the prosecution history of the '766 patent, the court declines to impose the limitation that the data is "distinct from name, location, and value."  Therefore, "format" is construed to mean "a specific arrangement of data."

/ / /

/ / /

/ / /

/ / /

/ / /

15 - OPINION & ORDER

CONCLUSION

Based on the foregoing, Plaintiff's motion for order construing claims [138] is granted in

part and denied in part.  The terms are construed as stated on the record and in this opinion and

order.  Defendant's motion for order construing claims [136] is denied as moot because the

counterclaim for infringement of the '212 patent has been dismissed.


IT IS SO ORDERED.


Dated this ⁀ day of December, 2014.


                                        _Marco Hernández_
                                        MARCO A. HERNÁNDEZ
                                        United States District Judge


16 - OPINION & ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TRANXITION, INC.,

                    Plaintiff,

        v.

NOVELL, INC.,

                    Defendant.

No. 3:12-cv-01404-HZ

OPINION & ORDER

Dayna Jean Christian
Immix Law Group
121 SW Salmon St., Ste. 1000
Portland, OR 97204

Paul H. Beattie
Rimon, P.C.
7920 SE Steller Way
Snoqualmie, WA 98065-9004

        Attorneys for Plaintiff

Daniel P. Larsen
Ater Wynne, LLP
1331 NW Lovejoy St., Ste. 900
Portland, OR 97209-2785

1 - OPINION & ORDER

Jared J. Braithwaite
L. Rex Sears
Maschoff Brennan
201 South Main St., Ste. 600
Salt Lake City, UT 84111

Sterling A. Brennan
Maschoff Brennan
20 Pacifica, Ste. 1130
Irvine, CA 92618

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Plaintiff Tranxition, Inc. brings this patent infringement action against Defendant Novell

Inc., alleging infringement of its United States Patent Nos. 6,728,877 ('877 patent) and

7,346,766 ('766 patent), both of which are titled "Method and System for Automatically

Transitioning of Configuration Settings Among Computer Systems."  Plaintiff filed a motion for

an order construing terms [72] in the '877 and '766 patents.  A two-day hearing was held on

August 26-27, 2014.  At the conclusion of oral argument, I resolved the dispute as to all but one

of the contested terms or phrases, "format," which I took under advisement.  I find that "format"

is not indefinite and construe the term to mean "a specific arrangement of data."

BACKGROUND

     The '877 and '766 patents share a history.  The '766 patent is a continuation of the patent

application that later became the '877 patent.  The two patents share the same title, abstract, and

specification.  In general, the invention is a method and system for transferring configuration

settings, a computer's "personality," from an old computer system to a replacement computer

system.  The abstract describes the invention as follows:

> A method and system for automatically transitioning configuration settings
> among computer systems.  Multiple configuration settings comprising a computer
> "personality" are located on a source computing system using multiple transition

2 - OPINION & ORDER

rules from a personality object. The computer personality includes customization choices, data files, electronic mail, system preferences, application customization choices, the network environment, browser information, etc. The configuration settings are extracted from multiple locations on the source computing system. The multiple extracted configuration settings are stored in a pre-determined transition format. The multiple extracted configuration settings are manipulated. A transition package is created from the multiple manipulated configuration settings. The transition package includes the multiple manipulated configuration settings. The transition package is sent to a target computing system. The transition package is infused on the target computing system to automatically transition configuration settings from the source computing system to the target computing system. The method and system may vastly reduce transition, configuration and deployment times for service providers, corporations, and end-users when a new computing system is deployed.

Compl. Ex. A ('877 patent) at 1, Ex. B ('766 patent) at 1. Plaintiff asserts that Defendant infringes at least claims 1 and 16 of the '877 patent. Am. Compl. ¶¶ 8, 15. Claims 1 and 16 are shown below.

**1.** A method in a computer system for preparing configuration settings for transfer from a source computing system to a target computing system, the method comprising:

providing configuration information about configuration settings on the source computing system, the configuration information including a name and location of each configuration setting;

generating an extraction plan that identifies configuration settings to be extracted from the source computing system, the generating including providing a list of configuration settings known to the source computing system and including identifying active configuration settings out of the provided list of configuration settings to be extracted from the source computing system;

extracting the active configuration settings of the extraction plan from the source computing system, the extracted configuration settings being located using the provided configuration information;

generating a transition plan that identifies configuration settings to be transferred from the source computing system to the target computing system, the generating including providing active configuration settings of the extraction plan and including identifying from the active configuration settings of the extraction plan active configuration settings to be transferred from the source computing system to the target computing; and

3 - OPINION & ORDER

for each active configuration setting of the transition plan,
retrieving the extracted configuration settings identified as active
configuration settings of the transition plan; and

transitioning one or more of the retrieved configuration settings
from a format used on the source computing system to a format
used on the target computing system.

'877 patent, 17:29-62.

16. A computer system for preparing configuration settings for transfer from a
source computing system to a target computing system, comprising:

configuration information about configuration settings on the source
computing system, the configuration information including a name and
location of each configuration setting;

a user interface application for generating an extraction plan that identifies
configuration settings to be extracted from the source computing system
and a transition plan that identifies configuration settings to be transferred
from the source computing system to the target computing system, the
extraction plan identifying active configuration settings to be extracted
from the source computing system, the transition plan identifying active
configuration settings of the extraction plan to be transferred from the
source computing system to the target computing;

an extraction application for extracting the active configuration settings of
the extraction plan from the source computing system, the extracted
configuration settings being located using the provided configuration
information; and

an transition application that retrieves the extracted configuration settings
identified as active configuration settings of the transition plan and
transitions one or more of the retrieved configuration settings from a
format used on the source computing system to a format used on the target
computing system.

Id. at 18:42-19:3.

Plaintiff also asserts that Defendant infringes at least claim 1 of the '766 patent, as stated

below.

1. A method for preparing configuration settings of a source computing system
for transitioning for use by a target computing system, the method comprising:

4 - OPINION & ORDER

providing information about configuration settings of the source computing system, the information identifying locations of configuration settings;

displaying an indication of the configuration settings that can be extracted from the source computing system;

receiving a selection of configuration settings to be extracted from the source computing system for use by the target computing system;

extracting the selected configuration settings from the locations of the source computing system indicated by the information;

manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format used on the target computing system; and

storing the extracted configuration settings and the at least one manipulated configuration settings on a storage device], wherein the stored configuration settings can be used by the target computing system to control its operation.

'766 patent, 17:51-18:8.

## CLAIM CONSTRUCTION STANDARDS

### I.    General Rules

"[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court." Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996). Claims are construed independently and not simply as a choice between the parties' proposed constructions. Exxon Chem. Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1555 (Fed. Cir. 1995). "[C]laims should be so construed, if possible, as to sustain their validity." ACS Hosp. Sys., Inc. v. Montefiore Hosp., 732 F.2d 1572, 1577 (Fed. Cir. 1984) (citations omitted). The claim language specifies "'the subject matter which the applicant regards as his invention.'" Markman, 517 U.S. at 373 (citing and quoting 35 U.S.C. § 112).

5 - OPINION & ORDER

To construe a patent claim, courts look to the language of the claims in the patent itself, the description in the patent's specification, and the prosecution history of the patent, all of which constitute a record "on which the public is entitled to rely." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996); see also Dow Chem. Co. v. Sumitomo Chem. Co., 257 F.3d 1364, 1372 (Fed. Cir. 2001). Claim language is given its "ordinary and accustomed meaning as understood by one of ordinary skill in the art." Dow Chem. Co., 257 F.3d at 1372 (citation omitted). Courts cannot rewrite claims, but must "give effect to the terms chosen by the patentee." K–2 Corp. v. Solomon S.A., 191 F.3d 1356, 1364 (Fed. Cir. 1999) (citation omitted). In most cases, the court should be able to resolve ambiguous claim terms by analyzing only the intrinsic evidence. See Phillips v. AWH Corp., 415 F.3d 1303, 1313-14 (Fed. Cir. 2005) (en banc).

II.     Claim Language

"The actual words of the claim are the controlling focus." Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998). The starting point for claim construction is a disputed term's ordinary meaning. Phillips, 415 F.3d at 1313. Ordinary meaning, in the patent claim construction context, is the meaning that a person of ordinary skill in the art would attribute to a claim term in the context of the entire patent at the time of the invention, i.e., as of the effective filing date of the patent application. ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1374 (Fed. Cir. 2009).

There is a "heavy presumption" that a claim term carries its "ordinary and customary meaning," and any party seeking to convince a court that a term has some other meaning "must, at the very least," point to statements in the written description that "affect the patent's scope." Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999) (quotation

marks omitted).  This may be accomplished if:  (1) "a different meaning is clearly and deliberately set forth in the intrinsic materials" of the patent or (2) use of "the ordinary and accustomed meaning…would deprive the claim of clarity…."  K–2 Corp., 191 F.3d at 1363.  In making this assessment, the court should use common sense and "the understanding of those of ordinary skill in the art" of the patent at issue, unless the patent history supplies another meaning. Id. at 1365; Digital Biometrics, 149 F.3d at 1344.

"An accused infringer may overcome this 'heavy presumption' and narrow a claim term's ordinary meaning, but he cannot do so simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002).  As clarified by the Federal Circuit:

> [A] court may constrict the ordinary meaning of a claim term in at least one of four ways.  First, the claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history.  Second, a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention.
>
> Third,…a claim term also will not have its ordinary meaning if the term chosen by the patentee so deprive[s] the claim of clarity as to require resort to the other intrinsic evidence for a definite meaning.  Last, as a matter of statutory authority, a claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto, if the patentee phrased the claim in step- or means-plus-function format.

Id. at 1366–67 (quotation marks omitted).

III.     The Patent's Specification

"[C]laims are always construed in light of the specification, of which they are a part." Netword LLC v. Centraal Corp., 242 F.3d 1347, 1352 (Fed. Cir. 2001).  "That claims are interpreted in light of the specification does not mean that everything expressed in the

7 - OPINION & ORDER

specification must be read into all the claims." SRI Int'l v. Matsushita Elec. Corp. of Am., 775

F.2d 1107, 1121 (Fed. Cir. 1985) (quotations omitted). It is improper to import, or "read in" to a

claim, a limitation from the specification's general discussion, embodiments, and examples.

E.g., Enercon GmbH v. Int'l Trade Comm'n, 151 F.3d 1376, 1384 (Fed. Cir. 1998); Intel Corp.

v. United States Int'l Trade Comm'n, 946 F.2d 821, 836 (Fed. Cir. 1991) (holding that "[w]here

a specification does not require a limitation, that limitation should not be read from the

specification into the claims."); Constant v. Advanced Micro–Devices, Inc., 848 F.2d 1560, 1571

(Fed. Cir. 1988) (finding that "[a]lthough the specification may aid the court in interpreting the

meaning of disputed language in the claims, particular embodiments and examples appearing in

the specification will not generally be read into the claims.").

Still, "[c]laims are not interpreted in a vacuum." Slimfold Mfg. Co. v. Kinkead Indus.,

Inc., 810 F.2d 1113, 1116 (Fed. Cir. 1987). "[T]he specification is always highly relevant to the

claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of

a disputed term." Vitronics, 90 F.3d at 1582. Thus, it is improper to eliminate, ignore, or "read

out" a claim limitation in order to extend a patent to subject matter disclosed, but not claimed.

See, e.g., Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp., 93 F.3d 1572, 1582–83 (Fed. Cir.

1996).

Claims may not "enlarge what is patented beyond what the inventor has described as the

invention." Netword, LLC, 242 F.3d at 1352. For example, when the patent specification

describes the invention as including a feature, the claims should be construed to require that

feature. See, e.g., Watts v. XL Sys., Inc., 232 F.3d 877, 883 (Fed. Cir. 2000). Similarly, when

the specification criticizes or disclaims certain features in the prior art, the claims should not be

read to encompass the criticized features. SciMed Life Sys., Inc. v. Advanced Cardiovascular

8 - OPINION & ORDER

Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001) (finding that the criticism of one type of "lumen" in patent excluded that type from construction of the claim term).

Finally, claims should not be limited to the preferred embodiment. CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1158 (Fed. Cir. 1997); see also Amhil Enter., Ltd. v. Wawa, Inc., 81 F.3d 1554, 1559 (Fed. Cir. 1996) (holding that "[a] preferred embodiment…is just that, and the scope of a patentee's claims is not necessarily or automatically limited to the preferred embodiment").

"[T]he distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." Phillips, 415 F.3d at 1323. "[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." Decisioning.com, Inc. v. Federated Dep't Stores, Inc., 527 F.3d 1300, 1307-08 (Fed. Cir. 2008) (quotation marks omitted). "[A]ttempting to resolve that problem in the context of the particular patent is likely to capture the scope of the actual invention more accurately than either strictly limiting the scope of the claims to the embodiments disclosed in the specification or divorcing the claim language from the specification." Id. at 1308. There is therefore "no magic formula or catechism for conducting claim construction," and the court must "read the specification in light of its purposes in order to determine whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." Id. (quotation marks omitted). In walking this "tightrope," Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1373 (Fed. Cir. 2007), the court hews to the question of "how a person of ordinary skill in the art would understand the claim terms." Phillips, 415 F.3d at 1323.

9 - OPINION & ORDER

IV.    Prosecution History

Prosecution history of a patent with the United States Patent and Trademark Office (USPTO) "limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." Jonsson v. Stanley Works, 903 F.2d 812, 817 (Fed. Cir. 1990) (quotation marks omitted). The prosecution "history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims." Vitronics, 90 F.3d at 1582–83. Any statements or actions made in the prosecution history by the patentee characterizing what the claimed invention includes or excludes provide notice to the public as to the scope of the claims and therefore are binding on the construction of the claims. See, e.g., Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc., 222 F.3d 951, 957 (Fed. Cir. 2000) (allowing patentee to erase actions in the prosecution history would be "inimical to the public notice function provided by the prosecution history.").

V.    Extrinsic Evidence

Consideration of intrinsic evidence will resolve any claim term ambiguity in most circumstances. See Phillips, 415 F.3d at 1313-14. Where it does not, however, the court may consider certain "extrinsic evidence." See id. at 1317. Expert testimony, for example, may provide helpful background on the technology at issue, explain how an invention works, or establish that a claim term has a particular meaning in the relevant field. See id. at 1319. Dictionaries and treatises may also be helpful in this regard. Id. at 1318. However, precedent counsels against reliance on dictionary definitions at the expense of the specification because

10 - OPINION & ORDER

such reliance "focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." Id. at 1321; see also Nystrom v. Trex Co., 424 F.3d 1136, 1145 (Fed. Cir. 2005).

In the end, the court's ultimate goal is to construe the disputed terms in a manner consistent with the way the inventor defined them and a person of ordinary skill in the art would understand them. j2 Global Comme'ns Inc. v. Captaris Inc., No. CV 09–04150 DDP (AJWx), 2011 WL 837923, at *2 (C.D. Cal. Mar. 4, 2011). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Phillips, 415 F.3d at 1316 (quotation marks omitted).

## DISCUSSION

I.    Oral Argument Rulings

The following terms were construed for the '877 and '766 patents after the completion of oral argument.

| Term | Ruling |
|---|---|
| configuration settings | settings added and/or customized, but not including default settings |
| extraction plan | a plan for extracting configuration settings that includes a full list of identity units to be located, an exclusion list, and an inclusion list |
| (transitioning or transitions) one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system | (changing or changes) the arrangement of data of one or more retrieved configuration settings from a format used on the source computing system to a format used on the target computing system |
| value | data stored in a variable or constant that is distinct from location, name, and format |
| personality | collection of configuration settings |

11 - OPINION & ORDER

| Term | Ruling |
|---|---|
| personality object | an object oriented programming object, which (1) is not directly associated with an initialization file and (2) is not a wizard or other programming module capable of reading and writing settings, containing (3) at least one object with information about configuration settings and (4) multiple transition rules for locating configuration settings |
| inclusion list | a user-selectable list of configuration settings for transfer |
| transition plan | a plan that identifies configuration settings to be transferred |
| active configuration settings | configuration settings selected from an inclusion list |
| means for providing the transitioned configuration settings to a target computing system for installation of the configuration settings on the target computing system | Functionality:  providing the transitioned configuration settings to a target computing system for installation of the configuration settings on the target computing system<br><br>Agreed Structure:  floppy disk, zip disk, CD-ROM, email, TCP/IP, FTP, or other network transfer mechanisms, and the equivalents thereof |
| stored configuration settings.[1] | '766 patent claims 1-15, 42-46:  extracted configuration settings and at least one manipulated configuration setting<br><br>'766 patent claims 37-41:  extracted configuration settings, calculated configuration settings, and at least one manipulated configuration setting |
| manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format used on the target computing system | changing at least one of the extracted configuration settings from a location, a name, a value, and a format used on the source computing system to a location, name, value, and format used on the target computing system |

In addition, the parties had previously agreed that the following terms would be given their plain and ordinary meaning:  "providing," "application," "installation application," "information for locating," and "storing the extracted configuration settings and the at least one manipulated configuration settings on a storage device."

---

[1] The parties had disputed the definition of this term, but at the hearing, Plaintiff agreed to Defendant's proposed definition.

II.        Construction of "Format"

Plaintiff argues that "format" should be construed as "specific arrangement of data."

Joint Proposed Claim Constr. [65] at 7.  Defendant argues that the term is indefinite and not

amenable to construction.  Id.  Alternatively, Defendant proposes that the term be construed as

"the specific arrangement of data that is distinct from name, location, and value."  Id.

A.        Indefiniteness

I first address the indefiniteness argument.  A patent must contain claims "particularly

pointing out and distinctly claiming the subject matter which the inventor or a joint inventor

regards as the invention."  35 U.S.C. § 112(b).  "Because claims delineate the patentee's right to

exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform

the public of the bounds of the protected invention, i.e., what subject matter is covered by the

exclusive rights of the patent."  Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1249

(Fed. Cir. 2008).

Indefiniteness under § 112(b) is a legal issue for the court to resolve.  Biosig Instruments,

Inc. v. Nautilus, Inc., 715 F.3d 891, 897 (Fed. Cir. 2013).  Claims are not indefinite when

"viewed in light of the specification and prosecution history, [they] inform those skilled in the art

about the scope of the invention with reasonable certainty.  The definiteness requirement, so

understood, mandates clarity, while recognizing that absolute precision is unattainable."

Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2129 (2014).  The mere "reduction of

the meaning of a claim into words is not dispositive of whether the term is definite."  Star

Scientific, Inc. v. R.J. Reynolds Tobacco Co. ("Star Scientific I"), 537 F.3d 1357, 1371 (Fed.

Cir. 2008) (citations omitted).  But "[a]bsolute clarity is not required to find a claim term

definite."  Star Scientific, Inc. v. R.J. Reynolds Tobacco Co. ("Star Scientific II"), 655 F.3d

13 - OPINION & ORDER

1364, 1373 (Fed. Cir. 2011). "[C]lose questions of indefiniteness in litigation involving issued

patents are properly resolved in favor of the patentee." Exxon Research & Eng'g Co. v. United

States, 265 F.3d 1371, 1380 (Fed. Cir. 2001).

General principles of claim construction are applicable to determining "whether allegedly

indefinite claim language is subject to construction." Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306,

1319 (Fed. Cir. 2008). Thus, the court may consider intrinsic evidence consisting of the claim

terms, the specification, and the prosecution history. Enzo Biochem, Inc. v. Applera Corp., 599

F.3d 1325, 1332-33 (Fed. Cir. 2010). The court may also consider extrinsic evidence when

necessary to resolve disputes of indefiniteness. Exxon Research, 265 F.3d at 1376.

Defendant argues that "format" is indefinite because Plaintiff used the term

inconsistently. Def.'s Resp. 10. On the one hand, Defendant points out that the specification

describes transitioning configuration settings from a format used on the source computing system

to a format used on the target computing system. '766 patent, 13:31-34. Two examples of such

transitioning are explained in specification.

> The manipulation at Step **54** also includes *transitioning one or more*
> *configuration settings from a format used on the source computing system to a*
> *format used on the target computing system.* For example, a configuration setting
> for a computer monitor may be stored with the name configmonitor-old on the
> source computer system. However, on the target computer system, the same
> configuration setting may be stored with a name configmonitor-new. *In addition,*
> *a configuration setting may be stored in a first directory-A on the source system,*
> *and in a second directory-B, on the target system.*

Id. at 13:34-41 (emphasis added). Defendant focuses on the second example, where the

configuration setting is stored in a different directory on the target computing system, and argues

that "format" encompasses changing the location of the configuration setting. Def.'s Resp. 10.

On the other hand, Defendant argues that during the prosecution of the '766 patent,

Plaintiff took the opposite position—that "format" does not encompass location. Id. The

14 - OPINION & ORDER

USPTO had rejected claim 37 of the patent application (claim 1 of the '766 patent) in light of

"Hunter," a prior art reference.  Sears Decl. Ex. D (Feb. 5, 2007 Resp.) at 13.  In relevant part,

claim 37 of the patent application originally stated:

> manipulating at least one of the extracted configuration settings from a format
> used on the source computing system to a format used on the target computing
> system…

Id. at 2.  To overcome the rejection in light of Hunter, Plaintiff amended claim 37 by adding the

underlined language:

> manipulating at least one of the extracted configuration settings from <u>a location, a
> name, a value, and</u> a format used on the source computing system to <u>a location, a
> name, a value, and</u> a format used on the target computing system…

Id. at 2.  Plaintiff explained to the USPTO that Hunter did not "teach or suggest

manipulating…configuration settings."  Id. at 14.  Plaintiff further argued that Hunter's use of

"tokens" is not the same as "manipulating the format" of the configuration setting.  Id.  As an

example, in Hunter, the location of a configuration setting corresponds to a particular "path"

identified by the token.  Id.  Plaintiff argued that having different paths on the source and target

computing settings is not the same as manipulating the configuration setting because "the path of

a setting does not correspond to the setting's format."  Id.  In light of this last statement,

Defendant argues that Plaintiff distinguished "format" from "location," i.e., that changing the

"format" of a setting is different from changing the "location" of the setting.  Def.'s Resp. 10.

In response to Defendant's indefiniteness argument, Plaintiff concedes that "format" and

"location" are not the same, and cannot be because the terms are claimed separately in the claims

of the '766 patent.  Pl.'s Reply 7.  But Plaintiff disputes that the specification equates "format"

with "location," arguing that the specification deals with "format, naming conventions, and

locations" separately.  Id.

15 - OPINION & ORDER

Notably, of the independent claims in the '766 patent, only claims 1 and 16 use "format" and "location" together in the manipulation step. '766 patent, 17:66-18:3 (claim 1); 18:65-19:4 (claim 16). In the '766 patent, claim 1 involves the step of "manipulating at least one of the extracted configuration settings from *a location, a name, a value, and a format*" and claim 16 provides that "at least one of the extracted configuration settings is manipulated from *a source location, a source name, a source value, and a source format*[.]" Id. (emphasis added). Unlike the '766 patent, independent claims 1 and 16 of the '877 patent describe transitioning only the "format" of the configuration setting. '877 patent, 17:59-62 (claim 1); 18:65-19:3 (claim 16). There is no mention of transitioning the location, name, or value of the configuration settings in the '877 patent claims.

The other basis for Defendant's indefiniteness argument is the '766 prosecution history. But there is no evidence that during the prosecution of the '877 patent, Plaintiff argued that changing the "format" is not the same as changing the "location" of a configuration setting. In other words, it appears that while Plaintiff used "format" broadly in the '877 patent claims, Plaintiff may have used "format" in a narrower sense in the '766 claims.

In light of the difference in claim language in the '877 and '766 patents and the prosecution history of the '766 patent, I find that the term "format" is not indefinite. At this juncture, I decline to rule whether a particular claim is indefinite. Indefiniteness of a claim is most appropriately addressed at summary judgment, not at the claim construction stage. Computer Stores Northwest, Inc. v. Dunwell Tech, Inc., No. CV-10-284-HZ, 2011 U.S. Dist. LEXIS 58660, at *107-108 (D. Or. May 31, 2011).

/ / /

/ / /

16 - OPINION & ORDER

B.    Proposed Definitions of "Format"

Plaintiff proposes that "format" should be construed as "specific arrangement of data";

and in the alternative to its indefiniteness argument, Defendant proposes that the term be

construed as "the specific arrangement of data that is distinct from name, location, and value." I

agree with the parties that "format" involves the "specific arrangement of data." The

specification is replete with references to "format" as data that can be stored in multiple ways.

'877 patent, 3:20-28; 4:35-38; 7:18-22; 8:3-8; 13:14-25. However, for reasons discussed in the

indefiniteness analysis, I decline to impose the limitation that the data is "distinct from name,

location, and value." Therefore, I construe "format" to mean "a specific arrangement of data."

CONCLUSION

Based on the foregoing, Plaintiff's motion for order construing claims [72] is granted in

part and denied in part. The terms are construed as stated on the record and in this opinion and

order.

IT IS SO ORDERED.

Dated this _____ day of October, 2014.

MARCO A. HERNÁNDEZ
United States District Judge

17 - OPINION & ORDER



US006728877B2

(12) **United States Patent**  (10) **Patent No.:** **US 6,728,877 B2**
Mackin et al.  (45) **Date of Patent:** **Apr. 27, 2004**

(54) **METHOD AND SYSTEM FOR AUTOMATICALLY TRANSITIONING OF CONFIGURATION SETTINGS AMONG COMPUTER SYSTEMS**

(75) Inventors: **Kenneth J. Mackin**, Beaverton, OR (US); **Gordon A. Rielly**, Chesterville (CA); **Mark C. Chweh**, Beaverton, OR (US)

(73) Assignee: **Tranxition Corporation**, Beaverton, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/319,437**

(22) Filed: **Dec. 13, 2002**

(65) **Prior Publication Data**

US 2003/0159028 A1 Aug. 21, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 09/300,862, filed on Apr. 28, 1999, now abandoned.

(51) Int. Cl.7 ............................................. **G06F 15/177**
(52) U.S. Cl. ............................................ **713/100**; 713/1
(58) Field of Search ................................ 713/1, 2, 100; 717/168, 174

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,758,071 A    5/1998    Burgess et al.

| | | | | |
|---|---|---|---|---|
| 6,066,182 A | * | 5/2000 | Wilde et al. | ................ 717/175 |
| 6,110,229 A | | 8/2000 | Yamaguchi | |
| 6,161,176 A | | 12/2000 | Hunter et al. | |
| 6,182,212 B1 | | 1/2001 | Atkins et al. | |
| 6,292,889 B1 | * | 9/2001 | Fitzgerald et al. | ............. 713/1 |

* cited by examiner

*Primary Examiner*—Dennis M. Butler
(74) *Attorney, Agent, or Firm*—Perkins Coie LLP

(57) **ABSTRACT**

A method and system for automatically transitioning configuration settings among computer systems. Multiple configuration settings comprising a computer "personality" are located on a source computing system using multiple transition rules from a personality object. The computer personality includes customization choices, data files, electronic mail, system preferences, application customization choices, the network environment, browser information, etc. The configuration settings are extracted from multiple locations on the source computing system. The multiple extracted configuration settings are stored in a pre-determined transition format. The multiple extracted configuration settings are manipulated. A transition package is created from the multiple manipulated configuration settings. The transition package includes the multiple manipulated configuration settings. The transition package is sent to a target computing system. The transition package is infused on the target computing system to automatically transition configuration settings from the source computing system to the target computing system. The method and system may vastly reduce transition, configuration and deployment times for service providers, corporations, and end-users when a new computing system is deployed.

**30 Claims, 8 Drawing Sheets**



U.S. Patent        Apr. 27, 2004        Sheet 1 of 8        US 6,728,877 B2

## FIG. 1



Exhibit A
Page 2 of 20

# FIG. 2

28



LAYERED
TRANSITION
ARCHITECTURE

**U.S. Patent**    Apr. 27, 2004    Sheet 3 of 8    US 6,728,877 B2

# FIG. 3



46

START

LOCATE MULTIPLE CONFIGURATION SETTINGS ON A SOURCE COMPUTING SYSTEM USING MULTIPLE TRANSITION RULES FROM A PERSONALITY OBJECT

48

EXTRACT THE MULTIPLE CONFIGURATION SETTINGS FROM MULTIPLE LOCATIONS ON THE SOURCE COMPUTING SYSTEM

50

STORE THE EXTRACTED MULTIPLE CONFIGURATION SETTINGS IN A PRE-DETERMINED FORMAT

52

MANIPULATE THE MULTIPLE CONFIGURATION SETTINGS ON THE SOURCE COMPUTING SYSTEM

54

PREPARE A TRANSITION PACKAGE FROM THE MANIPULATED CONFIGURATION SETTINGS ON THE SOURCE COMPUTING SYSTEM

56

END

**U.S. Patent**    Apr. 27, 2004    Sheet 4 of 8    **US 6,728,877 B2**

# FIG. 4

58



PERSONALITY OBJECT

DESKTOP OBJECT

60

NETWORK OBJECT

62

INTERNET OBJECT

64

MAIL OBJECT

66

APPLICATIONS OBJECT

68

Exhibit A
Page 5 of 20

# FIG. 5



70

START

RECEIVE A TRANSITION PACKAGE ON A TARGET COMPUTING SYSTEM, WHERE THE TRANSITION PACKAGE INCLUDES CONFIGURATION SETTINGS TO TRANSITION FROM THE SOURCE COMPUTING SYSTEM TO THE TARGET COMPUTING SYSTEM    72

INFUSE THE TRANSITION PACKAGE ON THE TARGET COMPUTING SYSTEM TO TRANSITION CONFIGURATION SETTINGS ON THE TARGET COMPUTING SYSTEM    74

OPTIONALLY VERIFY THE INJECTION OF THE TRANSITION PACKAGE ON THE TARGET COMPUTING SYSTEM    76

END

**Exhibit A**
**Page 6 of 20**

U.S. Patent        Apr. 27, 2004        Sheet 6 of 8        US 6,728,877 B2

# FIG. 6A



78

START

CREATE AN EXTRACTION PLAN AND A TRANSITION PLAN
WITH A USER INTERFACE APPLICATION

80

LOCATE MULTIPLE CONFIGURATION SETTINGS WITH AN
EXTRACTION APPLICATION ON A SOURCE COMPUTING
SYSTEM USING MULTIPLE TRANSITION RULES FROM A
PERSONALITY OBJECT

82

EXTRACT THE MULTIPLE CONFIGURATION SETTINGS FROM
MULTIPLE LOCATIONS ON THE SOURCE COMPUTING
SYSTEM WITH THE EXTRACTION APPLICATION USING THE
EXTRACTION PLAN

84

STORE THE EXTRACTED MULTIPLE CONFIGURATION
SETTINGS IN A PREDETERMINED FORMAT ON THE SOURCE
COMPUTING SYSTEM

86

MANIPULATE THE MULTIPLE CONFIGURATION SETTINGS
WITH A PREPARATION APPLICATION USING THE
TRANSITION PLAN

88

PREPARE A TRANSITION PACKAGE FROM THE
MANIPULATED CONFIGURATION SETTINGS WITH THE
PREPARATION APPLICATION ON THE SOURCE COMPUTING
SYSTEM

90

TO A
FIG. 6B

Exhibit A
Page 7 of 20

U.S. Patent        Apr. 27, 2004        Sheet 7 of 8        US 6,728,877 B2

# FIG. 6B



A

PREPARE AN INJECTION APPLICATION INCLUDING THE TRANSITION PACKAGE WITH THE PREPARATION APPLICATION — 92

SEND THE INJECTION APPLICATION FROM THE SOURCE COMPUTING SYSTEM TO THE TARGET COMPUTING SYSTEM — 94

RECEIVE THE INJECTION APPLICATION ON THE TARGET COMPUTING SYSTEM FROM THE SOURCE COMPUTING SYSTEM — 96

INFUSE THE TRANSITION PACKAGE ON THE TARGET COMPUTING SYSTEM USING THE INJECTION APPLICATION TO TRANSITION CONFIGURATION SETTINGS ON THE TARGET COMPUTING SYSTEM — 98

OPTIONALLY VERIFY THE INFUSION OF THE CONFIGURATION SETTINGS ON TARGET COMPUTING SYSTEM WITH THE INJECTION APPLICATION — 100

END

Exhibit A
Page 8 of 20

## FIG. 7



US 6,728,877 B2

# METHOD AND SYSTEM FOR AUTOMATICALLY TRANSITIONING OF CONFIGURATION SETTINGS AMONG COMPUTER SYSTEMS

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 09/300,862 entitled "METHOD AND SYSTEM FOR AUTOMATICALLY TRANSITIONING OF CONFIGURATION SETTINGS AMONG COMPUTER SYSTEMS," filed on Apr. 28, 1999, now abandoned which application is hereby incorporated by reference in its entirety.

## FIELD OF THE INVENTION

The present invention relates to configuration of computers. More specifically, it relates to a method and system for automatic transitioning of configuration settings among computer systems.

## BACKGROUND OF THE INVENTION

In today's world, where technology changes very quickly, it is very common to replace an old computer system every few years with a new computing system. It has been estimated that approximately 90,000,000 personal computers are sold each year, with approximately 90% of the sales comprising new computing systems to replace old computing systems. The new computing systems typically include more memory, larger hard-disks, faster central processing units, better quality monitors, updated versions of operating systems, new software applications and other improved features.

Any old computer system typically includes a large number of configuration settings that have been added and/or customized by a user or a network manager. The configuration settings may include Internet settings, modem or other network settings, dial-up phone numbers, a desktop "look and feel," file system folders settings, application settings, folder names and locations, macros and editing options, custom dictionaries, electronic mail ("e-mail") address books, inboxes, passwords, subscriptions, certificates and other configurations or setting customized by a user or a network manager, or other configuration parameters used over time such as cookies, etc.

There are several problems associated with making a transition from an old computing system to a new computing system. First, there is currently no easy way to determine what configuration settings a user or a network administrator may have customized, since there is no one central location where such configuration files are stored. Operating systems and other hardware and software applications typically have unique directories and unique file names to store configuration files and settings. These unique directories and configuration files can exist virtually anywhere on an old computer system. Trying to collect configuration settings is a difficult task. The average user or network administrator may have to spend large amounts of time reading documentation or help screens to figure out where the configuration files are stored for any given application.

Another problem is that there is no easy way to collect and store heterogeneous configuration settings when they are located. The operating system and applications typically use unique data layouts and data storage features that do not allow for homogenous collection and storage.

Another problem is that there is no easy way to transfer old configuration settings to a new computing system. When a new computer system is used, a user or a user's agent typically has to re-configure the new computing system to include configuration settings that were used on an old computer system. All but the most rudimentary pieces of "the migration process" are done by hand. This requires many hours of hands-on time, with lost productivity and a "start from scratch" resignation. Many users often decide to stick with an obsolete old computer system rather than wrestle migration and manual re-configuration required for a new computing system.

Yet another problem is that configurations settings on an old computing system may be stored in a new location, in a new file, or in new format on a new computing system. An old configuration setting may have to be translated or otherwise modified to provide the same results on the target computing system. Such translation and/or modifications are typically completed by hand and are prone to errors that lead to user frustration.

Yet another problem is that the migration to a new computing system typically requires training on new features of new target computing system before migration can take place. This training often delays the migration process. In addition, a manual migration process used without adequate training on the new computing system can decrease quality of service on the new computing system since one or more configuration settings may be missed on the old computing system and not be transferred to the new computing system.

Yet another problem is the Year 2000 ("Y2K") problem, which may force companies to quickly migrate large numbers of computing systems to new technology before the year 2000. The issues of migration in the face of a Y2K breakdown is a daunting problem by itself. A manual migration process acts to increase the complexity of the Y2K problem.

Thus, it is desirable to automatically determine configuration settings customized by a user or a network administrator on an old computing system. It is also desirable to provide an automatic migration of configuration settings from an old computing system to a new computing system without using a time consuming manual migration process.

## SUMMARY OF THE INVENTION

In accordance with preferred embodiments of the present invention, some of the problems associated with transferring configuration settings from an old computer system to a new computer system are overcome. A method and system for automatically transitioning configurations among computer systems is provided. One aspect of the invention includes a method for automatically transitioning configuration settings from source (i.e., old) computing system to a target (i.e., new) computing system.

This method includes locating multiple configuration settings on a source computing system using multiple transition rules from a Personality object. The multiple configuration settings are extracted from a multiple locations on the source computing system. The multiple extracted configuration settings are stored in a pre-determined transition format on the source computing system. The multiple extracted configuration settings stored in the pre-determined transition format are manipulated. A translation package is prepared from the multiple manipulated configuration settings stored in the pre-determined transition format. The translation package is used to transfer the multiple manipulated con-

Exhibit A
Page 10 of 20

US 6,728,877 B2

**3**

figuration settings from the source computing system to a target computing system.

The translation package is transferred to a target computing system, or stored as an intermediate step in the transition process. The translation package may also be created stored on an intermediate computing system. The translation package is infused on the target computing system to transition configuration settings from the source computing system to the target computing system. The configuration settings in the translation package may be optionally verified to ensure that the configuration settings have been correctly applied to the target computing system.

Another aspect of the invention includes an automatic transition system. The system comprises a database, and extraction application, a preparation application, an injection application and a user interface application. However, more or fewer system components could also be used and the present invention is not limited to the system components described.

The database is used for storing configuration settings extracted from a source computing system, manipulated configuration settings from a source computing system, and transition packages to transition configuration settings from a source computing system to a target computing system. The database may include data stored in a database format or in other formats such as a data structure format, a file format, or other volatile or non-volatile formats. The extraction application is used for locating and extracting configuration settings on a source computing system for transition to a target computing system. The preparation application is used for manipulating configuration settings extracted from a source computing system and for preparing a transition package. The injection application is used for infusing manipulated configuration settings from a transition package to transition configuration settings from a source computing system to a target computing system. The user interface application is used for preparing an extraction plan and a transition plan to extract and transition configuration settings from a source computing system for a target computing system.

The method and system provide an automated transition process for transition configuration settings from a target computing system to a host computing system. The method and system may vastly reduce transition, configuration and deployment times for service providers, corporations, and end-users for transitions from a target computing system to source computing system. The method and system may save time, resources, improve transition quality, and reduce user frustration.

The foregoing and other features and advantages of preferred embodiments of the present invention will be more readily apparent from the following detailed description. The detailed description proceeds with references to the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the present invention are described with reference to the following drawings, wherein:

FIG. 1 is a block diagram illustrating an exemplary translation system;

FIG. 2 is a block diagram illustrating an exemplary layered transition architecture;

FIG. 3 is a flow diagram illustrating a method for automatically determining transition configuration settings from a source computing system for a target computing system;

**4**

FIG. 4 is a block diagram illustrating components of a Personality object;

FIG. 5 is a flow diagram illustrating a method for automatically applying determined transition configuration settings;

FIGS. 6A and 6B are flow diagram illustrating a method for automatically transitioning configuration settings; and

FIG. 7 is a block diagram illustrating a data flow for the automatic configuration setting transition method of FIGS. 6A and 6B.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Exemplary Transition System

FIG. 1 is a block diagram illustrating an exemplary transition system 10 for automatically transitioning configuration settings from a source (i.e., old) computing system to a target (i.e., new) computing system. The transition system 10 includes a source computing system 12. The source computing system 12 includes a Transition application 14. The Transition application 14 comprises: a database 16, an Extraction application 18, a User Interface application 20, and a Preparation application 22. The Transition application 14 further comprises an Injection application 24 that is sent to a target computing system 26. However, more or fewer components could also be used in the transition system 10, including intermediate computing systems between the source computing system 12 and the target computing system 26, and the present invention is not limited to the components illustrated in FIG. 1.

In one exemplary preferred embodiment of the present invention, the database 16 is used for storing configuration settings extracted from the source computing system 12, manipulated configuration settings and transition packages to transition configuration settings from the source computing system 12 to a target computing system 26. The database 16 may include data stored in a database format or in other formats such as a data structure format, a file format, or other volatile or non-volatile storage formats. The Extraction application 18 is used for locating and extracting configuration settings on the source computing system 12 to transition to the target computing system 26. The User Interface application 20 is used for preparing an extraction plan and a transition plan to extract and transition configuration settings from the source computing system 12 to the target computing system 26. The Preparation application 22 is used for manipulating configuration settings extracted from the source computing system 12 and for preparing a transition package. The transition package is used to transition configuration settings from the source computing system 12 to the target computing system 26. The Injection application 24 is used for infusing manipulated configuration settings from a transition package to transition configuration settings from the source computing system 12 to a target computing system 26. However, the present invention is not limited to the functionality described for the transition applications, and the transition applications can include more or less functionality. The transition applications are explained in detail below.

In one embodiment of the present invention, the Transition application 14 including the database 16, the Extraction application 18, the User Interface application 20, and the Preparation application 22 without the Injection application 24 reside on the source computing system 12. This is illustrated in FIG. 1 by the dashed line dividing source and target components of the Transition application 14. In such an embodiment, only the Injection application 24 resides on the target computing system 26.

Exhibit A
Page 11 of 20

US 6,728,877 B2

5

In another preferred embodiment of the present invention, a Transition application **14** including a database **16**, an Extraction application **18**, a User Interface application **20**, and a Preparation application **22**, and an Injection application **24** resides on both the source computing system **12** and the target computing system **26** (not illustrated in FIG. **1**).

In another preferred embodiment of the present invention, the source computing system **12** only temporarily includes the Transition application **14**. That is, the Transition application **14** is not installed on any non-volatile storage on the source computing system **12**. The Transition application **14** only "resides" in volatile storage (e.g., Random Access Memory ("RAM")) on the source computing system **12** during the extraction and preparation portion of the transition process. The target computing system **26** may also only temporary include the Injection application **24**. The Injection application **14** may also only reside in volatile storage on the target computing system **14** during the injection portion of the translation process.

In yet another embodiment of the present invention, components of the Translation application **14** may only exist on a "third" computing system and not on either the source computing system **12** or the target computing system **14**. Additional software applications may be used only to retrieve and only to inject settings and such software applications would be present only on the source computing system **12** or the target computing system **14** and coordinated from the third computing system. In yet another embodiment of the present invention, computer hardware or firmware may be employed in such a manner that configuration settings are extracted and injected without a software Transition application **14** existing on the source computing system **12** or the target computing system **14**.

In yet another preferred embodiment of the present invention, the source computing system **12** may only include the Extraction application **18**. The other components of the Transition application **14** reside on one or more other computing systems and can be used in a distributed fashion. Extracted transition data can also be stored on the one or more other computing systems using distributed computing.

An operating environment for the computing systems **12**, **26** of the present invention include a processing system with one or more high speed Central Processing Unit(s) ("CPU") and a memory system. In accordance with the practices of persons skilled in the art of computer programming, the present invention is described below with reference to acts and symbolic representations of operations or instructions that are performed by the processing system. Such acts and operations or instructions are referred to as being "computer-executed" or "CPU executed."

The CPU can be either electrical or biological. The acts and symbolically represented operations or instructions include the manipulation of electrical signals or biological signals by the CPU. An electrical system or biological system represents data bits that cause a resulting transformation or reduction of the electrical signals or biological signals. The maintenance of data bits at memory locations in a memory system to thereby reconfigure or otherwise alter the CPU's operation, as well as other processing of signals. The memory locations where data bits are maintained are physical locations that have particular electrical, magnetic, optical, or organic properties corresponding to the data bits.

The data bits may also be maintained on a computer readable medium including magnetic disks, optical disks, electrical memory, organic memory, and any other volatile (e.g., Random Access Memory ("RAM")) or non-volatile (e.g., Read-Only Memory ("ROM") a hard disk, etc.,) mass

6

storage system readable by the CPU. The computer readable medium includes cooperating or interconnected computer readable medium, which exist exclusively on the processing system or be distributed among multiple interconnected processing systems that may be local or remote to the processing system.

Exemplary Transition Architecture

FIG. **2** is a block diagram illustrating an exemplary layered transition architecture **28** for the Transition application **14** of FIG. **1**. The Transition application **14** resides in a transition core process **30**. The transition core process **30** includes a control module **32** that is an interface to an operating system **34**. The operating system **34** can be a windowed operating system such as Windows 95/98/NT by Microsoft Corporation of Redmond, Wash., and other windowed or non-windowed operating systems can also be used (e.g., Linux). The transition core process **30** uses plug-in modules **36** to interface to the operating system **34** and to process configuration settings from the source computing system **12**. The plug-in modules **36** also allow additional modules to be added to provide new and enhanced functionality for the transition core process **30**. The plug-in modules **36** are explained below (See FIG. **4**).

In one exemplary preferred embodiment of the present invention, a first transition core process **30** on the source computing system **12** controls the Extraction application **18** (FIG. **1**), the User Interface application **20** (FIG. **1**), and the Preparation application **22** (FIG. **1**). The operating system **34** on the target computing system **26** controls execution of the Injection application **24** on the target computing system **26** (e.g., the Injection application **24** is an executable file (.EXE)). In another exemplary preferred embodiment of the present invention, a first transition core process **30** on the source computing system **12** controls the Extraction application **18**, the User Interface application **20**, and the Preparation application **22**. A second transition core process **30** on the target computing system **12** controls a first Injection application **24** on the target computing system **26**.

In one exemplary preferred embodiment of the present invention, the transition core process **30** includes an Application Programmer's Interface ("API"). The transition API allows other applications to call transition application functions (e.g., Hyper Text Markup Language ("HTML"), Java, Visual Basic, Visual Basic Scripts, C++, Visual C++, etc.). The transition API also includes functions for low level Input/Output ("I/O"), high level I/O, and smart I/O. The low level I/O includes functions for file system I/O, database **16** interaction, transition specific I/O, operating system registry I/O, etc. The high level I/O includes retrieval of configuration settings, storage of configuration settings, etc. The smart I/O includes smart configuration setting searching capabilities, smart copying capabilities, etc.

The transition core process **30** includes an output layer **38**, a protocol layer **40**, a message layer **42**, a database **16** and a file layer **44**. The output layer **38** is used for the various types of I/O as was described above. The protocol layer **40** allows the transition core process **30** to use protocols such as Hyper Text Transfer Protocol ("HTTP"), File Transfer Protocol ("FTP"), User Datagram Protocol ("UDP"), Transmission Control Protocol ("TCP"), Internet Protocol ("IP") and other protocols to communicate with the source computing system **12** and the target computing system **26**. The message layer **42** is used for electronic mail ("e-mail") and other communications with the operating system **34** and the source computing system **12** and the target computing system **26**.

The database **16** includes objects used to locate configuration settings on the source computing system. The data-

**Exhibit A**
**Page 12 of 20**

US 6,728,877 B2

7

base **16** may be temporary storage such as RAM, or permanent storage such as a floppy disk, hard disk, re-writeable, CD-ROM, Flash memory, Flash-ROM, or other non-volatile computer readable media. The file layer **44** includes configuration settings extracted from the source computing system **12**. The file layer **44** allows files to be create and retrieved across file volumes including local and remote file systems. However, more or fewer layers could also be used in the translation architecture **28**. The present invention is not limited to the architecture layers illustrated in FIG. **2**.

Automatic Transition of Configuration Settings

FIG. **3** is a flow diagram illustrating a Method **46** for automatically transitioning configuration settings from a source computing system to a target computing system. At Step **48**, multiple configuration settings are located on a source computing system using multiple transition rules from a Personality object. At Step **50**, multiple configuration settings are extracted from multiple locations on the source computing system. At Step **52**, the multiple extracted configuration settings are stored in a pre-determined transition format. At Step **54**, the multiple extracted configuration settings stored in the pre-determined transition format are manipulated. At Step **56**, a transition package is created from the multiple manipulated configuration settings. The transition package includes the multiple manipulated configuration settings. The transition package is sent from the source computing system to the target computing system or stored as an intermediate step in the transition process. The transition package may also be stored one or more intermediate computing systems, local or remote to the source computing system or the target computing system. The transition package is infused on the target computing system to transition configuration settings from the source computing system to a target computing system.

Preferred embodiments of the present invention use object-oriented programming techniques. However, non-object-oriented programming techniques could also be used. As is known in the art, an "object type," also called an "object class," comprises a data-type, services that operate on instances of the data type, and a set of object attributes in an object-oriented data-structure. An "object attribute" is a field of data in an object that partially defines that object's state. An "object service" implements and manipulates objects, usually by reading or changing the object attributes. "Object-oriented design" is a software development technique in which a system or component is expressed using objects.

An object typically is an object-oriented data-structure that has two components: a function table, containing a pointer to each "object member" or member function (i.e., sometimes known as an "object method") defined in the object's class, an events table, for accepting events (e.g., OLE or ActiveX control events) and a data block, containing the current values for each object variable (i.e., data members, sometimes known as an "object property"). A computer software application has some reference to an object through an object pointer. A computer software application obtains this object reference by using some type of function call (direct or implied) in which that function allocates an object block in computer memory, initializes the function table, and returns a reference to allocated computer memory to an application. The computer memory may be local or distributed on a remote computer.

The Component Object Model ("COM") and Distributed Component Object Model ("DCOM") are models used for object-oriented programming and known to those skilled in the art. The COM and DCOM specify how objects within a single application or between applications (e.g., client/server applications) interact and communicate by defining a set of standard interfaces. Interfaces are groupings of schemati-

8

cally related functions through which a client application accesses the services of a server application.

Object Linking and Embedding ("OLE") controls, such as OLE controls and ActiveX Controls by the Microsoft Corporation of Redmond, Wash., are based in part on the Component Object Model and allow the creation of objects of different formats which operate on data through defined interfaces, rather than operating on the applications responsible for the data. ActiveX is based in part on OLE technologies. An OLE or ActiveX control is an object that accepts and responds to events, such a selection by a mouse or a key on a keyboard, or a selection by another object-oriented member function. Detailed information on the OLE object interface can be found in *Inside OLE,* 2nd edition, by Kraig Brockschmidt, Microsoft Press, Redmond Wash., 1995 which is incorporated herein by reference.

In an exemplary preferred embodiment of the present invention, at Step **48**, multiple configuration settings are located on the source computing system **12** using multiple transition rules from a Personality object. In an exemplary preferred embodiment of the present invention, the Personality object includes five object-oriented plug-in modules **36**. However, more or fewer object-oriented plug-in modules **36** could also be used.

Translation Personality object

FIG. **4** is a block diagram illustrating components of a Personality object **58**. The Personality object **58** includes a Desktop object **60**, a Network object **62**, an Internet object **64**, a Mail object **66** and an Applications object **68**. However, more or fewer objects could also be used in the Personality object **58**. The objects include information about configuration settings such as location, name, associated sub-settings, etc. In an exemplary preferred embodiment of the present invention, the objects **60**, **62**, **64**, **66**, **68** in the Personality object **58** are object-oriented objects. However, non-object oriented objects could also be used in the Personality object **58**. The Personality object **58** and related objects **60**, **62**, **64**, **66**, **68** comprise object classes that include one or more object members and a data block as was described above.

In one exemplary preferred embodiment of the present invention, the Desktop object **60** includes user preferences that affect the appearance and operation of a basic windowed user interface. Exemplary configuration settings included in the Desktop object **60** are illustrated in Table 1. However, more or fewer configuration settings can also be used in the Desktop object **60**, and the present invention is not limited to the configuration settings illustrated in FIG. **1**.

TABLE 1

| Desktop Object 60 |
| --- |
| Visual Elements |
| Fonts including meta data colors, themes, sounds, password wall paper, screen savers, metrics, etc. |
| Accessibility Elements |
| Settings that disable accessibility to the source computing system 12 |
| User Interface Hardware Settings |
| Display resolutions, mouse trails, keyboard mappings, character settings, etc. |
| Regional Settings |
| Time zones, data formats, language, currency settings, etc. |
| Windows Preferences |
| Start menus, desktop shortcuts, document and run commands, etc. |
| Registry Settings |

The Network object **62** includes configuration settings that enable functionality within a private network of computers such as a Local Area Network ("LAN") or an intranet. In one exemplary preferred embodiment of the present invention, the Network object **62** may not include hardware

Exhibit A
Page 13 of 20

US 6,728,877 B2

9

configuration settings. The Network object **62** may instead include configuration settings that configure the operating system **34**, that in turn are mapped to underlying hardware on the source computing system **12**. In another exemplary preferred embodiment of the present invention, the network object **62** may include hardware settings.

Exemplary configuration settings included in the Network object **62** are illustrated in Table 2. However, more or fewer configuration settings can also be used in the Network object **62**, and the present invention is not limited to the configuration settings illustrated in Table 2.

TABLE 2

| Network Object 62 |
| --- |
| Service Providers |
| Name, network addresses (e.g., IP address), dial-up numbers, etc. |
| Services |
| Network services, etc. |
| Clients |
| Proxies, network servers, etc. |
| Domains |
| Domain names and subnets, workgroups |
| Protocols |
| TCP, UDP, IP, HTTP, FTP, etc. |
| Registry Settings |

The configuration settings from the Network Object **62** are applied to the target computing system **26** within the context of operating system **34** services available on the target computing system **26**. In one exemplary preferred embodiment of the present invention, the Network Object **62** will not install configuration settings for network applications that are not available on the target computing system. For example, if the source computing system **12** has TCP/IP installed, the Network Object **62** will locate and extract relevant TCP/IP settings from the source computing system **12**. If the target computing system does not have TCP/IP installed, the Network Object **62** will not automatically transition the TCP/IP settings from the source computing system **12**, since the TCP/IP settings can not be used. In another embodiment of the present invention, if the source computing system **12** has configuration settings for a network application that is not installed on the target system (e.g., TCP/IP) the network application will be installed on the target computing system and the appropriate configuration settings will then be applied.

Another feature of the Network Object **62** is to allow a user to review and edit configuration settings before they are applied to the target computing system **26**. For example, a network address (e.g., an IP address) extracted from the source computing system may or may not be appropriate for the target computing system, since the target computing system may be installed on a different computer network. Thus, the user can review and edit the configuration settings before they are applied to the target computing system **26**.

The Internet Object **64** includes configuration settings that are relevant to the public network of computers provided by the Internet. As is know in the art, the Internet is a worldwide network of inter-connected computers. Exemplary configuration settings included in the Internet object **64** are illustrated in Table 3. However, more or fewer configuration settings can also be used in the Internet object **64**, and the present invention is not limited to the configuration settings illustrated in Table 3

10

TABLE 3

| Internet Object 64 |
| --- |
| Accounts |
| Internet service provider accounts, logins, passwords, etc. |
| Internet Browser |
| Internet Explorer, Netscape Navigator, etc. |
| Internet browser options |
| Favorites, addresses (i.e., Uniform Resource Locators ("URL's"), cookies, bookmarks, histories, newsgroup filters, security settings, channels, certificates, etc. |
| Dial-up networking settings |
| Dial-up numbers, login names, passwords, etc. |
| Network addresses |
| IP addresses, etc. |
| Registry settings |

The Mail object **66** includes configuration settings for electronic mail ("e-mail") and other communication messaging used on the old computer system **12**. In one exemplary preferred embodiment of the present invention, the Mail object **66** includes configuration settings for Exchange, Outlook and Outlook Express, by Microsoft, Communicator, by Netscape Corporation of Mountain View, Calif., Pegasas, Eudora, and Lotus Notes, by IBM. However, more or fewer e-mail or communications programs could also be supported by the Mail object **66**, and the present invention is not limited to the e-mail and communications programs listed.

Exemplary configuration settings included in the Mail object **66** are illustrated in Table 4. However, more or fewer configuration settings can also be used in the Mail object **66**, and the present invention is not limited to the configuration settings illustrated in Table 4.

TABLE 4

| Mail Object 66 |
| --- |
| E-mail, communication applications |
| Express, Outlook, Outlook Express, Communicator, Pegasus, Eudora, Lotus Notes, etc. |
| Settings |
| E-mail address identification, address books, inbox/outbox folders, mail folders, etc. |
| Meta Data |
| Custom dictionaries, templates, macros, forms |
| Registry Settings |

The e-mail address identification in the Mail Object **66** includes addresses such as a Point-Of-Presence ("POP"), a Simple Mail Transfer Protocol ("SMTP") and other e-mail related addresses.

The Applications object **68** includes configuration settings of applications installed on the source computing system **12**. For example, the applications may include Microsoft Word, Excel, Power Point, etc., applications in the Word Perfect Suite, by Corel and other applications from the source computing system **12**.

Exemplary configuration settings included in the Application object **68** are illustrated in Table 5. However, more or fewer configuration settings can also be used in the Application object **68**, and the present invention is not limited to the configuration settings illustrated in Table 5.

Exhibit A
Page 14 of 20

US 6,728,877 B2

11

12

TABLE 5

| Application Object 68 |
| --- |
| Application |
| Word, Excel, Power Point, Word Perfect, etc. |
| Settings |
| Dictionaries, style, formats, language, fonts, etc. |
| Registry Settings |

In one exemplary preferred embodiment of the present invention, the Application object **68** includes configuration settings for applications following design guidelines developed for Microsoft Windows operating system applications. However, other design guideline developed for applications for other operating systems, such as Linux, could also be used to determine which configuration settings are included in the Application object **68**, and the present invention is not limited to an Application object **68** including configuration settings for just Microsoft Windows applications.

Exemplary Automatic Configuration Setting Translation

Returning to FIG. 3, at Step **48**, multiple configuration settings are located on a source computing system using multiple transition rules from the Personality object **60** (FIG. **4**). In one exemplary preferred embodiment of the present invention, the Extraction application **18** uses the Personality object **60** to locate configuration settings on the source computing system **12**.

The locating Step **48** can also be used to locate configuration settings on more than one computer simultaneously (e.g., a desktop computer and a laptop computer). The User Interface application **20** is used to configure the Extraction application **18**. The User Interface application **20** includes a list of "identity units" corresponding to configuration settings that will be extracted from the source computing system **12** and infused on the target computing system **26**. The User Interface application **20** includes the ability to "drill-down" to multiple options and sub-options within an identity unit.

The User Interface application **20** configures the Extraction application **18** with the following options: 1.) what configuration settings to extract; 2.) where to store the results; 3.) at what level will the extraction take place; 4.) how the results are "tagged" for later retrieval; and 5.) how verbose or silent the extraction process is. However, more or fewer options could also be configured on Extraction application **18**.

The "what to extract" option includes creating an Extraction plan. The Extraction plan identifies specific identity units that should be located and a list of options for each identity unit. The Extraction plan includes a full list of identity units to be located, an exclusion list and an inclusion list. The full list is a "vanilla" state that specifies all identity units known on the source computing system **12** that should be located and extracted. The Extraction plan may be modified by excluding one or more identity units from the full list. For example, if the full list included 250 identity units, an exclusion list could be used to exclude 50 identity units from the full list. If available, the Extraction application **18**, uses the exclusion list instead of the full list to locate and extract configuration settings corresponding to the identity units from the source computing system **12** (e.g., at Steps **50** and **52** of Method **48**).

The inclusion list allows a user to select any of the identity units from the full list. For example, if the full list included 250 identity units, a user may select only 30 identity units from the 250 available identity units. Thus, the only the 30 configuration settings from the inclusion list from the Extraction plan will marked as "active." The remaining 230 possible configuration settings are marked as "in-active" and are not used. If available, the Extraction application **18**, uses the inclusion list instead of the full list to locate and extract the configuration settings corresponding to the identity units. If no exclusion list or inclusion list is created, the Extraction application **18**, by default uses the full list to locate and extract configuration settings on the source computing system **12**.

The User Interface **20** is also used to configure the Preparation application **22**. The Preparation application **22** is configured in a similar manner to that described for the Extraction application **18**. However, the Preparation application **22** includes a "Transition plan" instead of an Extraction plan. The Transition plan includes a full list, as a default list, and allows creation of exclusion and inclusion lists as was discussed for the Extraction plan.

Returning again to FIG. 3, at Step **50**, multiple configuration settings are extracted from multiple locations on the source computing system by the Extraction application **18** using the Personality object **60**. In one exemplary preferred embodiment of the present invention, the Extraction application **18** uses objects from the Personality object **60** and the Extraction plan described to produce "work product" that is stored in a pre-determined transition format at Step **52**. In one exemplary preferred embodiment of the present invention, the work product is stored on the source computing system **12**. In another exemplary preferred embodiment of the present invention, the work product is stored on one or more intermediate computing systems in volatile or non-volatile storage.

In one preferred embodiment of the present invention, the pre-determined transition format used to store the configuration settings is a database format for relational databases. However, non-relational database formats could also be used. In one preferred embodiment of the present invention, the pre-determined transition format is a database format for System Query Language ("SQL") databases. In another preferred embodiment of the present invention, the pre-determined transfer format is a database format for a Microsoft Access databases. However, other pre-determined transition formats can also be used and the present invention is not limited to the database formats described.

In one exemplary preferred embodiment of the present invention, the Extraction application **18** stores the configuration settings in a pre-determined transition format in temporary volatile storage (e.g., in RAM). In another exemplary preferred embodiment of the present invention, the Extraction application **18** includes a Loader application that is used to transfer data from temporary storage to the database **16**. In such an embodiment, the Extraction application **18** does not maintain a persistent connection with the database **16**. The transfer of information from temporary storage to the database **16** is accomplished with the Loader application. In yet another exemplary preferred embodiment of the present invention, the Extraction application **18** maintains a persistent connection with the database **16** and is capable of writing configuration settings in the pre-determined format directly into the database **16**.

At Step **54**, the multiple extracted configuration settings stored in the pre-determined transition format are manipulated. In a preferred embodiment of the present invention, the configuration settings are manipulated with the Preparation application **22** using the Transition plan described above. For example, the Extraction application **18** may extract **250** configuration settings from the source computer with an exemplary Extraction plan that included only a full

Exhibit A
Page 15 of 20

US 6,728,877 B2

13

list (i.e., no extraction list or inclusion list). An exemplary Transition plan may include only an inclusion list. The exemplary inclusion list may include only 30 of 250 possible configuration settings from the Extraction plan. Thus, the only the 30 configuration settings from the inclusion list from the Transition plan will marked as "active" in the pre-determined transition format by the Preparation application 22. The remaining 230 possible configuration settings are marked as "in-active" by the Preparation application 22 and not used. Various combinations of full lists, exclusion lists, inclusion lists, from the Extraction plan and Transition plan can be used, and the present invention is not limited to this example.

The manipulation at Step 54 also includes transitioning one or more configuration settings from a format used on the source computing system to a format used on the target computing system. For example, a configuration setting for a computer monitor may be stored with the name config-monitor-old on the source computer system. However, on the target computer system, the same configuration setting may be stored with a name config-monitor-new. In addition, a configuration setting may be stored in a first directory-A on the source system, and in a second directory-B, on the target system. The preparation application 22 handles such transitions at step 54.

At Step 56, a transition package is created from the multiple manipulated configuration settings. In an exemplary preferred embodiment of the present invention, the Preparation application 22 creates a transition package. In one exemplary preferred embodiment of the present invention, the transition package includes a list of commands along with necessary source data for the manipulated configuration settings. The list of command may be used to provide an ordering for transitioning the configuration settings. However, other transition package formats could also be used and the present invention is not limited to the transition packages described. The transition package will be used by the Injection application 24 to transition the desired configuration settings from the source computing system 12 the target computing system 26.

In an exemplary preferred embodiment of the present invention, the transition package is stored in the database 16 by the Preparation application 22. In another exemplary preferred embodiment of the present invention, the transition package is also transferred directly to the Injection application 24. In yet another exemplary preferred embodiment of the present invention, the transition package is read from the database 16 by the Preparation application 22 and the Injection application included in at a later time.

Applying a Transition Package to a Target Computing System

FIG. 5 is a flow diagram illustrating a Method 70 for automatically applying transition configuration settings. At Step 72, a transition package is received on a target computing system from a source computing system. At Step 74, the transition package is infused on the target computing system to automatically transition manipulated configuration settings from the source computing system to the target computing system. At Step 76, transition package is optionally verified on the target computing system to ensure that the transition package has been correctly applied to the target computing system.

In one exemplary preferred embodiment of the present invention, the transition package is sent from the Preparation application 22 on the source computing system 12 within an Injection application 24 to the target computing system 26. The Injection application 24 with the transition package can

14

be sent to the target computing system 26 via on a floppy disk, zip-disk, or CD-ROM, or transferred using e-mail, TCP/IP, FTP, or with other network transfer mechanisms. At Step 72, the target computing system 26 receives the Injection application 24 with the transition package from the source computing system 12. As was described above, in one exemplary preferred embodiment of the present invention, the transition package includes a list of commands along with necessary source data for multiple manipulated configuration settings. At Step 74, an Injection application 24 "infuses" the target computing system 26 with manipulated configuration settings from the source computing system 12. The Injection application 24 reads and executes the list of commands from the transition package to transition configuration to the target computing system 26. The Injection application 24 is invoked by the operating system 34 on the target computing system. At Step 76, transition package is optionally verified on the target computing system 26 to ensure that the transition package has been correctly applied to the target computing system 26. In one exemplary preferred embodiment of the present invention, the Injection application 24 also verifies the injection of the transition configuration settings on the target computing system 26. In another exemplary preferred embodiment of the present invention, a separate Verification application verifies configuration settings infused by the Injection application 24.

Exemplary Automatic Transition of Configuration Settings

FIGS. 6A and 6B are flow diagram 78 illustrating one exemplary method for automatically transitioning configuration settings for one exemplary preferred embodiment of the present invention. However, the present invention is not limited to this exemplary embodiment and other embodiments could also be used. At Step 80 of FIG. 6A, an Extraction plan and a Transition plan are prepared with the User Interface application 20. At Step 82, multiple configuration settings are located on a source computing system 12 with an Extraction application 18 using a Personality object 58. At step 84, the multiple configuration settings are extracted from multiple locations on the source computing system 12 with the Extraction application 18 and the Extraction plan. At Step 86, the multiple extracted configuration settings are stored in a database format on the source computing system 12. At Step 88, the multiple extracted configuration settings are manipulated with a Preparation application 22 and the Transition plan. At Step 90, a transition package is prepared from the multiple manipulated configuration settings by the Preparation application 22. The transition package is used to transition configuration settings from the source computing system to the target computing system 26.

At Step 92 of FIG. 6B, an Injection application 24 including the transition package is prepared by the Preparation application 22. The Injection application 24 uses the transition package to transition configuration settings from the source computing system to the target computing system. At Step 94, the Injection application 24 including the transition package is sent from the source computing system 12 to the target computing system 26.

At Step 94, the Injection application including the transition package is received on the target computing system 26 from the source computing system 12. At Step 98, the transition package is infused with the Injection application 24 on the target computing system 26 to transition configuration settings from the source computing system 12 to the target computing system 26. At Step 100, configuration settings from the transition package are optionally verified

Exhibit A
Page 16 of 20

US 6,728,877 B2

15

with the Injection application **24** to ensure that the transition package has been correctly applied to the target computing system.

Data Flow for Exemplary Automatic Transition of Configuration Settings

FIG. **7** is a block diagram illustrating a data flow **102** for the automatic configuration setting transition from FIGS. **6A** and **6B**. The User Interface application **20** is used to create **104** an Extraction plan and a Transition plan (e.g., Step **80** of FIG. **6A**). The Extraction application **18** locates and extracts **106** multiple configuration settings from multiple locations on the source computing system using the Personality object **58** and the Extraction plan (e.g., Steps **82** and **84**). The multiple extracted configuration settings are stored **108** in a pre-determined transition format in temporary storage on the source computing system **12** (e.g., Step **86**). The multiple extracted configuration settings may also be stored **110** in persistent storage in the database **16**. The Preparation application **22** manipulates **112** the multiple extracted configuration settings stored in the pre-determined transition format using the Transition plan (e.g., Step **88**). The Preparation application **22** creates **114** a transition package from the multiple manipulated configuration settings. The transition package includes the multiple manipulated configuration settings (e.g., Step **90**).

As was discussed above, the transition package can be stored **116** in the database **16** by the Preparation application **22**. The transition package can also be transferred directly to the Injection application **24**. The transition package can also be read from the database **16** by the Preparation application **22** and sent to the Injection application **24** at a later time. The Preparation application **22** prepares **118** an Injection Application **24** including the transition package (e.g., Step **92**, FIG. **6B**). The Injection Application **24** is sent **120** from the source computing system **12** to the target computing system **26** (e.g., Step **94**).

The target computing system **26** receives the injection application **24** with transition package from the source computing system **12** (e.g., Step **96**). The Injection application **24** "infuses" **122** the target computing system **26** with manipulated configuration settings in the transition package from the source computing system **12** (e.g., Step **98**). The Injection application **24** reads and executes the list of commands from the transition package to transition configuration to the target computing system **26**. The transition package is optionally verified **124** on the target computing system **26** to ensure that the transition package has been correctly applied to the target computing system **26** (e.g., Step **100**).

Exemplary Automatic Transition Products

In one exemplary preferred embodiment of the present invention, the Extraction application **18**, the User Interface application **20**, the Preparation application **22** and the Injection application **24** are Windows 32-bit ("Win32") applications written in C++ and Visual Basic. However, the present invention is not limited to Win32 applications, and other types of applications can also be used. In addition, other programming languages could also be used to implement the transition applications. The transition Win32 applications support the exemplary transition illustrated in Table 6. However, the present invention is not limited to the transitions illustrated in Table 6, and other transitions could also be made between a source computing system and a target computing system.

16

TABLE 6

| |
|---|
| Windows 95 ver. X to Windows 95 ver. Y |
| Windows 95 to Windows 98 |
| Windows 98 ver. X to Windows 98 ver. Y |
| Windows 95 to Windows NT |
| Windows 98 to Windows NT |
| Windows NT ver. X to Window NT ver. Y |
| Windows XX to Windows YY |
| Windows XX ver. X to Windows YY ver. Y |

In one exemplary preferred embodiment of the present invention, the present invention may also include the transition of configuration settings to a target computing system that are NOT present on a source computing system, but were calculated from other settings on the source computing system. Such an embodiment can be inclusive such that "old settings" as well as "new calculated settings" are injected. The translation process may also be exclusive such that a target computing system does not receive any "old settings" but only new settings "calculated" from the old settings on a source computing system. The translation process may also be used for extracting configuration settings from multiple source computing systems that are local or remote, and "conglomerating" them onto a single target computing system.

In another exemplary preferred embodiment of the present invention, configuration settings can be transitioned without any transition data ever being embodied into a persistent storage medium. In such an embodiment, extracted transition data is transmitted via a data stream over a network and is consumed (i.e., processed and or injected) without ever being stored in a persistent storage medium.

In yet another exemplary preferred embodiment of the present invention, a target computing system can be infused with configurations settings that have not originated from a source computing system and have not been calculated from old configuration settings on the source computing system. In such an embodiment, a new target computing system is built and configuration settings are from a "newly developed" source that is not a source computing system (e.g., a proposed new operating system or proposed new computer hardware).

In yet another embodiment of the present invention, the transitioning process may also take settings from a single source computing system and "distribute" them to multiple target computing systems such that only a subset of the settings from the source computing system reside on any one target computing system. The subsets of transition data may overlap or be exclusive.

In yet another embodiment of the present invention, the transition process may take configuration settings from multiple source computing systems and inject them onto multiple target computing systems, but in a manner such that there is no correlation between the configuration settings from the source computing systems and target computing systems the configuration settings are injected onto. For example, three configuration settings from a first source computing system are transitioned to a first set target computing systems, while one configuration setting from a second source computing system is transitioned to a second set of target computing systems not including the first set of target computing systems.

The methods and system described herein provide an automated transition process for transition configuration settings from a target computing system to a host computing system. The method and system may vastly reduce transition, configuration and deployment times for service

**Exhibit A**
**Page 17 of 20**

US 6,728,877 B2

17

providers, corporations, and end-users for transitions from a target computing system to source computing system. The method and system may also save time, resources, improve transition quality, and lower user frustration.

It should be understood that the programs, processes, methods and systems described herein are not related or limited to any particular type of computer or network system (hardware or software), unless indicated otherwise. Various types of general purpose or specialized computer systems may be used with or perform operations in accordance with the teachings described herein.

In view of the wide variety of embodiments to which the principles of the present invention can be applied, it should be understood that the illustrated embodiments are exemplary only, and should not be taken as limiting the scope of the present invention. For example, the steps of the flow diagrams may be taken in sequences other than those described, and more or fewer elements may be used in the block diagrams. While various elements of the preferred embodiments have been described as being implemented in software, in other embodiments hardware or firmware implementations may alternatively be used, and vice-versa.

The claims should not be read as limited to the described order or elements unless stated to that effect. Therefore, all embodiments that come within the scope and spirit of the following claims and equivalents thereto are claimed as the invention.

We claim:

1. A method in a computer system for preparing configuration settings for transfer from a source computing system to a target computing system, the method comprising:

providing configuration information about configuration settings on the source computing system, the configuration information including a name and location of each configuration selling;

generating an extraction plan that identifies configuration settings to be extracted from the source computing system, the generating including providing a list of configuration settings known to the source computing system and including identifying active configuration settings out of the provided list of configuration settings to be extracted from the source computing system;

extracting the active configuration settings of the extraction plan from the source computing system, the extracted configuration settings being located using the provided configuration information;

generating a transition plan that identifies configuration settings to be transferred from the source computing system to the target computing system, the generating including providing active configuration settings of the extraction plan and including identifying from the active configuration settings of the extraction plan active configuration settings to be transferred from the source computing system to the target computing; and

for each active configuration setting of the transition plan, retrieving the extracted configuration settings identified as active configuration settings of the transition plan; and

transitioning one or more of the retrieved configuration settings from a format used on the source computing system to a format used on the target computing system.

2. The method of claim 1 where the provided configuration information is stored in a personality object.

3. The method of claim 2 wherein the personality object includes desktop, network, Internet, mail, and applications configuration information.

18

4. The method of claim 2 wherein the personality object includes information for locating user preferences that affect the appearance and operation of a basic windowed user interface.

5. The method of claim 2 wherein the personality object includes desktop information for locating visual elements, user interface hardware settings, and windows preferences configuration information.

6. The method of claim 2 wherein the personality object includes network information for locating service providers, services, clients, and domains configuration information.

7. The method of claim 2 wherein the personality object includes Internet information for locating accounts, browser, and network addresses configuration information.

8. The method of claim 2 wherein the personality object includes mail information for locating mail application and application settings configuration information.

9. The method of claim 2 herein the personality object includes application information for locating application and application settings configuration information.

10. The method of claim 2 wherein the personality object includes information for locating registry settings configuration information.

11. The method of claim 1 including providing the transitioned configuration settings to a target computing system for installation of the configuration settings on the target computing system.

12. The method of claim 11 wherein when an application is not installed on the target computing system, the configuration settings for that application are not installed on the target computer system.

13. The method of claim 11 wherein when an application is not installed on the target computing system, the application and the configuration settings for that application are installed on the target computer system.

14. The method of claim 1 wherein the extraction plan includes an exclusion list of configuration settings not to be extracted.

15. The method of claim 1 wherein the extraction plan includes an inclusion list of configuration settings to be extracted.

16. A computer system for preparing configuration settings for transfer from a source computing system to a target computing system, comprising:

configuration information about configuration settings on the source computing system, the configuration information including a name and location of each configuration setting;

a user interface application for generating an extraction plan that identifies configuration settings to be extracted from the source computing system and a transition plan that identifies configuration settings to be transferred from the source computing system to the target computing system, the extraction plan identifying active configuration settings to be extracted from the source computing system, the transition plan identifying active configuration settings of the extraction plan to be transferred from the source computing system to the target computing;

an extraction application for extracting the active configuration settings of the extraction plan from the source computing system, the extracted configuration settings being located using the provided configuration information; and

an transition application that retrieves the extracted configuration settings identified as active configuration settings of the transition plan and transitions one or

US 6,728,877 B2

19

more of the retrieved configuration settings from a format used on the source computing system td a format used on the target computing system.

17. The computer system of claim 16 where the configuration information is stored in a personality object.

18. The computer system of claim 17 wherein the personality object includes information for locating of user preferences that affect the appearance and operation of a basic windowed user interface.

19. The computer system of claim 17 wherein the personality object includes desktop information for locating visual elements, user interface hardware settings, and windows preferences configuration information.

20. The computer system of claim 17 wherein the personality object includes network information for locating service providers, services, clients, and domains configuration information.

21. The computer system of claim 17 wherein the personality object includes Internet information for locating accounts, browser, and network addresses configuration information.

22. The computer system of claim 17 wherein the personality object includes mail information for locating mail application and application settings configuration information.

23. The computer system of claim 17 wherein the personality object includes application information for locating application and application settings configuration information.

24. The computer system of claim 17 wherein the personality object includes information for locating registry settings configuration information.

25. The computer system of claim 16 including means for providing the transitioned configuration settings to a target computing system for installation of the configuration settings on the target computing system.

20

26. The computer system of claim 25 wherein when an application is not installed on the target computing system, the configuration settings for that application are not installed on the target computing system.

27. The computer system of claim 25 wherein when an application is not installed on the target computing system, the application and the configuration settings for that application are installed on the target computer system.

28. The computer system of claim 16 wherein the extraction plan includes an exclusion list of configuration settings not to be extracted.

29. The computer system of claim 16 wherein the extraction plan includes an inclusion list of configuration settings to be extracted.

30. A computer-readable medium containing a data structure comprising:

information for locating of user preferences that affect the appearance and operation of a basic windowed user interface;

information for locating visual elements, user interface hardware settings, and windows preferences configuration information;

information for locating service providers, services, clients, and domains configuration information;

information for locating accounts, browser, and network addresses configuration information;

information for locating mail application and mail application settings configuration information;

information for locating application and application settings configuration information; and

information for locating registry settings configuration information.

* * * * *

Exhibit A
Page 19 of 20

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,728,877 B2                              Page 1 of 1
DATED        : April 27, 2004
INVENTOR(S)  : Kenneth J. Mackin et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Column 12,</u>
Line 57, delete "is" between "persistent" and "connection";

<u>Column 17,</u>
Line 35, "selling" should be -- setting --;

<u>Column 18,</u>
Line 18, "herein" should be -- wherein --;

<u>Column 19,</u>
Line 2, "td" should be -- to --;

Signed and Sealed this

Fifteenth Day of March, 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

Exhibit A
Page 20 of 20



US007346766B2

(12) **United States Patent**          (10) **Patent No.:**     **US 7,346,766 B2**
Mackin et al.                          (45) **Date of Patent:**     *Mar. 18, 2008

| | | | | |
|---|---|---|---|---|
| (54) | **METHOD AND SYSTEM FOR AUTOMATICALLY TRANSITIONING OF CONFIGURATION SETTINGS AMONG COMPUTER SYSTEMS** | 5,832,274 A | 11/1998 | Cutler et al. |
| | | 6,066,182 A | 5/2000 | Wilde et al. |
| | | 6,110,229 A | 8/2000 | Yamaguchi |
| (75) | Inventors: **Kenneth J. Mackin**, Beaverton, OR (US); **Gordon A. Rielly**, Chesterville (CA); **Mark C. Chweh**, Beaverton, OR (US) | 6,151,608 A | 11/2000 | Abrams |
| | | 6,161,176 A | 12/2000 | Hunter et al. |
| | | 6,182,212 B1 | 1/2001 | Atkins et al. |
| | | 6,292,889 B1 | 9/2001 | Fitzgerald et al. |
| | | 6,880,051 B2 | 4/2005 | Timpanaro-Perrotta |

(73) Assignee: **Tranxition Corporation**, Beaverton, OR (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 481 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/796,571**

(22) Filed: **Mar. 9, 2004**

(65) **Prior Publication Data**

US 2004/0243794 A1     Dec. 2, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 10/319,437, filed on Dec. 13, 2002, now Pat. No. 6,728,877, which is a continuation of application No. 09/300,862, filed on Apr. 28, 1999, now abandoned.

(51) **Int. Cl.**
*G06F 15/177*     (2006.01)

(52) **U.S. Cl.** ......................................... **713/100**; 713/1

(58) **Field of Classification Search** .................... 713/1, 713/2, 100; 717/168, 174
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,758,071 A     5/1998  Burgess et al.

*Primary Examiner*—Dennis M. Butler
(74) *Attorney, Agent, or Firm*—Perkins Coie LLP

(57)          **ABSTRACT**

A method and system for automatically transitioning configuration settings among computer systems. Multiple configuration settings comprising a computer "personality" are located on a source computing system using multiple transition rules from a personality object. The computer personality includes customization choices, data files, electronic mail, system preferences, application customization choices, the network environment, browser information, etc. The configuration settings are extracted from multiple locations on the source computing system. The multiple extracted configuration settings are stored in a pre-determined transition format. The multiple extracted configuration settings are manipulated. A transition package is created from the multiple manipulated configuration settings. The transition package includes the multiple manipulated configuration settings. The transition package is sent to a target computing system. The transition package is infused on the target computing system to automatically transition configuration settings from the source computing system to the target computing system. The method and system may vastly reduce transition, configuration and deployment times for service providers, corporations, and end-users when a new computing system is deployed.

**51 Claims, 8 Drawing Sheets**



U.S. Patent          Mar. 18, 2008          Sheet 1 of 8          US 7,346,766 B2

# FIG. 1



Exhibit B
Page 2 of 21

# FIG. 2

28



LAYERED
TRANSITION
ARCHITECTURE

Exhibit B
Page 3 of 21

U.S. Patent          Mar. 18, 2008      Sheet 3 of 8          US 7,346,766 B2



**FIG. 3**

46

START

LOCATE MULTIPLE CONFIGURATION SETTINGS ON A
SOURCE COMPUTING SYSTEM USING MULTIPLE
TRANSITION RULES FROM A PERSONALITY OBJECT
48

EXTRACT THE MULTIPLE CONFIGURATION SETTINGS FROM
MULTIPLE LOCATIONS ON THE SOURCE COMPUTING
SYSTEM
50

STORE THE EXTRACTED MULTIPLE CONFIGURATION
SETTINGS IN A PRE-DETERMINED FORMAT
52

MANIPULATE THE MULTIPLE CONFIGURATION SETTINGS
ON THE SOURCE COMPUTING SYSTEM
54

PREPARE A TRANSITION PACKAGE FROM THE
MANIPULATED CONFIGURATION SETTINGS ON THE
SOURCE COMPUTING SYSTEM
56

END

U.S. Patent          Mar. 18, 2008      Sheet 4 of 8          US 7,346,766 B2

# FIG. 4



PERSONALITY OBJECT

58

DESKTOP OBJECT

60

NETWORK OBJECT

62

INTERNET OBJECT

64

MAIL OBJECT

66

APPLICATIONS OBJECT

68

Exhibit B
Page 5 of 21

# FIG. 5



70

START

RECEIVE A TRANSITION PACKAGE ON A TARGET COMPUTING SYSTEM, WHERE THE TRANSITION PACKAGE INCLUDES CONFIGURATION SETTINGS TO TRANSITION FROM THE SOURCE COMPUTING SYSTEM TO THE TARGET COMPUTING SYSTEM        72

INFUSE THE TRANSITION PACKAGE ON THE TARGET COMPUTING SYSTEM TO TRANSITION CONFIGURATION SETTINGS ON THE TARGET COMPUTING SYSTEM        74

OPTIONALLY VERIFY THE INJECTION OF THE TRANSITION PACKAGE ON THE TARGET COMPUTING SYSTEM        76

END

Exhibit B
Page 6 of 21



**FIG. 6A**

78

START

CREATE AN EXTRACTION PLAN AND A TRANSITION PLAN
WITH A USER INTERFACE APPLICATION

80

LOCATE MULTIPLE CONFIGURATION SETTINGS WITH AN
EXTRACTION APPLICATION ON A SOURCE COMPUTING
SYSTEM USING MULTIPLE TRANSITION RULES FROM A
PERSONALITY OBJECT

82

EXTRACT THE MULTIPLE CONFIGURATION SETTINGS FROM
MULTIPLE LOCATIONS ON THE SOURCE COMPUTING
SYSTEM WITH THE EXTRACTION APPLICATION USING THE
EXTRACTION PLAN

84

STORE THE EXTRACTED MULTIPLE CONFIGURATION
SETTINGS IN A PREDETERMINED FORMAT ON THE SOURCE
COMPUTING SYSTEM

86

MANIPULATE THE MULTIPLE CONFIGURATION SETTINGS
WITH A PREPARATION APPLICATION USING THE
TRANSITION PLAN

88

PREPARE A TRANSITION PACKAGE FROM THE
MANIPULATED CONFIGURATION SETTINGS WITH THE
PREPARATION APPLICATION ON THE SOURCE COMPUTING
SYSTEM

90

TO A
FIG. 6B

Exhibit B
Page 7 of 21

# FIG. 6B



A

PREPARE AN INJECTION APPLICATION INCLUDING THE TRANSITION PACKAGE WITH THE PREPARATION APPLICATION — 92

SEND THE INJECTION APPLICATION FROM THE SOURCE COMPUTING SYSTEM TO THE TARGET COMPUTING SYSTEM — 94

RECEIVE THE INJECTION APPLICATION ON THE TARGET COMPUTING SYSTEM FROM THE SOURCE COMPUTING SYSTEM — 96

INFUSE THE TRANSITION PACKAGE ON THE TARGET COMPUTING SYSTEM USING THE INJECTION APPLICATION TO TRANSITION CONFIGURATION SETTINGS ON THE TARGET COMPUTING SYSTEM — 98

OPTIONALLY VERIFY THE INFUSION OF THE CONFIGURATION SETTINGS ON TARGET COMPUTING SYSTEM WITH THE INJECTION APPLICATION — 100

END

# FIG. 7



US 7,346,766 B2

1

# METHOD AND SYSTEM FOR AUTOMATICALLY TRANSITIONING OF CONFIGURATION SETTINGS AMONG COMPUTER SYSTEMS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. Patent Application No. 10/319,437 filed on Dec. 13, 2002, now U.S. Pat. No. 6,728,877 which application is a continuation of U.S. patent application Ser. No. 09/300,862 filed on Apr. 28, 1999, now abandoned which applications are hereby incorporated by reference in their entireties.

## FIELD OF THE INVENTION

The present invention relates to configuration of computers. More specifically, it relates to a method and system for automatic transitioning of configuration settings among computer systems.

## BACKGROUND OF THE INVENTION

In today's world, where technology changes very quickly, it is very common to replace an old computer system every few years with a new computing system. It has been estimated that approximately 90,000,000 personal computers are sold each year, with approximately 90% of the sales comprising new computing systems to replace old computing systems. The new computing systems typically include more memory, larger hard-disks, faster central processing units, better quality monitors, updated versions of operating systems, new software applications and other improved features.

Any old computer system typically includes a large number of configuration settings that have been added and/or customized by a user or a network manager. The configuration settings may include Internet settings, modem or other network settings, dial-up phone numbers, a desktop "look and feel," file system folders settings, application settings, folder names and locations, macros and editing options, custom dictionaries, electronic mail ("e-mail") address books, inboxes, passwords, subscriptions, certificates and other configurations or setting customized by a user or a network manager, or other configuration parameters used over time such as cookies, etc.

There are several problems associated with making a transition from an old computing system to a new computing system. First, there is currently no easy way to determine what configuration settings a user or a network administrator may have customized, since there is no one central location where such configuration files are stored. Operating systems and other hardware and software applications have unique directories and unique file names to store configuration files and settings. These unique directories and configuration files can exist virtually anywhere on an old computer system. Trying to collect configuration settings is a difficult task. The average user or network administrator may have to spend large amounts of time reading documentation or help screens to figure out where the configuration files are stored for any given application.

Another problem is that there is no easy way to collect and store heterogeneous configuration settings when they are located. The operating system and software applications typically use unique data layouts and data storage features that do not allow for homogenous collection and storage.

2

Another problem is that there is no easy way to transfer old configuration settings to a new computing system. When a new computer system is used, a user or a user's agent typically has to re-configure the new computing system to include configuration settings that were used on an old computer system. All but the most rudimentary pieces of "the migration process" are done by hand. This requires many hours of hands-on time, with lost productivity and a "start from scratch" resignation. Many users often decide to stick with an obsolete old computer system rather than wrestle migration and manual reconfiguration required for a new computing system.

Yet another problem is that configurations settings on an old computing system may be stored in a new location, in a new file, or in new format on a new computing system. An old configuration setting may have to be translated or otherwise modified to provide the same results on the target computing system. Such translation and/or modifications are typically completed by hand and are prone to errors that lead to user frustration.

Yet another problem is that the migration-to a new computing system typically requires training on new features of new target computing system before migration can take place. This training often delays the migration process. In addition, a manual migration process used without adequate training on the new computing system can decrease quality of service on the new computing system since one or more configuration settings may be missed on the old computing system and not be transferred to the new computing system.

Yet another problem is the Year 2000 ("Y2K") problem, which may force companies to quickly migrate large numbers of computing systems to new technology before the year 2000. The issues of migration in the face of a Y2K breakdown is a daunting problem by itself. A manual migration process acts to increase the complexity of the Y2K problem.

Thus, it is desirable to automatically determine configuration settings customized by a user or a network administrator on a old computing system. It is also desirable to provide an automatic migration of configuration settings from an old computing system to a new computing system without using a time consuming manual migration process.

## SUMMARY OF THE INVENTION

In accordance with preferred embodiments of the present invention, some of the problems associated with transferring configuration settings from an old computer system to a new computer system are overcome. A method and system for automatically transitioning configurations among computer systems is provided. One aspect of the invention includes a method for automatically transitioning configuration settings from source (i.e., old) computing system to a target (i.e., new) computing system.

This method includes locating multiple configuration settings on a source computing system using multiple transition rules from a Personality object. The multiple configuration settings are extracted from a multiple locations on the source computing system. The multiple extracted configuration settings are stored in a pre-determined transition format on the source computing system. The multiple extracted configuration settings stored in the pre-determined transition format are manipulated. A translation package is prepared from the multiple manipulated configuration settings stored in the pre-determined transition format. The translation

**Exhibit B**
**Page 10 of 21**

US 7,346,766 B2

3

package is used to transfer the multiple manipulated configuration settings from the source computing system to a target computing system.

The translation package is transferred to a target computing system, or stored as an intermediate step in the transition process. The translation package may also be created stored on an intermediate computing system. The translation package is infused on the target computing system to transition configuration settings from the source computing system to the target computing system. The configuration settings in the translation package may be optionally verified to ensure that the configuration settings have been correctly applied to the target computing system.

Another aspect of the invention includes an automatic transition system. The system comprises a database, and extraction application, a preparation application, an injection application and a user interface application. However, more or fewer system components could also be used and the present invention is not limited to the system components described.

The database is used for storing configuration settings extracted from a source computing system, manipulated configuration settings from a source computing system, and transition packages to transition configuration settings from a source computing system to a target computing system. The database may include data stored in a database format or in other formats such as a data structure format, a file format, or other volatile or non-volatile formats. The extraction application is used for locating and extracting configuration settings on a source computing system for transition to a target computing system. The preparation application is used for manipulating configuration settings extracted from a source computing system and for preparing a transition package. The injection application is used for infusing manipulated configuration settings from a transition package to transition configuration settings from a source computing system to a target computing system. The user interface application is used for preparing an extraction plan and a transition plan to extract and transition configuration settings from a source computing system for a target computing system.

The method and system provide an automated transition process for transition configuration settings from a target computing system to a host computing system. The method and system may vastly reduce transition, configuration and deployment times for service providers, corporations, and end-users for transitions from a target computing system to source computing system. The method and system may save time, resources, improve transition quality, and reduce user frustration.

The foregoing and other features and advantages of preferred embodiments of the present invention will be more readily apparent from the following detailed description. The detailed description proceeds with references to the accompanying drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the present invention are described with reference to the following drawings, wherein:

FIG. 1 is a block diagram illustrating an exemplary translation system;

FIG. 2 is a block diagram illustrating an exemplary layered transition architecture;

4

FIG. 3 is a flow diagram illustrating a method for automatically determining transition configuration settings from a source computing system for a target computing system;

FIG. 4 is a block diagram illustrating components of a Personality object;

FIG. 5 is a flow diagram illustrating a method for automatically applying determined transition configuration settings;

FIGS. 6A and 6B are flow diagram illustrating a method for automatically transitioning configuration settings; and

FIG. 7 is a block diagram illustrating a data flow for the automatic configuration setting transition method of FIGS. 6A and 6B.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Exemplary Transition System

FIG. 1 is a block diagram illustrating an exemplary transition system 10 for automatically transitioning configuration settings from a source (i.e., old) computing system to a target (i.e., new) computing system. The transition system 10 includes a source computing system 12. The source computing system 12 includes a Transition application 14. The Transition application 14 comprises: a database 16, an Extraction application 18, a User Interface application 20, and a Preparation application 22. The Transition application 14 further comprises an Injection application 24 that is sent to a target computing system 26. However, more or fewer components could also be used in the transition system 10, including intermediate computing systems between the source computing system 12 and the target computing system 26, and the present invention is not limited to the components illustrated in FIG. 1.

In one exemplary preferred embodiment of the present invention, the database 16 is used for storing configuration settings extracted from the source computing system 12, manipulated configuration settings and transition packages to transition configuration settings from the source computing system 12 to a target computing system 26. The database 16 may include data stored in a database format or in other formats such as a data structure format, a file format, or other volatile or non-volatile storage formats. The Extraction application 18 is used for locating and extracting configuration settings on the source computing system 12 to transition to the target computing system 26. The User Interface application 20 is used for preparing an extraction plan and a transition plan to extract and transition configuration settings from the source computing system 12 to the target computing system 26. The Preparation application 22 is used for manipulating configuration settings extracted from the source computing system 12 and for preparing a transition package. The transition package is used to transition configuration settings from the source computing system 12 to the target computing system 26. The Injection application 24 is used for infusing manipulated configuration settings from a transition package to transition configuration settings from the source computing system 12 to a target computing system 26. However, the present invention is not limited to the functionality described for the transition applications, and the transition applications can include more or less functionality. The transition applications are explained in detail below.

In one embodiment of the present invention, the Transition application 14 including the database 16, the Extraction application 18, the User Interface application 20, and the

Exhibit B
Page 11 of 21

US 7,346,766 B2

5

Preparation application **22** without the Injection application **24** reside on the source computing system **12**. This is illustrated in FIG. **1** by the dashed line dividing source and target components of the Transition application **14**. In such an embodiment, only the Injection application **24** resides on the target computing system **26**.

In another preferred embodiment of the present invention, a Transition application **14** including a database **16**, an Extraction application **18**, a User Interface application **20**, and a Preparation application **22**, and an Injection application **24** resides on both the source computing system **12** and the target computing system **26** (not illustrated in FIG. **1**).

In another preferred embodiment of the present invention, the source computing system **12** only temporarily includes the Transition application **14**. That is, the Transition application **14** is not installed on any non-volatile storage on the source computing system **12**. The Transition application **14** only "resides" in volatile storage (e.g., Random Access Memory ("RAM")) on the source computing system **12** during the extraction and preparation portion of the transition process. The target computing system **26** may also only temporary include the Injection application **24**. The Injection application **14** may also only reside in volatile storage on the target computing system **14** during the injection portion of the translation process.

In yet another embodiment of the present invention, components of the Translation application **14** may only exist on a "third" computing system and not on either the source computing system **12** or the target computing system **14**. Additional software applications may be used only to retrieve and only to inject settings and such software applications would be present only on the source computing system **12** or the target computing system **14** and coordinated from the third computing system. In yet another embodiment of the present invention, computer hardware or firmware may be employed in such a manner that configuration settings are extracted and injected without a software Transition application **14** existing on the source computing system **12** or the target computing system **14**.

In yet another preferred embodiment of the present invention, the source computing system **12** may only include the Extraction application **18**. The other components of the Transition application **14** reside on one or more other computing systems and can be used in a distributed fashion. Extracted transition data can also be stored on the one or more other computing systems using distributed computing.

An operating environment for the computing systems **12**, **26** of the present invention include a processing system with one or more high speed Central Processing Unit(s) ("CPU") and a memory system. In accordance with the practices of persons skilled in the art of computer programming, the present invention is described below with reference to acts and symbolic representations of operations or instructions that are performed by the processing system. Such acts and operations or instructions are referred to as being "computer-executed" or "CPU executed."

The CPU can be either electrical or biological. The acts and symbolically represented operations or instructions include the manipulation of electrical signals or biological signals by the CPU. An electrical signal or biological system represents data bits that cause a resulting transformation or reduction of the electrical signals or biological signals. The maintenance of data bits at memory locations in a memory system to thereby reconfigure or otherwise alter the CPU's operation, as well as other processing of signals. The memory locations where data bits are maintained are

6

physical locations that have particular electrical, magnetic, optical, or organic properties corresponding to the data bits.

The data bits may also be maintained on a computer readable medium including magnetic disks, optical disks, electrical memory, organic memory, and any other volatile (e.g., Random Access Memory ("RAM")) or non-volatile (e.g., Read-Only Memory ("ROM") a hard disk, etc.,) mass storage system readable by the CPU. The computer readable medium includes cooperating or interconnected computer readable medium, which exist exclusively on the processing system or be distributed among multiple interconnected processing systems that may be local or remote to the processing system.

Exemplary Transition Architecture

FIG. **2** is a block diagram illustrating an exemplary layered transition architecture **28** for the Transition application **14** of FIG. **1**. The Transition application **14** resides in a transition core process **30**. The transition core process **30** includes a control module **32** that is an interface to an operating system **34**. The operating system **34** can be a windowed operating system such as Windows 95/98/NT by Microsoft Corporation of Redmond, Wash., and other windowed or non-windowed operating systems can also be used (e.g., Linux). The transition core process **30** uses plug-in modules **36** to interface to the operating system **34** and to process configuration settings from the source computing system **12**. The plug-in modules **36** also allow additional modules to be added to provide new and enhanced functionality for the transition core process **30**. The plug-in modules **36** are explained below (See FIG. **4**).

In one exemplary preferred embodiment of the present invention, a first transition core process **30** on the source computing system **12** controls the Extraction application **18** (FIG. **1**), the User Interface application **20** (FIG. **1**), and the Preparation application **22** (FIG. **1**). The operating system **34** on the target computing system **26** controls execution of the Injection application **24** on the target computing system **26** (e.g., the Injection application **24** is an executable file (.EXE)). In another exemplary preferred embodiment of the present invention, a first transition core process **30** on the source computing system **12** controls the Extraction application **18**, the User Interface application **20**, and the Preparation application **22**. A second transition core process **30** on the target computing system **12** controls a first Injection application **24** on the target computing system **26**.

In one exemplary preferred embodiment of the present invention, the transition core process **30** includes an Application Programmer's Interface ("API"). The transition API allows other applications to call transition application functions (e.g., Hyper Text Markup Language ("HTML"), Java, Visual Basic, Visual Basic Scripts, C++, Visual C++, etc.). The transition API also includes functions for low level Input/Output ("I/O"), high level I/O, and smart I/O. The low level I/O includes functions for file system I/O, database **16** interaction, transition specific I/O, operating system registry I/O, etc. The high level I/O includes retrieval of configuration settings, storage of configuration settings, etc. The smart I/O includes smart configuration setting searching capabilities, smart copying capabilities, etc.

The transition core process **30** includes an output layer **38**, a protocol layer **40**, a message layer **42**, a database **16** and a file layer **44**. The output layer **38** is used for the various types of I/O as was described above. The protocol layer **40** allows the transition core process **30** to use protocols such as Hyper Text Transfer Protocol ("HTTP"), File Transfer Protocol ("FTP"), User Datagram Protocol ("UDP"), Transmis-

**Exhibit B**
**Page 12 of 21**

US 7,346,766 B2

7

sion Control Protocol ("TCP"), Internet Protocol ("IP") and other protocols to communicate with the source computing system 12 and the target computing system 26. The message layer 42 is used for electronic mail ("e-mail") and other communications with the operating system 34 and the source computing system 12 and the target computing system 26.

The database 16 includes objects used to locate configuration settings on the source computing system. The database 16 may be temporary storage such as RAM, or permanent storage such as a floppy disk, hard disk, re-writeable, CD-ROM, Flash memory, Flash-ROM, or other non-volatile computer readable media. The file layer 44 includes configuration settings extracted from the source computing system 12. The file layer 44 allows files to be create and retrieved across file volumes including local and remote file systems. However, more or fewer layers could also be used in the translation architecture 28. The present invention is not limited to the architecture layers illustrated in FIG. 2.

Automatic Transition of Configuration Settings

FIG. 3 is a flow diagram illustrating a Method 46 for automatically transitioning configuration settings from a source computing system to a target computing system. At Step 48, multiple configuration settings are located on a source computing system using multiple transition rules from a Personality object. At Step 50, multiple configuration settings are extracted from multiple locations on the source computing system. At Step 52, the multiple extracted configuration settings are stored in a pre-determined transition format. At Step 54, the multiple extracted configuration settings stored in the pre-determined transition format are manipulated. At Step 56, a transition package is created from the multiple manipulated configuration settings. The transition package includes the multiple manipulated configuration settings. The transition package is sent from the source computing system to the target computing system or stored as an intermediate step in the transition process. The transition package may be stored one or more intermediate computing systems, local or remote to the source computing system or the target computing system. The transition package is infused on the target computing system to transition configuration settings from the source computing system to a target computing system.

Preferred embodiments of the present invention use object-oriented programming techniques. However, non-object-oriented programming techniques could also be used. As is known in the art, an "object type," also called an "object class," comprises a data-type, services that operate on instances of the data type, and a set of object attributes in an object-oriented data-structure. An "object attribute" is a field of data in an object that partially defines that object's state. An "object service" implements and manipulates objects, usually by reading or changing the object attributes. "Object-oriented design" is a software development technique in which a system or component is expressed using objects.

An object typically is an object-oriented data-structure that has two components: a function table, containing a pointer to each "object member" or member function (i.e., sometimes known as an "object method") defined in the object's class, an events table, for accepting events (e.g., OLE or ActiveX control events) and a data block, containing the current values for each object variable (i.e., data members, sometimes known as an "object property"). A computer software application has some reference to an object through an object pointer. A computer software application obtains

8

this object reference by using some type of function call (direct or implied) in which that function allocates an object block in computer memory, initializes the function table, and returns a reference to allocated computer memory to an application. The computer memory may be local or distributed on a remote computer.

The Component Object Model ("COM") and Distributed Component Object Model ("DCOM") are models used for object-oriented programming and known to those skilled in the art. The COM and DCOM specify how objects within a single application or between applications (e.g., client/server applications) interact and communicate by defining a set of standard interfaces. Interfaces are groupings of schematically related functions through which a client application accesses the services of a server application.

Object Linking and Embedding ("OLE") controls, such as OLE controls and ActiveX Controls by the Microsoft Corporation of Redmond, Wash., are based in part on the Component Object Model and allow the creation of objects of different formats which operate on data through defined interfaces, rather than operating on the applications responsible for the data. ActiveX is based in part on OLE technologies. An OLE or ActiveX control is an object that accepts and responds to events, such as a selection by a mouse or a key on a keyboard, or a selection by another object-oriented member function. Detailed information on the OLE object interface can be found in *Inside OLE*, 2nd edition, by Kraig Brockschmidt, Microsoft Press, Redmond Washington, 1995 which is incorporated herein by reference.

In an exemplary preferred embodiment of the present invention, at Step 48, multiple configuration settings are located on the source computing system 12 using multiple transition rules from a Personality object. In an exemplary preferred embodiment of the present invention, the Personality object includes five object-oriented plug-in modules 36. However, more or fewer object-oriented plug-in modules 36 could also be used.

Translation Personality Object

FIG. 4 is a block diagram illustrating components of a Personality object 58. The Personality object 58 includes a Desktop object 60, a Network object 62, an Internet object 64, a Mail object 66 and an Applications object 68. However, more or fewer objects could also be used in the Personality object 58. The objects include information about configuration settings such as location, name, associated sub-settings, etc. In an exemplary preferred embodiment of the present invention, the objects 60, 62, 64, 66, 68 in the Personality object 58 are object-oriented objects. However, non-object oriented objects could also be used in the Personality object 58. The Personality object 58 and related objects 60, 62, 64, 66, 68 comprise object classes that include one or more object members and a data block as was described above.

In one exemplary preferred embodiment of the present invention, the Desktop object 60 includes user preferences that affect the appearance and operation of a basic windowed user interface. Exemplary configuration settings included in the Desktop object 60 are illustrated in Table 1. However, more or fewer configuration settings can also be used in the Desktop object 60, and the present invention is not limited to the configuration settings illustrated in FIG. 1.

**Exhibit B**
**Page 13 of 21**

US 7,346,766 B2

**9**

TABLE 1

| Desktop Object 60 |
| --- |
| Visual Elements |
| Fonts including meta data colors, themes, sounds, password wall |
| paper, screen savers, metrics, etc. |
| Accessibility Elements |
| Settings that disable accessibility to the source computing system 12 |
| User Interface Hardware Settings |
| Display resolutions, mouse trails, keyboard mappings, |
| character settings, etc. |
| Regional Settings |
| Time zones, data formats, language, currency settings, etc. |
| Windows Preferences |
| Start menus, desktop shortcuts, document and run commands, etc. |
| Registry Settings |

The Network object 62 includes configuration settings that enable functionality within a private network of computers such as a Local Area Network ("LAN") or an intranet. In one exemplary preferred embodiment of the present invention, the Network object 62 may not include hardware configuration settings. The Network object 62 may instead include configuration settings that configure the operating system 34, that in turn are mapped to underlying hardware on the source computing system 12. In another exemplary preferred embodiment of the present invention, the network object 62 may include hardware settings.

Exemplary configuration settings included in the Network object 62 are illustrated in Table 2. However, more or fewer configuration settings can also be used in the Network object 62, and the present invention is not limited to the configuration settings illustrated in Table 2.

TABLE 2

| Network Object 62 |
| --- |
| Service Providers |
| Name, network addresses (e.g., IP address), dial-up numbers, etc. |
| Services |
| Network services, etc. |
| Clients |
| Proxies, network servers, etc. |
| Domains |
| Domain names and subnets, workgroups |
| Protocols |
| TCP, UDP, IP, HTTP, FTP, etc. |
| Registry Settings |

The configuration settings from the Network Object 62 are applied to the target computing system 26 within the context of operating system 34 services available on the target computing system 26. In one exemplary preferred embodiment of the present invention, the Network Object 62 will not install configuration settings for network applications that are not available on the target computing system. For example, if the source computing system 12 has TCP/IP installed, the Network Object 62 will locate and extract relevant TCP/IP settings from the source computing system 12. If the target computing system does not have TCP/IP installed, the Network Object 62 will not automatically transition the TCP/IP settings from the source computing system 12, since the TCP/IP settings can not be used. In another embodiment of the present invention, if the source computing system 12 has configuration settings for a network application that is not installed on the target system (e.g., TCP/IP) the network application will be installed on the target computing system and the appropriate configuration settings will then be applied.

**10**

Another feature of the Network Object 62 is to allow a user to review and edit configuration settings before they are applied to the target computing system 26. For example, a network address (e.g., an IP address) extracted from the source computing system may or may not be appropriate for the target computing system, since the target computing system may be installed on a different computer network. Thus, the user can review and edit the configuration settings before they are applied to the target computing system 26.

The Internet Object 64 includes configuration settings that are relevant to the public network of computers provided by the Internet. As is know in the art, the Internet is a world-wide network of inter-connected computers. Exemplary configuration settings included in the Internet object 64 are illustrated in Table 3. However, more or fewer configuration settings can also be used in the Internet object 64, and the present invention is not limited to the configuration settings illustrated in Table 3.

TABLE 3

| Internet Object 64 |
| --- |
| Accounts |
| Internet service provider accounts, logins, passwords, etc. |
| Internet Browser |
| Internet Explorer, Netscape Navigator, etc. |
| Internet browser options |
| Favorites, addresses (i.e., Uniform Resource Locators ("URL's"), |
| cookies, bookmarks, histories, newsgroup filters, security |
| settings, channels, certificates, etc. |
| Dial-up networking settings |
| Dial-up numbers, login names, passwords, etc. |
| Network addresses |
| IP addresses, etc. |
| Registry settings |

The Mail object 66 includes configuration settings for electronic mail ("e-mail") and other communication messaging used on the old computer system 12. In one exemplary preferred embodiment of the present invention, the Mail object 66 includes configuration settings for Exchange, Outlook and Outlook Express, by Microsoft, Communicator, by Netscape Corporation of Mountain View, Calif., Pegasus, Eudora, and Lotus Notes, by IBM. However, more or fewer e-mail or communications programs could also be supported by the Mail object 66, and the present invention is not limited to the e-mail and communications programs listed.

Exemplary configuration settings included in the Mail object 66 are illustrated in Table 4. However, more or fewer configuration settings can also be used in the Mail object 66, and the present invention is not limited to the configuration settings illustrated in Table 4.

TABLE 4

| Mail Object 66 |
| --- |
| E-mail, communication applications |
| Express, Outlook, Outlook Express, Communicator, Pegasus, |
| Eudora, Lotus Notes, etc. |
| Settings |
| E-mail address identification, address books, inbox/outbox folders, |
| mail folders, etc. |
| Meta Data |
| Custom dictionaries, templates, macros, forms |
| Registry Settings |

**Exhibit B**
**Page 14 of 21**

US 7,346,766 B2

11

The e-mail address identification in the Mail Object 66 includes addresses such as a Point-Of-Presence ("POP"), a Simple Mail Transfer Protocol ("SMTP") and other e-mail related addresses.

The Applications object 68 includes configuration settings of applications installed on the source computing system 12. For example, the applications may include Microsoft Word, Excel, Power Point, etc., applications in the Word Perfect Suite, by Corel and other applications from the source computing system 12.

Exemplary configuration settings included in the Application object 68 are illustrated in Table 5. However, more or fewer configuration settings can also be used in the Application object 68, and the present invention is not limited to the configuration settings illustrated in Table 5.

TABLE 5

| Application Object 68 |
| --- |
| Application |
| Word, Excel, Power Point, Word Perfect, etc. |
| Settings |
| Dictionaries, style, formats, language, fonts, etc. |
| Registry Settings |

In one exemplary preferred embodiment of the present invention, the Application object 68 includes configuration settings for applications following design guidelines developed for Microsoft Windows operating system applications. However, other design guideline developed for applications for other operating systems, such as Linux, could also be used to determine which configuration settings are included in the Application object 68, and the present invention is not limited to an Application object 68 including configuration settings for just Microsoft Windows applications.

Exemplary Automatic Configuration Setting Translation

Returning to FIG. 3, at Step 48, multiple configuration settings are located on a source computing system using multiple transition rules from the Personality object 60 (FIG. 4). In one exemplary preferred embodiment of the present invention, the Extraction application 18 uses the Personality object 60 to locate configuration settings on the source computing system 12.

The locating Step 48 can also be used to locate configuration settings on more than one computer simultaneously (e.g., a desktop computer and a laptop computer). The User Interface application 20 is used to configure the Extraction application 18. The User Interface application 20 includes a list of "identity units" corresponding to configuration settings that will be extracted from the source computing system 12 and infused on the target computing system 26. The User Interface application 20 includes the ability to "drill-down" to multiple options and sub-options within an identity unit.

The User Interface application 20 configures the Extraction application 18 with the following options: 1.) what configuration settings to extract; 2.) where to store the results; 3.) at what level will the extraction take place; 4.) how the results are "tagged" for later retrieval; and 5.) how verbose or silent the extraction process is. However, more or fewer options could also be configured on Extraction application 18.

The "what to extract" option includes creating an Extraction plan. The Extraction plan identifies specific identity units that should be located and a list of options for each identity unit. The Extraction plan includes a full list of

12

identity units to be located, an exclusion list and an inclusion list. The full list is a "vanilla" state that specifies all identity units known on the source computing system 12 that should be located and extracted. The Extraction plan may be modified by excluding one or more identity units from the full list. For example, if the full list included 250 identity units, an exclusion list could be used to exclude 50 identity units from the full list. If available, the Extraction application 18, uses the exclusion list instead of the full list to locate and extract configuration settings corresponding to the identity units from the source computing system 12 (e.g., at Steps 50 and 52 of Method 48).

The inclusion list allows a user to select any of the identity units from the full list. For example, if the full list included 250 identity units, a user may select only 30 identity units from the 250 available identity units. Thus, the only the 30 configuration settings from the inclusion list from the Extraction plan will marked as "active." The remaining 230 possible configuration settings are marked as "in-active" and are not used. If available, the Extraction application 18, uses the inclusion list instead of the full list to locate and extract the configuration settings corresponding to the identity units. If no exclusion list or inclusion list is created, the Extraction application 18, by default uses the full list to locate and extract configuration settings on the source computing system 12.

The User Interface 20 is also used to configure the Preparation application 22. The Preparation application 22 is configured in a similar manner to that described for the Extraction application 18. However, the Preparation application 22 includes a "Transition plan" instead of an Extraction plan. The Transition plan includes a full list, as a default list, and allows creation of exclusion and inclusion lists as was discussed for the Extraction plan.

Returning again to FIG. 3, at Step 50, multiple configuration settings are extracted from multiple locations on the source computing system by the Extraction application 18 using the Personality object 60. In one exemplary preferred embodiment of the present invention, the Extraction application 18 uses objects from the Personality object 60 and the Extraction plan described to produce "work product" that is stored in a pre-determined transition format at Step 52. In one exemplary preferred embodiment of the present invention, the work product is stored on the source computing system 12. In another exemplary preferred embodiment of the present invention, the work product is stored on one or more intermediate computing systems in volatile or non-volatile storage.

In one preferred embodiment of the present invention, the pre-determined transition format used to store the configuration settings is a database format for relational databases. However, non-relational database formats could also be used. In one preferred embodiment of the present invention, the pre-determined transition format is a database format for System Query Language ("SQL") databases. In another preferred embodiment of the present invention, the pre-determined transfer format is a database format for a Microsoft Access databases. However, other pre-determined transition formats can also be used and the present invention is not limited to the database formats described.

In one exemplary preferred embodiment of the present invention, the Extraction application 18 stores the configuration settings in a pre-determined transition format in temporary volatile storage (e.g., in RAM). In another exemplary preferred embodiment of the present invention, the Extraction application 18 includes a Loader application that is used to transfer data from temporary storage to the

US 7,346,766 B2

13

database **16**. In such an embodiment, the Extraction application **18** does not maintain a persistent connection with the database **16**. The transfer of information from temporary storage to the database **16** is accomplished with the Loader application. In yet another exemplary preferred embodiment of the present invention, the Extraction application **18** maintains a persistent connection with the database **16** and is capable of writing configuration settings in the pre-determined format directly into the database **16**.

At Step **54**, the multiple extracted configuration settings stored in the pre-determined transition format are manipulated. In a preferred embodiment of the present invention, the configuration settings are manipulated with the Preparation application **22** using the Transition plan described above. For example, the Extraction application **18** may extract **250** configuration settings from the source computer with an exemplary Extraction plan that included only a full list (i.e., no extraction list or inclusion list). An exemplary Transition plan may include only an inclusion list. The exemplary inclusion list may include only **30** of **250** possible configuration settings from the Extraction plan. Thus, the only the **30** configuration settings from the inclusion list from the Transition plan will marked as "active" in the pre-determined transition format by the Preparation application **22**. The remaining **230** possible configuration settings are marked as "inactive" by the Preparation application **22** and not used. Various combinations of full lists, exclusion lists, inclusion lists, from the Extraction plan and Transition plan can be used, and the present invention is not limited to this example.

The manipulation at Step **54** also includes transitioning one or more configuration settings from a format used on the source computing system to a format used on the target computing system. For example, a configuration setting for a computer monitor may be stored with the name config-monitor-old on the source computer system. However, on the target computer system, the same configuration setting may be stored with a name config-monitor-new. In addition, a configuration setting may be stored in a first directory-A on the source system, and in a second directory-B, on the target system. The preparation application **22** handles such transitions at step **54**.

At Step **56**, a transition package is created from the multiple manipulated configuration settings. In an exemplary preferred embodiment of the present invention, the Preparation application **22** creates a transition package. In one exemplary preferred embodiment of the present invention, the transition package includes a list of commands along with necessary source data for the manipulated configuration settings. The list of command may be used to provide an ordering for transitioning the configuration settings. However, other transition package formats could also be used and the present invention is not limited to the transition packages described. The transition package will be used by the Injection application **24** to transition the desired configuration settings from the source computing system **12** the target computing system **26**.

In an exemplary preferred embodiment of the present invention, the transition package is stored in the database **16** by the Preparation application **22**. In another exemplary preferred embodiment of the present invention, the transition package is also transferred directly to the Injection application **24**. In yet another exemplary preferred embodiment of the present invention, the transition package is read from the database **16** by the Preparation application **22** and the Injection application included in at a later time.

14

Applying a transition package to a target computing system

FIG. **5** is a flow diagram illustrating a Method **70** for automatically applying transition configuration settings. At Step **72**, a transition package is received on a target computing system from a source computing system. At Step **74**, the transition package is infused on the target computing system to automatically transition manipulated configuration settings from the source computing system to the target computing system. At Step **76**, transition package is optionally verified on the target computing system to ensure that the transition package has been correctly applied to the target computing system.

In one exemplary preferred embodiment of the present invention, the transition package is sent from the Preparation application **22** on the source computing system **12** within an Injection application **24** to the target computing system **26**. The Injection application **24** with the transition package can be sent to the target computing system **26** via on a floppy disk, zip-disk, or CD-ROM, or transferred using e-mail, TCP/IP, FTP, or with other network transfer mechanisms. At Step **72**, the target computing system **26** receives the Injection application **24** with the transition package from the source computing system **12**. As was described above, in one exemplary preferred embodiment of the present invention, the transition package includes a list of commands along with necessary source data for multiple manipulated configuration settings. At Step **74**, an Injection application **24** "infuses" the target computing system **26** with manipulated configuration settings from the source computing system **12**. The Injection application **24** reads and executes the list of commands from the transition package to transition configuration to the target computing system **26**. The Injection application **24** is invoked by the operating system **34** on the target computing system. At Step **76**, transition package is optionally verified on the target computing system **26** to ensure that the transition package has been correctly applied to the target computing system **26**. In one exemplary preferred embodiment of the present invention, the Injection application **24** also verifies the injection of the transition configuration settings on the target computing system **26**. In another exemplary preferred embodiment of the present invention, a separate Verification application verifies configuration settings infused by the Injection application **24**.

Exemplary Automatic Transition of Configuration Settings

FIGS. **6**A and **6**B are flow diagram **78** illustrating one exemplary method for automatically transitioning configuration settings for one exemplary preferred embodiment of the present invention. However, the present invention is not limited to this exemplary embodiment and other embodiments could also be used. At Step **80** of FIG. **6**A, an Extraction plan and a Transition plan are prepared with the User Interface application **20**. At Step **82**, multiple configuration settings are located on a source computing system **12** with an Extraction application **18** using a Personality object **58**. At step **84**, the multiple configuration settings are extracted from multiple locations on the source computing system **12** with the Extraction application **18** and the Extraction plan. At Step **86**, the multiple extracted configuration settings are stored in a database format on the source computing system **12**. At Step **88**, the multiple extracted configuration settings are manipulated with a Preparation application **22** and a Transition plan. At Step **90**, a transition package is prepared from the multiple manipulated configuration settings by the Preparation application **22**. The

**Exhibit B**
**Page 16 of 21**

US 7,346,766 B2

<table>
<tr><td>15</td><td>16</td></tr>
</table>

transition package is used to transition configuration settings from the source computing system to the target computing system **26**.

At Step **92** of FIG. **6**B, an Injection application **24** including the transition package is prepared by the Preparation application **22**. The Injection application **24** uses the transition package to transition configuration settings from the source computing system to the target computing system. At Step **94**, the Injection application **24** including the transition package is sent from the source computing system **12** to the target computing system **26**.

At Step **94**, the Injection application including the transition package is received on the target computing system **26** from the source computing system **12**. At Step **98**, the transition package is infused with the Injection application **24** on the target computing system **26** to transition configuration settings from the source computing system **12** to the target computing system **26**. At Step **100**, configuration settings from the transition package are optionally verified with the Injection application **24** to ensure that the transition package has been correctly applied to the target computing system.

Data Flow for Exemplary Automatic Transition of Configuration Settings

FIG. **7** is a block diagram illustrating a data flow **102** for the automatic configuration setting transition from FIGS. **6**A and **6**B. The User Interface application **20** is used to create **104** an Extraction plan and a Transition plan (e.g., Step **80** of FIG. **6**A). The Extraction application **18** locates and extracts **106** multiple configuration settings from multiple locations on the source computing system using the Personality object **58** and the Extraction plan (e.g., Steps **82** and **84**). The multiple extracted configuration settings are stored **108** in a pre-determined transition format in temporary storage on the source computing system **12** (e.g., Step **86**). The multiple extracted configuration settings may also be stored **110** in persistent storage in the database **16**. The Preparation application **22** manipulates **112** the multiple extracted configuration settings stored in the pre-determined transition format using the Transition plan (e.g., Step **88**). The Preparation application **22** creates **114** a transition package from the multiple manipulated configuration settings. The transition package includes the multiple manipulated configuration settings (e.g., Step **90**).

As was discussed above, the transition package can be stored **116** in the database **16** by the Preparation application **22**. The transition package can also be transferred directly to the Injection application **24**. The transition package can also be read from the database **16** by the Preparation application **22** and sent to the Injection application **24** at a later time. The Preparation application **22** prepares **118** an Injection Application **24** including the transition package (e.g., Step **92**, FIG. **6**B). The Injection Application **24** is sent **120** from the source computing system **12** to the target computing system **26** (e.g., Step **94**).

The target computing system **26** receives the injection application **24** with transition package from the source computing system **12** (e.g., Step **96**). The Injection application **24** "infuses" **122** the target computing system **26** with manipulated configuration settings in the transition package from the source computing system **12** (e.g., Step **98**). The Injection application **24** reads and executes the list of commands from the transition package to transition configuration to the target computing system **26**. The transition package is optionally verified **124** on the target computing

system **26** to ensure that the transition package has been correctly applied to the target computing system **26** (e.g., Step **100**).

Exemplary Automatic Transition Products

In one exemplary preferred embodiment of the present invention, the Extraction application **18**, the User Interface application **20**, the Preparation application **22** and the Injection application **24** are Windows 32-bit ("Win 32") applications written in C++ and Visual Basic. However, the present invention is not limited to Win32 applications, and other types of applications can also be used. In addition, other programming languages could also be used to implement the transition applications. The transition Win32 applications support the exemplary transition illustrated in Table 6. However, the present invention is not limited to the transitions illustrated in Table 6, and other transitions could also be made between a source computing system and a target computing system.

TABLE 6

| |
|---|
| Windows 95 ver. X to Windows 95 ver. Y |
| Windows 95 to Windows 98 |
| Windows 98 ver. X to Windows 98 ver. Y |
| Windows 95 to Windows NT |
| Windows 98 to Windows NT |
| Windows NT ver. X to Window NT ver. Y |
| Windows XX to Windows YY |
| Windows XX ver. X to Windows YY ver. Y |

In one exemplary preferred embodiment of the present invention, the present invention may also include the transition of configuration settings to a target computing system that are NOT present on a source computing system, but were calculated from other settings on the source computing system. Such an embodiment can be inclusive such that "old settings" as well as "new calculated settings" are injected. The translation process may also be exclusive such that a target computing system does not receive any "old settings" but only new settings "calculated" from the old settings on a source computing system. The translation process may also be used for extracting configuration settings from multiple source computing systems that are local or remote, and "conglomerating" them onto a single target computing system.

In another exemplary preferred embodiment of the present invention, configuration settings can be transitioned without any transition data ever being embodied into a persistent storage medium. In such an embodiment, extracted transition data is transmitted via a data stream over a network and is consumed (i.e., processed and or injected) without ever being stored in a persistent storage medium.

In yet another exemplary preferred embodiment of the present invention, a target computing system can be infused with configurations settings that have not originated from a source computing system and have not been calculated from old configuration settings on the source computing system. In such an embodiment, a new target computing system is built and configuration settings are from a "newly developed" source configuration that is not a source computing system (e.g., a proposed new operating system or proposed new computer hardware).

In yet another embodiment of the present invention, the transitioning process may also take settings from a single source computing system and "distribute" them to multiple target computing systems such that only a subset of the

**Exhibit B**
**Page 17 of 21**

US 7,346,766 B2

17

settings from the source computing system reside on any one target computing system. The subsets of transition data may overlap or be exclusive.

In yet another embodiment of the present invention, the transition process may take configuration settings from multiple source computing systems and inject them onto multiple target computing systems, but in a manner such that there is no correlation between the configuration settings from the source computing systems and target computing systems the configuration settings are injected onto. For example, three configuration settings from a first source computing system are transitioned to a first set target computing systems, while one configuration setting from a second source computing system is transitioned to a second set of target computing systems not including the first set of target computing systems.

The methods and system described herein provide an automated transition process for transition configuration settings from a target computing system to a host computing system. The method and system may vastly reduce transition, configuration and deployment times for service providers, corporations, and end-users for transitions from a target computing system to source computing system. The method and system may also save time, resources, improve transition quality, and lower user frustration.

It should be understood that the programs, processes, methods and systems described herein are not related or limited to any particular type of computer or network system (hardware or software), unless indicated otherwise. Various types of general purpose or specialized computer systems may be used with or perform operations in accordance with the teachings described herein.

In view of the wide variety of embodiments to which the principles of the present invention can be applied, it should be understood that the illustrated embodiments are exemplary only, and should not be taken as limiting the scope of the present invention. For example, the steps of the flow diagrams may be taken in sequences other than those described, and more or fewer elements may be used in the block diagrams. While various elements of the preferred embodiments have been described as being implemented in software, in other embodiments hardware or firmware implementations may alternatively be used, and vice-versa.

The claims should not be read as limited to the described order or elements unless stated to that effect. Therefore, all embodiments that come within the scope and spirit of the following claims and equivalents thereto are claimed as the invention.

We claim:

1. A method for preparing configuration settings of a source computing system for transitioning for use by a target computing system, the method comprising:

providing information about configuration settings of the source computing system, the information identifying locations of configuration settings;

displaying an indication of the configuration settings that can be extracted from the source computing system;

receiving a selection of configuration settings to be extracted from the source computing system for use by the target computing system;

extracting the selected configuration settings from the locations of the source computing system indicated by the information;

manipulating at least one of the extracted configuration settings from a location, a name, a value, and a format

18

used on the source computing system to a location, a name, a value, and a format used on the target computing system; and

storing the extracted configuration settings and the at least one manipulated configuration settings on a storage device, wherein the stored configuration settings can be used by the target computing system to control its operation.

2. The method of claim 1 including installing the stored configuration settings on the target computing system.

3. The method of claim 2 wherein the installing is performed under control of an installation application.

4. The method of claim 3 wherein the installation application is received from the source computing system.

5. The method of claim 1 wherein the extracted configuration settings include browser configuration settings.

6. The method of claim 1 wherein the extracted configuration settings include browser favorites.

7. The method of claim 1 wherein the extracted configuration settings include browser bookmarks.

8. The method of claim 1 wherein the extracted configuration settings include cookies.

9. The method of claim 1 wherein the extracted configuration settings include an electronic mail folder.

10. The method of claim 9 wherein the electronic mail folder is an inbox folder.

11. The method of claim 1 wherein the extracted configuration settings include electronic mail addresses.

12. The method of claim 1 wherein the storage device includes an installation application.

13. The method of claim 12 wherein the target computing system receives and executes the installation application.

14. The method of claim 12 wherein the installation application installs the configuration settings on the target computing system.

15. The method of claim 1 wherein the extracted configuration settings include registry settings.

16. A method for transitioning configuration settings of a source computing system to a target computing system, the source computing system having a first operating system and the target computing system having a second operating system, wherein the second operating system is different from the first operating system, the method comprising:

providing a storage device having configuration settings extracted from the source computing system, wherein at least one of the extracted configuration settings is manipulated from a source location, a source name a source value, and a source format of the first operating system to a target location, a target name, a target value, and a target format of the second operating system;

retrieving the configuration settings from the storage device; and

applying the retrieved configuration settings to the target computing system to control the operation of the target computing system.

17. The method of claim 16 including at the source computing system,

providing information about configuration settings of the source computing system, the information identifying locations of configuration settings;

receiving from a user a selection of configuration settings;

extracting the selected configuration settings from the locations of the source computing system indicated by the information;

manipulating at least one of the extracted configuration settings from a source location, a source name, a source value, and a source format of the first operating system

**Exhibit B**
**Page 18 of 21**

US 7,346,766 B2

19

to a target location, a target name, a target value, and a target format of the second operating system, wherein at least the target format is different from the source format; and

storing the extracted configuration settings on the storage device.

**18**. The method of claim **16** wherein applying the retrieved configuration settings to the target computing system includes storing the retrieved configuration settings on the target computing system.

**19**. The method of claim **16** wherein applying the retrieved configuration settings to the target computing system includes an installation application, the installation application is stored on the storage device.

**20**. The method of claim **16** wherein the extracted configuration settings include browser configuration settings.

**21**. The method of claim **16** wherein the extracted configuration settings include browser favorites.

**22**. The method of claim **16** wherein the extracted configuration settings include browser bookmarks.

**23**. The method of claim **16** wherein the extracted configuration settings include cookies.

**24**. The method of claim **16** wherein the extracted configuration settings include an electronic mail folder.

**25**. The method of claim **24** wherein the electronic mail folder is an inbox folder.

**26**. The method of claim **16** wherein the extracted configuration settings include electronic mail addresses.

**27**. The method of claim **16** wherein the extracted configuration settings include registry settings.

**28**. A computer-readable medium containing instructions for controlling a source computing system and a target computing system to transition configuration settings of the source computing system to the target computing system by a method comprising:

providing configuration information about configuration settings of the source computing system, the configuration information identifying locations of configuration settings;

providing a selection of configuration settings to be extracted from the source computing system;

extracting the selected configuration settings from the locations of the source computing system indicated by the configuration information;

when a configuration setting of the target computing system is not present on the source computing system, calculating the configuration setting for the target system from other configuration settings of the source computing system; and

storing the extracted configuration settings and the at least one calculated configuration settings on a storage device.

**29**. The computer-readable medium of claim **28** including installing the configuration settings stored on the storage device on the target computing system.

**30**. The computer-readable medium of claim **29** wherein the installing is performed under control of an installation application.

**31**. The computer-readable medium of claim **30** wherein the installation application is stored on the storage device.

**32**. The computer-readable medium of claim **29** including receiving from a user a selection of the configuration settings stored on the storage device that are to be installed on the target computing system.

**33**. The computer-readable medium of claim **28** wherein the extracted configuration settings are selected from the

20

group consisting of browser configuration settings, browser favorites, and browser bookmarks.

**34**. The computer-readable medium of claim **28** wherein the extracted configuration settings include cookies.

**35**. The computer-readable medium of claim **28** wherein the extracted configuration settings are selected from the group consisting of an electronic mail folder and electronic mail addresses.

**36**. The computer-readable medium of claim **28** wherein the extracted configuration settings include registry settings.

**37**. A computer-readable medium containing instructions for controlling a source computing device and a target computing device to transition configuration settings of the source computing device to the target computing device by a method comprising:

providing configuration information about configuration settings of the source computing device, the configuration information identifying locations of configuration settings;

providing a selection of configuration settings to be extracted from the source computing device;

extracting the selected configuration settings from the locations of the source computing device indicated by the configuration information;

manipulating at least one of the extracted configuration settings from a first location, a first name, a first value, and a first format used on the source computing system to a second location, a second name, a second value, and a second format used on the target computing system, wherein at least the second value is different from the first value;

when a configuration setting of the target computing system is not present on the source computing system, calculating the configuration setting for the target computing system from other configuration settings of the source computing system;

storing the extracted configuration settings, the calculated configuration setting, and the at least one manipulated configuration settings on a storage device;

receiving a selection of the stored configuration settings;

applying the selection of stored configuration settings to the target computing device.

**38**. The computer-readable medium of claim **37** wherein the extracted configuration settings are selected from the group consisting of browser configuration settings, browser favorites, and browser bookmarks.

**39**. The computer-readable medium of claim **37** wherein the extracted configuration settings include cookies.

**40**. The computer-readable medium of claim **37** wherein the extracted configuration settings are selected from the group consisting of an electronic mail folder and electronic mail addresses.

**41**. The computer-readable medium claim **37** wherein the extracted configuration settings include registry settings.

**42**. A method for manipulating a personality of a target computing system based on a personality of the source computing system, the source computing system having a first version of a program and the target computing system having a second version of the program, wherein the second version is different from the first version, the method comprising:

providing a selection of configuration settings, wherein the configuration settings are part of the personality of the source computing system, wherein the configuration settings comprise at least one configuration setting of the first version of the program;

US 7,346,766 B2

21

extracting the selected configuration settings from the source computing system;

manipulating the at least one extracted program configuration setting from a location, a name, a value, and a format used by the first version of the program on the source computing system to a location, a name, a value, and a format used by the second version of the program on the target computing system;

storing the extracted configuration settings and the at least one manipulated configuration settings on a storage device; and

applying the stored configuration settings to the target computing system so that the personality of the target computing system can be manipulated based on the configuration settings stored on the storage device.

**43**. The method of claim **42** wherein the personality of the source computing system includes at least one personality object.

**44**. The method of claim **43** wherein the at least one personality object includes configuration settings for a program.

**45**. The method of claim **42** wherein applying the stored configuration settings to the target computing system includes storing the configuration settings stored on the storage device on the target computing system.

**46**. The method of claim **45** wherein an installation application stores the configuration settings stored on the storage device on the target computing system.

**47**. A system for manipulating a personality of a target computing system based on a personality of the source computing system, comprising:

means for presenting to a user the personality of the source computing system, the personality of the source computing system including configuration settings;

means for receiving a selection of the configuration settings;

means for storing the selected configuration settings on a storage device;

22

means for manipulating at least one of the selected configuration settings from a location, a name, a value, and a format used on the source computing system to a location, a name, a value, and a format used on the target computing system;

means for calculating a distinguished configuration setting for the target computing system from other configuration settings of the source computing system when the distinguished configuration setting is not present on the source computing system; and

means for applying the selected configuration settings, the calculated configuration setting, and the at least one manipulated configuration setting to the target computing system so that the personality of the target computing system can be manipulated based on the personality of the source computing system.

**48**. The system of claim **47** wherein the personality of the source computing system includes at least one personality object.

**49**. The system of claim **48** wherein the at least one personality object includes configuration settings for a program.

**50**. The system of claim **47** wherein the means for applying the selected configuration settings, the calculated configuration setting, and the at least one manipulated configuration setting to the target computing system includes means for storing the selected configuration settings, the calculated configuration setting, and the at least one manipulated configuration setting on the target computing system.

**51**. The system of claim **50** wherein an installation application stores the selected configuration settings, the calculated configuration setting, and the at least one manipulated configuration setting on the target computing system.

\*    \*    \*    \*    \*

**Exhibit B**
**Page 20 of 21**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,346,766 B2                                           Page 1 of 1
APPLICATION NO. : 10/796571
DATED              : March 18, 2008
INVENTOR(S)       : Mackin et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

On the title page, under "Notice", in column 1, line 3, delete "481 days." and insert
-- 391 days. --, therefor.

In column 2, line 22, delete "migration-to" and insert -- migration to --, therefor.

In column 2, line 41, before "old" delete "a" and insert -- an --, therefor.

In column 7, line 15, delete "create" and insert -- created --, therefor.

In column 8, line 47, delete "Applications" and insert -- Application --, therefor.

In column 10, line 44, delete "Pegasas," and insert -- Pegasus, --, therefor.

In column 16, line 28, delete "Window" and insert -- Windows --, therefor.

In column 18, line 47, in Claim 16, after "name" insert -- , --.

In column 20, line 54, in Claim 41, after "medium" insert -- of --.

In column 21, line 4, in Claim 42, delete "setting" and insert -- settings --, therefor.

Signed and Sealed this

Seventh Day of April, 2009

JOHN DOLL
*Acting Director of the United States Patent and Trademark Office*